**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| STEFAN PASSANTINO,<br><br>                    *Plaintiff*,<br><br>          *v.*<br><br>ANDREW WEISSMANN,<br><br>                    *Defendant*. | Case No. 1:23-cv-02780 (LLA) |

**MEMORANDUM OF POINTS AND AUTHORITIES**
**IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................. ii

INTRODUCTION ............................................................................................. 1

BACKGROUND ...............................................................................................4

    A.    Mr. Passantino Prepares Ms. Hutchinson to Testify Before the January 6th Committee. ....................................................................................4

    B.    Ms. Hutchinson Fires Mr. Passantino and Agrees to Testify Again at a Public Hearing. ...................................................................................11

    C.    Ms. Hutchinson's Testimony About Mr. Passantino's Conduct Prompts National News Coverage and Public Criticism. ...................................13

    D.    Mr. Passantino Files This Lawsuit in Response to Mr. Weissmann's Tweet. ............................................................................................16

LEGAL STANDARD ........................................................................................18

ARGUMENT ..................................................................................................19

I.    A Tweet by a "Political Pundit" that Provides His Subjective Assessment of a Lawyer's Conduct, Based on Publicly Available Transcripts of Depositions Taken by a Congressional Committee, Constitutes a Protected Expression of Opinion. ..............................................................................................19

    A.    Subjective assessments are entitled to full constitutional protection....................19

    B.    Both the context and language of Mr. Weissmann's one-off tweet strongly signal that it is non-actionable opinion.................................21

        i.    The challenged statement was made by a well-known "political pundit" and public commentator on social media...................22

        ii.    The challenged statement was immediately preceded by subjective language and based upon publicly available facts...................26

        iii.    The challenged statement conveys no precise meaning. ..........................28

        iv.    The challenged statement is not objectively verifiable............................30

II.    Plaintiff's Injurious Falsehood Claim Fails for the Independent Reason that Plaintiff Failed to Adequately Allege Special Damages....................................35

CONCLUSION................................................................................................39

# TABLE OF AUTHORITIES

CASES*

\* *3M Co. v. Boulter*, 842 F. Supp. 2d 85 (D.D.C. 2012) .......................................... 35-37

*Abbas v. Foreign Policy Group, LLC*, 783 F.3d 1328 (D.C. Cir. 2015)........................................34

*Accuardi v. Fredericks*, 2014 WL 848263 (D. Or. Mar. 4, 2014) ...............................................34

\* *Armstrong v. Thompson*, 80 A.3d 177 (D.C. 2013) ...........................................................20, 32

*Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151 (D.C. Cir. 1985)....................................35

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................................18

*Automated Transactions, LLC v. American Bankers Ass'n*, 216 A.3d 71 (N.H. 2019) ...........................................................................................................................30

*Bauman v. Butowsky*, 377 F. Supp. 3d 1 (D.D.C. 2019)...................................... 29-31, 34

*Brian v. Richardson*, 660 N.E.2d 1126 (N.Y. 1995) .................................................................24

*Broughty v. Bouzy*, 2023 WL 5013654 (D.N.J. Aug. 7, 2023) ....................................................23

*Brown v. McDonough*, 2023 WL 3646933 (D.D.C. May 25, 2023) ...............................................4

\* *Browning v. Clinton*, 292 F.3d 235 (D.C. Cir. 2002) ....................................................... 35-38

*BYD Co. Ltd. v. Alliance for American Manufacturing*, 554 F. Supp. 3d 1 (D.D.C. 2021), *aff'd*, 2022 WL 1463866 (D.C. Cir. May 10, 2022), *cert. denied*, 143 S. Ct. 306 (2022) ..........................................................................................................18

*Cannon v. District of Columbia*, 717 F.3d 200 (D.C. Cir. 2013) ..................................................5

*Carroll v. Trump*, 2023 WL 4393067 (S.D.N.Y. July 5, 2023), *aff'd in part*, 88 F.4th 418 (2d Cir. 2023) ......................................................................................................23

*Catalfo v. Jensen*, 657 F. Supp. 463 (D.N.H. 1987) ...........................................................30, 33

*Clemmons v. Academy for Educational Development*, 70 F. Supp. 3d 282 (D.D.C. 2014) ...........................................................................................................................31

*Clifford v. Trump*, 339 F. Supp. 3d 915 (C.D. Cal. 2018), *aff'd*, 818 F. App'x 746 (9th Cir. 2020)...........................................................................................................26

_____

\* Cases upon which Defendant chiefly relies are marked with an asterisk.

*Coles v. Washington Free Weekly, Inc.*, 881 F. Supp. 26 (D.D.C. 1995) .......................................27

*Cummins v. SunTrust Capital Markets, Inc.*, 649 F. Supp. 2d 224 (S.D.N.Y. 2009), *aff'd*, 416 F. App'x 101 (2d Cir. 2011) .....................................................................30

*Donald J. Trump for President, Inc. v. WP Co. LLC*, 2023 WL 1765193 (D.D.C. Feb. 3, 2023) .............................................................................................................4, 21

*Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146 (11th Cir. 2011) .........................................20

\* *Farah v. Esquire Magazine*, 736 F.3d 528 (D.C. Cir. 2013) .......................4-5, 20-28, 31, 34-35

*Farah v. Esquire Magazine, Inc.*, 863 F. Supp. 2d 29 (D.D.C. 2012), *aff'd*, 736 F.3d 528 (D.C. Cir. 2013) ................................................................................................5

*Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36 (D.D.C. 2022), *appeal docketed*, No. 22-7117 (D.C. Cir. Aug. 22, 2022) .................................................................21

*Ganske v. Mensch*, 480 F. Supp. 3d 542 (S.D.N.Y. 2020) ...........................................................23

*Geders v. United States*, 425 U.S. 80 (1976) ................................................................................29

\* *Guilford Transportation Industries, Inc. v. Wilner*, 760 A.2d 580 (D.C. 2000) ...... 19-20, 22, 24

*Herring Networks, Inc. v. Maddow*, 8 F.4th 1148 (9th Cir. 2021) ...............................................24

*Hindu American Found. v. Viswanath*, 646 F. Supp. 3d 78 (D.D.C. 2022) ..................................21

*Houlahan v. World Wide Ass'n of Specialty Programs & Schools*, 2006 WL 785326 (D.D.C. Mar. 28, 2006) ...........................................................................................27

*Hurd v. District of Columbia*, 864 F.3d 671 (D.C. Cir. 2017) .................................................4, 18

*Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) .............................................................3, 19

*Jankovic v. International Crisis Group*, 494 F.3d 1080 (D.C. Cir. 2007) ......................................5

*Johnson v. Commission on Presidential Debates*, 202 F. Supp. 3d 159 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017) ...............................................................4-5

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) ..........................................................................4

*Kahl v. Bureau of National Affairs, Inc.*, 856 F.3d 106 (D.C. Cir. 2017) ...................................18

*Kartte v. Davis*, 2022 WL 1442789 (D.D.C. May 6, 2022) ..........................................................33

*Kaspersky Lab, Inc. v. United States Department of Homeland Security*, 909 F.3d 446 (D.C. Cir. 2018) ...............................................................................................5

*Khodorkovskaya v. Gay*, 5 F.4th 80 (D.C. Cir. 2021)................................................................ 21-23

*KLEO AG v. Rivada Networks, Inc.*, 2023 WL 7921969 (D.D.C. Nov. 16, 2023),
    *appeal docketed*, No. 23-7175 (D.C. Cir. Dec. 22, 2023) ................................................ 36-37

*Lane v. Random House, Inc.*, 985 F. Supp. 141 (D.D.C. 1995)............................................... 33-34

*Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287 (D.C. Cir. 1988) ................................. 21

*Marcelus v. Corrections Corp. of America/Correctional Treatment Facility*, 540 F.
    Supp. 2d 231 (D.D.C. 2008) ....................................................................................................... 4

*Mastro v. Potomac Electric Power Co.*, 447 F.3d 843 (D.C. Cir. 2006)..................................... 20

*McBride v. Merrell Dow & Pharmaceuticals Inc.*, 717 F.2d 1460 (D.C. Cir. 1983) .................. 19

*McCabe v. Rattiner*, 814 F.2d 839 (1st Cir. 1987) ...................................................................... 30

*McCaskill v. Gallaudet University*, 36 F. Supp. 3d 145 (D.D.C. 2014) ..........................21, 31, 35

*McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174 (S.D.N.Y. 2020) ........................... 24

* *Milkovich v. Lorain Journal Co.*, 497 U.S. 1 (1990) ................................................................... 3

*Mirbaha v. Pompeo*, 513 F. Supp. 3d 179 (D.D.C. 2021) .............................................................. 4

* *Moldea v. New York Times Co.*, 22 F.3d 310 (D.C. Cir. 1994) ......................... 20-22, 25, 28, 31

*Montgomery v. Risen*, 875 F.3d 709 (D.C. Cir. 2017)................................................................. 25

*Nader v. de Toledano*, 408 A.2d 31 (D.C. 1979)........................................................................ 19

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ................................................................. 2

*Obsidian Finance Group, LLC v. Cox*, 812 F. Supp. 2d 1220 (D. Or. 2011), *aff'd*,
    740 F.3d 1284 (9th Cir. 2014) ................................................................................................. 33

* *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984) (en banc) ..................................... 23-27, 29-31

*Partington v. Bugliosi*, 56 F.3d 1147 (9th Cir. 1995)....................................................22, 27, 31

*Peak Health Center v. Dorfman*, 2019 WL 5893188 (N.D. Cal. Nov. 12, 2019) ...................... 26

*Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724 (1st Cir. 1992)......................... 33

*Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767 (1986) .................................................... 3

*Piccone v. Bartels*, 785 F.3d 766 (1st Cir. 2015)........................................................................ 30

iv

*Pueschel v. Chao*, 955 F.3d 163 (D.C. Cir. 2020) ..........................................................4

*Q International Courier, Inc. v. Seagraves*, 1999 WL 1027034 (D.D.C. Feb. 26, 1999) ...........................................................................................................................35

*Rapaport v. Barstool Sports Inc.*, 2024 WL 88636 (2d Cir. Jan. 9, 2024) ....................23

*Sarlak v. Pompeo*, 2020 WL 3082018 (D.D.C. June 10, 2020) .......................................4

*Schoen v. Washington Post*, 246 F.2d 670 (D.C. Cir. 1957) ........................................36

*Scott v. District Hospital Partners, L.P.*, 60 F. Supp. 3d 156 (D.D.C. 2014), *aff'd*, 715 F. App'x 6 (D.C. Cir. 2018) ................................................................................4

*Sigal Construction Corp. v. Stanbury*, 586 A.2d 1204 (D.C. 1991) ....................... 20-21

*Small Business Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290 (S.D.N.Y. 2017) ......................................................................................................33

*Smith v. Clinton*, 886 F.3d 122 (D.C. Cir. 2018) ...................................................... 35-37

*Standing Committee on Discipline of United States District Court for Central District of California v. Yagman*, 55 F.3d 1430 (9th Cir. 1995) ...............................33

*State v. Earp*, 571 A.2d 1227 (Md. 1990) .....................................................................32

*Trudeau v. FTC*, 456 F.3d 178 (D.C. Cir. 2006) ..........................................................19

*Vindman v. Trump*, 2022 WL 16758575 (D.D.C. Nov. 8, 2022) ...................................18

*Wait v. Beck's North America, Inc.*, 241 F. Supp. 2d 172 (N.D.N.Y. 2003) ...............33

*Washington Post Co. v. Keogh*, 365 F.2d 965 (D.C. Cir. 1966) ....................................19

*Washington Post v. Robinson*, 935 F.2d 282 (D.C. Cir. 1991) .......................................5

* *Weyrich v. New Republic, Inc.*, 235 F.3d 617 (D.C. Cir. 2001) ..............................20, 22, 24, 26

*WinePress Publishing v. Levine*, 2009 WL 3765188 (W.D. Wash. Nov. 9, 2009) .......33

*Xereas v. Heiss*, 933 F. Supp. 2d 1 (D.D.C. 2013) ......................................................34

CONGRESSIONAL MATERIALS

*Business Meeting to Consider the Select Committee's Final Report: Meeting of the H. Select Comm. to Investigate the January 6th Attack on the United States Capitol*, 117th Cong. (Dec. 19, 2022), https://www.govinfo.gov/content/pkg/CPRT-117HPRT50119/pdf/CPRT-117HPRT50119.pdf .................................13

*Hearing on the January 6th Investigation: Hearing Before the H. Select Comm. to Investigate the January 6th Attack on the United States Capitol*, 117th Cong. (June 28, 2022), https://www.govinfo.gov/content/pkg/CHRG-117hhrg49354/ pdf/CHRG-117hhrg49354.pdf ..............................................................................6, 12

House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Transcribed Interview of Cassidy Hutchinson* (Feb. 23, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000050 113/pdf/GPO-J6-TRANSCRIPT-CTRL0000050113.pdf ...................................5, 10

House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Continued Interview of Cassidy Hutchinson* (Mar. 7, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL00000 51189/pdf/GPO-J6-TRANSCRIPT-CTRL0000051189.pdf ......................................5

House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Continued Interview of Cassidy Hutchinson* (May 17, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL000093 0041/pdf/GPO-J6-TRANSCRIPT-CTRL0000930041.pdf ................................... 5-6

House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Transcribed Interview of Cassidy Hutchinson* (June 20, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL000092 8884/pdf/GPO-J6-TRANSCRIPT-CTRL0000928884.pdf ........................................6

House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Transcribed Interview of Cassidy Hutchinson* (Sept. 14, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL000092 8888/pdf/GPO-J6-TRANSCRIPT-CTRL0000928888.pdf ....................................6-13, 27-28

House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Continued Interview of Cassidy Hutchinson* (Sept. 15, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL000092 8889/pdf/GPO-J6-TRANSCRIPT-CTRL0000928889.pdf ........................................6

H.R. Rep. No. 117-663 (2022), https://www.govinfo.gov/content/pkg/GPO-J6-REPORT/pdf/GPO-J6-REPORT.pdf................................................................................13, 38

**OTHER AUTHORITIES**

ABA Standing Comm. on Ethics and Professional Responsibility, *Formal Opinion 508: The Ethics of Witness Preparation* (2023) https://www.americanbar. org/content/dam/aba/administrative/professional_responsibility/ethics-opinio ns/aba-formal-opinion-508.pdf .......................................................................29, 32

John S. Applegate, *Witness Preparation*, 68 Tex. L. Rev. 277 (1989).........................32

Complaint, *Passantino v. United States*, No. 23-cv-00300 (N.D. Ga. Dec. 20, 2023), ECF No. 1 ................................................................................................5, 16, 25, 38

Joseph D. Piorkowski, Jr., Note, *Professional Conduct and the Preparation of Witnesses for Trial: Defining the Acceptable Limitations of "Coaching,"* 1 Geo. J. Legal Ethics 389 (1987) ...........................................................................................32

*Read the Jan. 6 Committee Report Executive Summary*, N.Y. TIMES (Dec. 19, 2022), https://www.nytimes.com/interactive/2022/12/19/us/politics/jan-6-committee-report-executive-summary.html ...............................................................................13

Fred C. Zacharias & Shaun Martin, *Coaching Witnesses*, 87 Ky. L.J. 1001 (1999) ....................32

## INTRODUCTION

Cassidy Hutchinson is a former aide to White House Chief of Staff Mark Meadows whose testimony before the House Select Committee to Investigate the January 6th Attack on the United States Capitol made national news. Over the course of her several appearances before the Committee, she changed lawyers, moving on from Stefan Passantino—Plaintiff here—who had represented her in her initial appearances. Under penalty of law, Ms. Hutchinson later testified to the Committee as to the advice she received from Mr. Passantino. A transcript of her testimony was made public by the Committee in December 2022 and is incorporated by reference in the Complaint. Ms. Hutchinson's testimony generated extensive media coverage, as major outlets described Mr. Passantino's conduct as "coaching" Ms. Hutchinson "to tell committee investigators during her interviews that she did not recall certain things," "pressur[ing] her to withhold information from lawmakers," and "aimed at influencing her cooperation with Congress and stifling potentially damaging testimony about [President Trump]." *See infra* 14-15.

This defamation case arises from a single tweet posted by a legal analyst and "political pundit," Compl. ¶ 1, some nine months after release of the transcript and the publicity that followed. The "pundit" was Andrew Weissmann, an attorney who served at the highest levels of the Justice Department in the Bush, Obama, and Trump Administrations, before becoming a law professor at NYU and a legal analyst for MSNBC. The tweet obliquely referenced Mr. Passantino and briefly evaluated his advice to Ms. Hutchinson, adding Mr. Weissmann's own assessment to the debate on an issue of national importance: a lawyer's perceived efforts to influence the testimony of a key witness in a congressional investigation into conduct that attacked the very core of our democracy—an investigation that called for unvarnished candor, not evasion.

Based on his appraisal of Ms. Hutchinson's testimony, Mr. Weissmann tweeted his "take" on Mr. Passantino's advice. Specifically, Mr. Weissmann asserted that Mr. Passantino had "coached" Ms. Hutchinson to lie when preparing her to testify before the Committee. As is common with commentary on Twitter, Mr. Weissmann's evaluation was short and fleeting—an eight-word parenthetical that did not even mention Mr. Passantino by name, contained within a single tweet of thirty-six words discussing another lawyer for Ms. Hutchinson. But it was immediately clear to anyone who followed the January 6th hearings, or the media storm that ensued, whose testimony Mr. Weissmann was talking about. Mr. Weissmann's assessment was pithy by necessity, consistent with the constraints imposed by Twitter, but it nevertheless addressed matters that received (and continue to receive) national news coverage and that speak to core issues in our democracy. His assessment therefore lies at the heart of the First Amendment's protection.

The full tweet, as presented in the Complaint, reads as follows:

> Hunt also is Cassidy Hutchinson's good lawyer. (Not the one who coached her to lie) And he is the guy who took notes of Trump saying, when Mueller was appointed, quoting him as saying "I'm f….d"

Compl. ¶ 18. Notably, Mr. Weissmann did not assert that Mr. Passantino explicitly "instructed" or "ordered" or "told" Ms. Hutchinson to lie—on that the parties agree. Compl. ¶¶ 16-18. Instead, Mr. Weissmann offered his conclusion that Mr. Passantino's advice—as described at length by Ms. Hutchinson in the very transcript on which Mr. Passantino now relies—amounted to improper "coach[ing]" of a witness to testify in a manner that was so evasive and incomplete that it was tantamount to being untruthful.

The U.S. Supreme Court has repeatedly affirmed this country's "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide open." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964). "The freedom to speak one's mind

is not only an aspect of individual liberty—and thus a good unto itself—but also is essential to the common quest for truth and the vitality of society as a whole." *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50-51 (1988) (alteration and citation omitted). As the Court has further observed, "[t]he sort of robust political debate encouraged by the First Amendment is bound to produce speech that is critical," and "[s]uch criticism, inevitably, will not always be reasoned or moderate." *Id.* at 51.

But freedom of expression requires "breathing space." *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 772 (1986). And that space is provided by a constitutional rule prohibiting plaintiffs from recovering for defamation unless the challenged statement conveys "a provably false factual connotation." *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990). Where, by contrast, the statement's context and language signal that it is the writer's subjective assessment, interpretation, or judgment of events, the statement is not actionable—and that is so even if the subject disagrees (even vehemently) with the assessment or perceives it to be damaging.

The statement at issue here bears all the hallmarks of subjective, interpretative, political commentary. It appeared on a social-media site notorious for hot takes, authored by a well-known commentator. It was relegated to a parenthetical immediately following Mr. Weissmann's characterization of a different lawyer's abilities, and it was not repeated. It was based on publicly available information that had already received widespread media coverage, leaving readers free to reach their own conclusions. It employed language ("coached") that even lawyers have a hard time defining with precision and that inevitably involves a good measure of judgment. And it contrasted lawyers through terms that were likewise judgment-laden ("Cassidy Hutchinson's good lawyer"). In these circumstances, Mr. Weissmann's followers would have readily recognized the tweet as conveying Mr. Weissmann's own assessment of Mr. Passantino's conduct.

3

That assessment, reflecting Mr. Weissmann's subjective interpretation of a public factual record, cannot sustain a claim for defamation or injurious falsehood. The First Amendment protects Mr. Weissmann's right to express his opinion, just as it protects Mr. Passantino's right to disagree with it. Accordingly, that disagreement must be aired in the rough and tumble of public debate—not adjudicated in a courtroom. Courts in this Circuit routinely dismiss defamation actions on First Amendment grounds at the motion-to-dismiss stage, and this Court should follow suit.

## BACKGROUND

### A.     Mr. Passantino Prepares Ms. Hutchinson to Testify Before the January 6th Committee.

On January 6, 2021, while our elected representatives gathered to affirm the presidential election results, a mob attacked the United States Capitol.[1] Congress swiftly established a special

---

[1] In determining whether the Complaint fails to state a claim, the Court may consider not only "the facts alleged in the complaint," but also "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (alteration in original) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)); *see Farah v. Esquire Mag.*, 736 F.3d 528, 534 (D.C. Cir. 2013) (applying rule to defamation action). "Documents incorporated into the complaint include 'documents upon which the plaintiff's complaint necessarily relies even if the document is produced … by the defendant in a motion to dismiss.'" *Brown v. McDonough*, 2023 WL 3646933, at *4 (D.D.C. May 25, 2023) (alteration in original) (quoting *Ward v. D.C. Dep't of Youth Rehab. Servs.*, 768 F. Supp. 2d 117, 119 (D.D.C. 2011)).

Because Mr. Passantino specifically references and links to the February 23, 2022, March 7, 2022, May 17, 2022, and September 14, 2022 transcripts of Ms. Hutchinson's testimony before the January 6th Committee, these documents are incorporated into his complaint and may therefore be considered without converting the motion to dismiss into a motion for summary judgment. Compl. ¶¶ 1, 9 & nn.1-3, 10-11, 16 & n.5, 17 & nn.6-7, 19, 27; *see, e.g.*, *Pueschel v. Chao*, 955 F.3d 163, 168 (D.C. Cir. 2020); *Scott v. Dist. Hosp. Partners, L.P.*, 60 F. Supp. 3d 156, 161 (D.D.C. 2014), *aff'd*, 715 F. App'x 6 (D.C. Cir. 2018); *Marcelus v. Corr. Corp. of Am./Corr. Treatment Facility*, 540 F. Supp. 2d 231, 235 n.5 (D.D.C. 2008); *Sarlak v. Pompeo*, 2020 WL 3082018, at *5 & n.5 (D.D.C. June 10, 2020); *Donald J. Trump for President, Inc. v. WP Co. LLC*, 2023 WL 1765193, at *1 n.1 (D.D.C. Feb. 3, 2023). The transcripts of Ms. Hutchinson's congressional testimony are also properly before the Court as public records.

Public records and other publicly available materials are subject to judicial notice. *See, e.g.*, *Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) (public records); *Mirbaha v. Pompeo*, 513 F. Supp. 3d 179, 185 (D.D.C. 2021) (congressional testimony); *Johnson v. Comm'n on*

committee to investigate the attack—the House Select Committee to Investigate the January 6th

Attack on the United States Capitol, more commonly known as the January 6th Committee. Compl.

¶ 7. Over the next eighteen months, the Committee interviewed dozens of witnesses and held

televised hearings. Compl. ¶¶ 7, 9, 16.[2]

Plaintiff Stefan Passantino, an experienced lawyer who served as the top ethics official in

the Trump White House, "represented several witnesses" before the Committee. Compl. ¶¶ 5-7;

Complaint ¶¶ 3, 11, *Passantino v. United States*, No. 23-cv-00300 (N.D. Ga. Dec. 20, 2023), ECF

No. 1 ("Georgia Complaint"). One of those witnesses was Cassidy Hutchinson, a former aide to

White House Chief of Staff Mark Meadows who was called to testify before the Committee seven

times. Compl. ¶¶ 9, 16; House Select Committee to Investigate the January 6th Attack on the

United States Capitol, *Transcribed Interview of Cassidy Hutchinson*, Tr. 9:2-20 (Feb. 23, 2022)

("Feb. 23 Deposition") (describing her position and responsibilities).[3]

---

*Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016) (government documents available from reliable sources), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017); *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (government document available on government website); *Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1088 (D.C. Cir. 2007) (documents filed by plaintiff himself in court); *Farah*, 736 F.3d at 534 (online publications). The Court may also take judicial notice of historical, political, or statistical facts, or any other facts that are verifiable with certainty. *Farah v. Esquire Mag., Inc.*, 863 F. Supp. 2d 29, 35 (D.D.C. 2012), *aff'd*, 736 F.3d 528 (D.C. Cir. 2013). If a news article or other document contains disputed facts, it may be noticed not for its truth, but for its existence and content. *See, e.g.*, *Wash. Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991) (news articles); *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018) (legislative materials) (citing *Hurd*, 864 F.3d at 686).

[2] *See* Lisa Desjardins & Joshua Barajas, *How to Watch the Jan. 6 Hearings*, PBS (updated Oct. 11, 2022), https://www.pbs.org/newshour/politics/how-to-watch-the-jan-6-hearings.

[3] Available at https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000050113/pdf/GPO-J6-TRANSCRIPT-CTRL0000050113.pdf.

For the transcripts of Ms. Hutchinson's subsequent testimony before the Committee, see House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Continued Interview of Cassidy Hutchinson* (Mar. 7, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000051189/pdf/GPO-J6-TRANSCRIPT-CTRL0000051189.pdf;   House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Continued*

Although Mr. Passantino and Ms. Hutchinson had both worked in the White House, they had seldom crossed paths before February 2022. According to the September 14, 2022 transcript of Ms. Hutchinson's testimony, which is incorporated by reference in the Complaint and attached to this motion as Exhibit 1, Mr. Passantino called Ms. Hutchinson on February 7 to inform her that he was her attorney. Ex. 1, House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Transcribed Interview of Cassidy Hutchinson*, Tr. 21:3-10 (Sept. 14, 2022) ("Sept. 14 Deposition").[4] Ms. Hutchinson asked him whether she should sign an engagement letter. Tr. 21:10-22. "No, no, no. We're not doing that," he replied. "Don't worry. We have you taken care of." Tr. 21:16-17. She then inquired "where the funding for this is coming from." Tr. 21:23-25. He declined to say, but reiterated, "Don't worry, we're taking care of you." Tr. 22:1-4.

Shortly after his initial outreach to Ms. Hutchinson, Mr. Passantino offered to meet with her "for a couple hours," in case she "want[ed] to talk through some things." Tr. 28:14-18. Ms. Hutchinson, who had never prepared for a deposition before, agreed. Tr. 28:19-20, 29:4-7. They scheduled the meeting for February 16, 2022—one week ahead of her first deposition with the

---

*Interview of Cassidy Hutchinson* (May 17, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000930041/pdf/GPO-J6-TRANSCRIPT-CTRL0000930041.pdf; House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Transcribed Interview of Cassidy Hutchinson* (June 20, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000928884/pdf/GPO-J6-TRANSCRIPT-CTRL0000928884.pdf; *Hearing on the January 6th Investigation: Hearing Before the H. Select Comm. to Investigate the January 6th Attack on the United States Capitol*, 117th Cong. (June 28, 2022), https://www.govinfo.gov/content/pkg/CHRG-117hhrg49354/pdf/CHRG-117hhrg49354.pdf; House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Transcribed Interview of Cassidy Hutchinson* (Sept. 14, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANS CRIPT-CTRL0000928888/pdf/GPO-J6-TRANSCRIPT-CTRL0000928888.pdf; House Select Committee to Investigate the January 6th Attack on the United States Capitol, *Continued Interview of Cassidy Hutchinson* (Sept. 15, 2022), https://www.govinfo.gov/content/pkg/GPO-J6-TRANS CRIPT-CTRL0000928889/pdf/GPO-J6-TRANSCRIPT-CTRL0000928889.pdf.

[4] Available at https://www.govinfo.gov/content/pkg/GPO-J6-TRANSCRIPT-CTRL0000928888/ pdf/GPO-J6-TRANSCRIPT-CTRL0000928888.pdf.

Committee—at Mr. Passantino's office in Washington, D.C. Compl. ¶ 9; Tr. 28:12-13. When Ms. Hutchinson asked whether she should bring anything with her, Mr. Passantino responded, "No. Just maybe a flash drive with some text messages that you think we might need to turn over. But most of them probably won't be responsive." Tr. 29:9-13. He did not define which messages qualified as "responsive" to the Committee's subpoena. Tr. 29:20-30:2.

The day of the meeting arrived. After introductions had been made, Mr. Passantino asked, "What do you want to talk about?" Tr. 29:4-5. Ms. Hutchinson suggested they discuss "what the Committee is going to talk to me about." Tr. 29:6-7. Having spoken with other attorneys about "deposition prep," she expected that Mr. Passantino would work with her to "recreate" the months leading up to January 6, 2021. Tr. 30:7-13. So she "start[ed] at the beginning," with "the first few weeks of November." Tr. 30:3-6.

When she reached late November, she asked whether she could "print off a calendar really quick." Tr. 30:14-16. "Well, what do you need a calendar for?" Mr. Passantino inquired. Tr. 30:17. "I want to make sure that I'm getting the dates right with these things," answered Ms. Hutchinson. Tr. 30:18. Mr. Passantino made clear that was not part of the plan:

> Look, we want to get you in, get you out. We're going to downplay your role. You were a secretary. You had an administrative role. Everyone's on the same page about this. … But the less you remember, the better. I don't think that you should be filling in any calendars or anything.

Tr. 30:19-31:2; *see* Tr. 33:13-21.

Mr. Passantino then asked Ms. Hutchinson whether "there [was] anything that [she was] worried about." Tr. 33:22-23. She expressed several concerns. For starters, she'd had "a lot of exposure to Members of Congress" and had "overhear[d] things." Tr. 33:24-34:4. "Well," Mr. Passantino responded, "if you had just overheard conversations that happened, you don't need to

testify to that." Tr. 34:7-8. "So, if I overheard it from a Member, do I have to?" pressed Ms. Hutchinson. Tr. 34:9. "It's circumstantial," said Mr. Passantino. "We can talk about it." Tr. 34:10.

Mr. Passantino gave similar advice in response to other issues raised by Ms. Hutchinson, such as a notable December 18, 2020 White House meeting. Although Ms. Hutchinson confirmed she "was there for logistics," Mr. Passantino told her, "[A]gain, you don't need to repeat what you overheard. … [E]verybody who was in that meeting is cooperating with the Committee, so there's no reason that you'll have to answer any questions pertaining to that." Tr. 43:9-19.

Ms. Hutchinson next described "the incident that happened in the Beast," the moniker for the presidential limo. Tr. 34:12-13. More specifically, Ms. Hutchinson recounted how White House Deputy Chief of Staff Tony Ornato "told [her] that the President tried to wrap his hands around [the driver's] neck and strangle him because he wouldn't take him to the Capitol." Tr. 34:13-21.

"No, no, no, no, no," replied Mr. Passantino. "We don't want to go there. We don't want to talk about that." Tr. 34:22-24. "I agree," Ms. Hutchinson answered, "but what if they do?" Tr. 35:1. "They have no way of knowing that," Mr. Passantino assured her. Tr. 35:2. She had never told anyone that story. Tr. 35:2-4. And "[i]f anybody [were] going to tell it," Mr. Passantino continued, "it [was] Tony's responsibility." Tr. 35:9-10; *see* Tr. 43:6-8. "But just because he told you doesn't mean that you need to share that with them." Tr. 35:10-11. After all, remarked Mr. Passantino, the story "[i]s not important to anything that actually happened on [January 6th]. It's a headline." Tr. 35:6-8.

"Okay, well, what's the line that I draw here?" Ms. Hutchinson asked. "Like, do I not ever say anything that I overheard, because I overheard a lot of things?" Tr. 35:12-13. "Look," responded Mr. Passantino, "the goal with you is to get you in and out. Keep your answers short,

sweet, and simple, seven words or less. The less the Committee thinks you know, the better, the quicker it's going to go. It's going to be painless. And then you're going to be taken care of." Tr. 35:14-18.

Ms. Hutchinson "dropped the limo incident" and moved on to the "planning behind the march to the Capitol." Tr. 35:20, 36:1-3. Mr. Passantino had thoughts about that, too. "[W]e're not building out timelines," he reiterated, "[s]o, unless you remember [ ] a very specific day with a very specific event [ ], 'I don't recall' is your answer." Tr. 36:4-6. According to Mr. Passantino, "I don't recall" would be "entirely fine" in other situations as well—including where Ms. Hutchinson did not "100 percent recall something," such as "a date or somebody who may or may not have been in the room." Tr. 36:7-10.

Ms. Hutchinson again sought clarification. "But, if I do recall something but not every little detail, Stefan, can I still say I don't recall?" Tr. 36:11-12. "Yes," he answered. Tr. 36:13. "[W]ouldn't I be perjuring myself?" she persisted. Tr. 36:14-15. Mr. Passantino offered her the same assurances as before. "The Committee doesn't know what you can and can't recall," he explained, "so we want to be able to use that [answer] as much as we can unless you really, really remember something very clearly. And that's when you give a short, sweet response." Tr. 36:16-19; *see* Tr. 37:21-38:3. To Ms. Hutchinson, the takeaway was clear: "The less you remember, the better." Tr. 37:1-3; Tr. 48:12-15.

One week later, Mr. Passantino and Ms. Hutchinson met for breakfast ahead of her first deposition with the Committee. Tr. 49:16-17. He repeated his earlier advice: "Just downplay your position." Tr. 49:19. "Your go-to [answer] is 'I don't recall.'" Tr. 52:5-8. "Trust me." Tr. 52:11. His reasoning also remained the same: "Again, if you start using ['I don't recall'] in the beginning, they're going to realize really quick that they have better witnesses than you, and they're not going

to ask you as complicated of questions as you're worried about." Tr. 52:9-11. In any event, added Mr. Passantino, "the Committee is talking to so many people that, even if you were entirely forthcoming with them, they're going to have all this by the end from someone else anyway." Tr. 49:23-24. "We just want to focus on protecting the President," he told her. "We all know you're loyal. Let's just get you in and out, and this day will be easy, I promise." Tr. 50:1-2.

The Committee investigators offered their own admonitions at the start of Ms. Hutchinson's deposition. Chief among them was an explicit request to "provide complete answers based on your best recollection." Feb. 23 Deposition, Tr. 4:14. Ms. Hutchinson was also reminded that "it is unlawful to deliberately provide false information to Congress, and this is a proceeding of Congress and the Select Committee." Tr. 4:22-23; *accord* Compl. ¶ 1 (stating that Ms. Hutchinson "testified[] under penalty of law").

Despite these admonitions, Mr. Passantino's advice did not change—not even when the Committee's questions turned to the Beast, a topic Ms. Hutchinson understood she should stay away from. Sept. 14 Deposition, Tr. 57:12-14. During a break in that line of questioning, Ms. Hutchinson told Mr. Passantino, "I just lied." Tr. 54:5-55:16. "You didn't lie," he responded. Tr. 55:16. "I just lied," she repeated. Tr. 55:17-18. Mr. Passantino remained unmoved. "They don't know what you know, Cassidy," he told her. "They don't know that you can recall some of these things. So you saying 'I don't recall' is an entirely acceptable response to this." Tr. 55:18-20. "They're prodding," he continued. "They want there to be something. They don't know that there is something." Tr. 55:21-22. But "[w]e're not going to give them anything because this is not important," he reaffirmed. Tr. 55:21-23. He ended with words of encouragement: "You're doing great. You're doing fine. You're doing exactly what you should be doing." Tr. 55:23-24.

10

When the subject of rally speakers arose, Mr. Passantino reiterated that this did not concern Ms. Hutchinson. Although she confirmed she "kn[ew] a decent amount about it, because Mark was fairly involved in planning the rally speakers," Mr. Passantino replied, "Yeah, but that's Mark's problem. Just because you knew what Mark was doing doesn't mean that you have to answer these questions." Tr. 41:2-14.

When the Committee "sent over materials pertaining to rally speakers" ahead of Ms. Hutchinson's second deposition, Mr. Passantino handed them to her minutes before the deposition was scheduled to begin and confirmed the Committee intended to ask questions about them. Tr. 41:17-24. "[B]ut don't worry about it," he said. "[T]hey'll tell you to pull up an exhibit, and you can read it." Tr. 41:24-25. Ms. Hutchinson informed him that she "probably will know a lot about this," but would "need a second to remember it." Tr. 42:2-3. "No, it's fine," he repeated. "If you don't remember when you look at it, it's fine; you just say you don't remember." Tr. 42:3-4.

**B.     Ms. Hutchinson Fires Mr. Passantino and Agrees to Testify Again at a Public Hearing.**

Mr. Passantino represented Ms. Hutchinson before the January 6th Committee at three closed-door depositions. Compl. ¶ 9. After the second deposition, Ms. Hutchinson asked a friend to "back channel to the Committee and say that there [are] a few things that I want to talk about." Tr. 85:1-86:12. More specifically, she felt she "need[ed] to go in and kind of expand on some things." Tr. 85:18-21. Three days later, the Committee reached out to schedule another deposition. Tr. 86:18-23.

The third deposition took place on May 17, 2022. Compl. ¶ 9. Ms. Hutchinson did not recall receiving any "legal counsel" or "pointers" from Mr. Passantino that day, "which was unusual." Tr. 97:4-6. Instead, "he would say something along the lines of, 'How do they have all of this? How do they know that you know all of this?'" Tr. 97:7-14.

11

By the beginning of June, when it appeared Ms. Hutchinson might be asked to testify publicly, her relationship with Mr. Passantino had broken down. Tr. 107:5-110:5. On June 9, 2022, Ms. Hutchinson notified Mr. Passantino that she was terminating their attorney-client relationship and that she had secured new counsel, including Jody Hunt. Tr. 110:6-9.[5]

Ms. Hutchinson gave live testimony at a televised hearing on June 28, 2022.[6] As Mr. Passantino predicted, she made headlines. Major media outlets reported her "bombshell," "explosive" testimony regarding President Trump's actions leading up to the January 6th attack and declared her "the most powerful witness yet" in the Committee's investigation.[7]

---

[5] Betsy Woodruff Swan, *Hutchinson, Former Meadows Aide, Replaces Lawyer on Cusp of Jan. 6 Hearings*, POLITICO (June 9, 2022), https://www.politico.com/news/2022/06/09/hutchinson-form er-meadows-aide-replaces-lawyer-jan-6-hearings-00038439.

[6] *See Hearing on the January 6th Investigation: Hearing Before the H. Select Comm. to Investigate the January 6th Attack on the United States Capitol*, 117th Cong. (June 28, 2022), https://www. govinfo.gov/content/pkg/CHRG-117hhrg49354/pdf/CHRG-117hhrg49354.pdf; David Bauder, *Hutchinson's Jan. 6 Committee Testimony a Television Hit*, ASSOCIATED PRESS (July 6, 2022), https://apnews.com/article/entertainment-tv-television-donald-trump-db4bf20c82cdb6b1b2c0b33 a00ad83de.

[7] *See, e.g.*, Maggie Haberman, *Cassidy Hutchinson Stuns with Testimony About Trump on Jan. 6*, N.Y. TIMES (June 28, 2022), https://www.nytimes.com/2022/06/28/us/cassidy-hutchinson-trump.html; Tyler Olson & Kelly Laco, *January 6 Hearing: Top 5 Moments of Explosive Cassidy Hutchinson Testimony on Trump, Attack on Capitol*, FOX NEWS (June 28, 2022), https://www.fox news.com/politics/january-6-hearing-top-5-moments-explosive-cassidy-hutchinson-testimony-tr ump-attack-capitol; Aaron Blake, *Cassidy Hutchinson's Explosive—and Damning—Jan. 6 Testimony*, WASH. POST (June 28, 2022) https://www.washingtonpost.com/—politics/— 2022/06/28/cassidy-hutchinsons-explosive-damning-jan-6-testimony/; Marshall Cohen, Zachary Cohen & Alex Rogers, *7 Takeaways from Tuesday's Shocking January 6 Hearing*, CNN (June 29, 2022), https://www.cnn.com/2022/06/28/politics/january-6-hearing-day-6-takeaways-hutchinson/ index.html; Barbara Sprunt, *Hutchinson's Bombshell Jan. 6 Testimony Sways Legal Experts and Conservative Media*, NPR (June 29, 2022), https://www.npr.org/2022/06/29/1108573335/ hutchinsons-bombshell-jan-6-testimony-sways-legal-experts-and-conservative-media; Alexandra Hutzler & Libby Cathey, *Key Takeaways from Cassidy Hutchinson's Bombshell Testimony to Jan. 6 Committee*, ABC NEWS (June 29, 2022), https://abcnews.go.com/Politics/key-takeaways-cassi dy-hutchinsons-bombshell-testimony-jan-committee/story?id=85880256; Scott Patterson, Siobhan Hughes & Sadie Gurman, *Cassidy Hutchinson Says Trump Demanded to Be Driven to the Capitol on Jan. 6*, WALL ST. J. (June 29, 2022), https://www.wsj.com/articles/cassidy-hutchinson-to-testify-in-jan-6-hearing-tuesday-11656423562.

C.     **Ms. Hutchinson's Testimony About Mr. Passantino's Conduct Prompts National News Coverage and Public Criticism.**

Ms. Hutchinson's extraordinary revelations did not end there. In a letter sent to the January 6th Committee, she "indicate[d] that [she] ha[d] made a decision to waive the attorney-client privilege in order to share information with the Committee that [was] relevant to [her] prior testimony." Tr. 5:7-11. On September 14, 2022, she testified as to her interactions with Mr. Passantino between February and June of 2022, when he was her lawyer. Tr. 3:3-6.

"I want to make this clear to you," she told investigators. "Stefan never told me to lie." Tr. 42:11. But, she continued, he had told her that "'I don't recall' isn't perjury," because "[t]hey don't know what you can and can't recall." Tr. 42:12-13.

The Committee alluded to Mr. Passantino's conduct during its final public session, held December 19, 2022, and in the Executive Summary of its Final Report, which was published the same day.[8] A member of the Committee announced that they had "obtained evidence" that "one lawyer told a witness the witness could in certain circumstances tell the Committee that she didn't recall facts when she actually did recall them."[9] The Executive Summary provided further details about this witness's testimony in a section describing "evidence suggesting specific efforts to obstruct the Committee's investigation."[10]

---

[8] *Read the Jan. 6 Committee Report Executive Summary*, N.Y. TIMES (Dec. 19, 2022), https://www.nytimes.com/interactive/2022/12/19/us/politics/jan-6-committee-report-executive-summary.html ("Executive Summary").

[9] *Business Meeting to Consider the Select Committee's Final Report: Meeting of the H. Select Comm. to Investigate the January 6th Attack on the United States Capitol*, 117th Cong. 8 (Dec. 19, 2022), https://www.govinfo.gov/content/pkg/CPRT-117HPRT50119/pdf/CPRT-117HPRT50119.pdf.

[10] Executive Summary at 93-94; *accord* H.R. Rep. No. 117-663, at 121-22 (2022), https://www.govinfo.gov/content/pkg/GPO-J6-REPORT/pdf/GPO-J6-REPORT.pdf ("Final Report").

A day later, CNN publicly identified Mr. Passantino as the lawyer who "told Cassidy Hutchinson to give misleading testimony" to the Committee.[11] Other outlets soon followed suit, and Mr. Passantino announced he was taking a leave of absence from his law firm.[12]

That reporting was confirmed on December 22, 2022, when the transcripts of Ms. Hutchinson's closed-door testimony were released by the Committee.[13] As in June, her testimony generated extensive media coverage.[14] National news outlets described Mr. Passantino's conduct

---

[11] Katelyn Polantz et al., *Exclusive: Trump's Former White House Ethics Lawyer Told Cassidy Hutchinson to Give Misleading Testimony to January 6 Committee, Sources Say*, CNN (updated Dec. 21, 2022), https://www.cnn.com/2022/12/20/politics/trump-ethics-lawyer-passantino-cassidy-hutchinson-misleading-testimony-jan-6/index.html.

[12] *See, e.g.*, Maggie Haberman & Luke Broadwater, *Lawyer for Key Jan. 6 Witness Seeks to Rebut Panel's Claim of Interference*, N.Y. TIMES (Dec. 20, 2022), https://www.nytimes.com/2022/12/20/us/politics/stefan-passantino-cassidy-hutchinson-jan-6.html; Hannah Getahun, *Jan. 6 Committee Says a Trump-Connected Lawyer Advised Cassidy Hutchinson to Mislead the Committee on What She Knew, CNN Reports*, BUSINESS INSIDER (Dec. 20, 2022), https://www.businessinsider.com/lawyer-advised-cassidy-hutchinson-to-mislead-jan-6-panel-report-2022-12; Justin Wise, *Trump Lawyer Takes Leave from Firm After Jan. 6 Panel Allegation*, BLOOMBERG LAW (Dec. 21, 2022), https://news.bloomberglaw.com/business-and-practice/trump-lawyer-takes-leave-from-firm-after-jan-6-panel-allegation.

[13] Eric Tucker, *Read the Transcripts of Cassidy Hutchinson's Closed-Door Jan. 6 Testimony*, PBS (Dec. 22, 2022), https://www.pbs.org/newshour/politics/read-the-transcripts-of-cassidy-hutchinsons-closed-door-jan-6-testimony.

[14] *See, e.g.*, Luke Broadwater & Alan Feuer, *Jan. 6 Witness Told Panel that Lawyer Tried to Influence Her Testimony*, N.Y. TIMES (Dec. 22, 2022), https://www.nytimes.com/2022/12/22/us/politics/jan-6-hutchinson-testimony-transcript.html; Scott Patterson, *Cassidy Hutchinson Said Trump Allies Urged Her to Limit Jan. 6 Testimony*, WALL ST. J. (Dec. 22, 2022), https://www.wsj.com/articles/trump-allies-urged-her-to-limit-testimony-cassidy-hutchinson-told-jan-6-committee-11671741853; Jacqueline Alemany, Isaac Stanley-Becker, Amy Gardner & Carol D. Leonnig, *Cassidy Hutchinson Claims Trump Figures Sought to Influence Her Testimony*, WASH. POST (Dec. 22, 2022), https://www.washingtonpost.com/national-security/2022/12/22/cassidy-hutchinson-jan-6-transcript/; Jamie Gangel et al., *Cassidy Hutchinson Told the January 6 Committee She Felt Pressure from Trump Allies Not to Talk and Instead Risk 'Contempt,'* CNN (Dec. 22, 2022), https://www.cnn.com/2022/12/22/politics/cassidy-hutchinson-jan-6-testimony-trump-pressure/index.html; Melissa Quinn, *Cassidy Hutchinson Told Jan. 6 Committee Trump-Linked Lawyer Urged Her to "Downplay" Role in Testimony, Transcript Reveals*, CBS NEWS (Dec. 22, 2022), https://www.cbsnews.com/news/cassidy-hutchinson-transcript-jan-6-trump-linked-lawyer-testimony-interview/; Eric Tucker, *Jan. 6 Witness Recounts Pressure Campaign from Trump Allies*, ASSOCIATED PRESS (Dec. 22, 2022), https://apnews.com/article/politics-3e7

as "coaching" Ms. Hutchinson "to tell committee investigators during her interviews that she did

not recall certain things,"[15] "pressur[ing] her to withhold information from lawmakers,"[16] and

"aimed at influencing her cooperation with Congress and stifling potentially damaging testimony

about [President Trump]."[17]

Reporters were not the only ones to take notice. Two different organizations founded by

lawyers filed ethics complaints against Mr. Passantino in the District of Columbia, Georgia, and

New York.[18] They accused Mr. Passantino of committing serious ethical breaches, violating the

---

524f9bf2adb9aa9b064bf8ea5d98c; Sara Dorn, *Jan. 6 Committee Report: Cassidy Hutchinson Said Trump Allies Pressured Her Not to Testify, Transcripts Show*, FORBES (Dec. 22, 2022), https://www.forbes.com/sites/saradorn/2022/12/21/final-january-6-report-about-to-be-released-heres-everything-we-know-so-far/?sh=1fd2e572780a; People Staff, *Cassidy Hutchinson's Full Bombshell Testimony Released:'They Will Ruin My Life, Mom,'* PEOPLE (Dec. 22, 2022), https://people.com/politics/cassidy-hutchinson-private-testimony-released-they-will-ruin-my-life/.

[15] Jacqueline Alemany, Isaac Stanley-Becker, Amy Gardner & Carol D. Leonnig, *Cassidy Hutchinson Claims Trump Figures Sought to Influence Her Testimony*, WASH. POST (Dec. 22, 2022), https://www.washingtonpost.com/national-security/2022/12/22/cassidy-hutchinson-jan-6-transcript/.

[16] Sara Dorn, *Jan. 6 Committee Report: Cassidy Hutchinson Said Trump Allies Pressured Her Not to Testify, Transcripts Show*, FORBES (Dec. 22, 2022), https://www.forbes.com/sites/saradorn/2022/12/21/final-january-6-report-about-to-be-released-heres-everything-we-know-so-far/?sh=1fd2e572780a; *accord* Jacqueline Alemany, Isaac Stanley-Becker, Amy Gardner & Carol D. Leonnig, *Cassidy Hutchinson Claims Trump Figures Sought to Influence Her Testimony*, WASH. POST (Dec. 22, 2022), https://www.washingtonpost.com/national-security/2022/12/22/cassidy-hutchinson-jan-6-transcript/ ("Former White House aide Cassidy Hutchinson testified to the House select committee investigating the Jan. 6, 2021, attack on the U.S. Capitol that she was advised by her first lawyer to deliberately withhold information from investigators[.]"); Eric Tucker, *Read the Transcripts of Cassidy Hutchinson's Closed-Door Jan. 6 Testimony*, PBS (Dec. 22, 2022), https://www.pbs.org/newshour/politics/read-the-transcripts-of-cassidy-hutchinsons-closed-door-jan-6-testimony ("Hutchinson recounted ... how her own lawyer—a former ethics counsel in the Trump White House—advised her against being fully forthcoming with lawmakers[.]").

[17] Eric Tucker, *Read the Transcripts of Cassidy Hutchinson's Closed-Door Jan. 6 Testimony*, PBS (Dec. 22, 2022), https://www.pbs.org/newshour/politics/read-the-transcripts-of-cassidy-hutchinsons-closed-door-jan-6-testimony.

[18] D.C. Ethics Complaint Against Stefan Passantino, Lawyers Defending American Democracy (Mar. 6, 2023), https://ldad.org/wp-content/uploads/2023/03/Ethics-Complaint-against-Stefan-Passantino.pdf ("LDAD Complaint"); Georgia Ethics Complaint Against Stefan Passantino, The 65

Rules of Professional Conduct (and possibly even federal criminal statutes), and seeking to obstruct the January 6th Committee's investigation.[19] In laying out the facts giving rise to the complaints, both organizations highlighted that Mr. Passantino had "encourag[ed] [Ms. Hutchinson] to give false testimony to Congress"[20] and "advised [her] against speaking truthfully to the Select Committee."[21] One complaint, which was signed by over thirty lawyers, characterized this conduct as "coaching" and called for Mr. Passantino's disbarment.[22]

Both complaints were made public and covered by the press.[23]

### D.    Mr. Passantino Files This Lawsuit in Response to Mr. Weissmann's Tweet.

On September 15, 2023, many months after the release of the transcript and the resulting media tsunami, Defendant Andrew Weissmann shared his one-line assessment of Mr. Passantino's

---

Project (Feb. 15, 2023), https://the65project.com/ethics-complaint-against-stefan-passantino/ ("65 Project Complaint"); *see* Press Release, Lawyers Defending American Democracy, *National Lawyers' Group Files Ethics Complaint Against Cassidy Hutchinson's Attorney Stefan C. Passantino* (Mar. 6, 2023), https://ldad.org/wp-content/uploads/2023/03/Hutchinson-Press-Release.pdf (stating that the organization was filing its complaint with disciplinary authorities in New York and Georgia as well).

[19] LDAD Complaint at 1, 8-16; 65 Project Complaint at 1, 3-7.

[20] LDAD Complaint at 1, 11-12.

[21] 65 Project Complaint at 3.

[22] LDAD Complaint at 12, 16, 19-22.

[23] *See, e.g.*, Charlie Savage, *Group Seeks Disbarment of a Trump-Aligned Lawyer for a Key Jan. 6 Witness*, N.Y. TIMES (Mar. 6, 2023), https://www.nytimes.com/2023/03/06/us/politics/trump-lawyer-ethics-jan-6.html; Nick Reynolds, *Trump Attorney Could Face Disbarment over Cassidy Hutchinson Testimony*, NEWSWEEK (Mar. 6, 2023), https://www.newsweek.com/trump-attorney-could-face-disbarment-over-cassidy-hutchinson-testimony-1785869; Andrew Goudsward, *Group Wants Trump-Aligned Lawyer Investigated over Capitol Riot Testimony*, REUTERS (Feb. 15, 2023), https://www.reuters.com/legal/legalindustry/group-wants-trump-aligned-lawyer-investigated-over-capitol-riot-testimony-2023-02-15/; Justin Wise, *Trump Lawyer Passantino Needs Georgia Bar Probe, Group Says*, BLOOMBERG LAW (Feb. 16, 2023), https://news.bloomberglaw.com/business-and-practice/trump-lawyer-passantino-needs-georgia-bar-probe-group-says; *accord* Georgia Complaint ¶ 74 (stating that the bar complaints were "well-publicized").

conduct in a tweet discussing Ms. Hutchinson's new lawyer, Jody Hunt. Compl. ¶¶ 16, 18. [24] Mr. Weissmann—a former prosecutor and top deputy to Special Counsel Robert Mueller—had now become an MSNBC commentator with approximately 322,000 Twitter followers. Compl. ¶¶ 1, 26. In that role, he tracked the January 6th Committee's investigation, including its repercussions for the various individuals involved, and provided public commentary on the matter.[25] Consequently, when he came across a tweet concerning Mr. Hunt, he alerted his followers that Mr. Hunt "is Cassidy Hutchinson's good lawyer." Compl. ¶ 18. In a parenthetical, he added that Mr. Hunt is "[n]ot the one who coached her to lie." Compl. ¶ 18.

Rather than ask Mr. Weissmann to retract this allegedly defamatory and "deeply damag[ing]" tweet, Mr. Passantino sued him for defamation and injurious falsehood. Compl. ¶ 21. Mr. Passantino alleges that the statement "coached [Ms. Hutchinson] to lie" impugns his reputation as an honorable and ethical attorney and contains a provably false factual proposition because Ms.

---

[24] As noted above, *see supra* p. 2, the full tweet reads as follows:

> Hunt also is Cassidy Hutchinson's good lawyer. (Not the one who coached her to lie) And he is the guy who took notes of Trump saying, when Mueller was appointed, quoting him as saying "I'm f….d"

Compl. ¶ 18.

[25] *See, e.g.*, Deadline: White House, *Andrew Weissmann: DOJ Should Be Pressing for Corroboration of Hutchinson Testimony*, MSNBC (June 29, 2022), https://www.msnbc.com/dead line-white-house/watch/andrew-weissmann-doj-should-be-pressing-for-corroboration-of-hutchin son-testimony-143115333559; Deadline: White House, *Andrew Weissmann: 1/6 Committee's Display of Trump's Repeated Lies Will Be Devastating*, MSNBC (Oct. 13, 2022), https://www.ms nbc.com/deadline-white-house/watch/andrew-weissmann-1-6-committee-s-display-of-trump-s-re peated-lies-will-be-devastating-150600261557; *Unfinished Business of Jan. 6th Committee*, The Just Security Podcast (Jan. 6, 2023), https://www.buzzsprout.com/2074610/11990688-the-lasting-impact-of-january-6th; Deadline: White House, *Andrew Weissmann: The Oath Keepers and the Proud Boys Are Not Going Away*, MSNBC (May 4, 2023), https://www.msnbc.com/deadline-white-house/watch/andrew-weissmann-the-oath-keepers-and-the-proud-boys-are-not-going-away -172795461700; Ayesha Rascoe, *Understanding the Latest Investigations into Trump's Role in January 6*, NPR's Weekend Edition Sunday (July 23, 2023), https://www.npr.org/2023/07/ 23/1189659903/understanding-the-latest-investigations-into-trumps-role-in-january-6.

Hutchinson testified that he "never told [her] to lie." Compl. ¶¶ 1, 16-17, 23, 25, 27-28. Mr. Passantino bases his claim for injurious falsehood on the same statement. Compl. ¶ 35.

## LEGAL STANDARD

"Rule 12 plays an especially important role in defamation cases, such as this one." *BYD Co. Ltd. v. All. for Am. Mfg.*, 554 F. Supp. 3d 1, 6 (D.D.C. 2021), *aff'd*, 2022 WL 1463866 (D.C. Cir. May 10, 2022), *cert. denied*, 143 S. Ct. 306 (2022); *accord Vindman v. Trump*, 2022 WL 16758575, at *4 (D.D.C. Nov. 8, 2022). "To preserve First Amendment freedoms and give reporters, commentators, bloggers, and tweeters (among others) the breathing room they need to pursue the truth, the Supreme Court has directed courts to expeditiously weed out unmeritorious defamation suits." *Kahl v. Bureau of Nat'l Affs., Inc.*, 856 F.3d 106, 109 (D.C. Cir. 2017) (Kavanaugh, J.) (collecting cases). "Early resolution of defamation cases under Federal Rule of Civil Procedure 12(b)(6) not only protects against the costs of meritless litigation, but provides assurance to those exercising their First Amendment rights that doing so will not needlessly become prohibitively expensive." *BYD Co.*, 554 F. Supp. 3d at 6 (quoting *Fairbanks v. Roller*, 314 F. Supp. 3d 85, 89 (D.D.C. 2018)).

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Plausibility requires that the Complaint raise "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Thus, the Court need not accept as true "a legal conclusion couched as a factual allegation," nor "inferences …

unsupported by the facts set out in the complaint." *Trudeau v. FTC*, 456 F.3d 178, 193 (D.C. Cir. 2006) (citations omitted).

## ARGUMENT

**I.    A Tweet by a "Political Pundit" that Provides His Subjective Assessment of a Lawyer's Conduct, Based on Publicly Available Transcripts of Depositions Taken by a Congressional Committee, Constitutes a Protected Expression of Opinion.**

### A.    Subjective assessments are entitled to full constitutional protection.

"At the heart of the First Amendment is the recognition of the fundamental importance of the free flow of ideas and opinions on matters of public interest and concern." *Hustler Mag., Inc.*, 485 U.S. at 50. Defamation suits threaten to impede this flow, as courts have long acknowledged. *See Wash. Post Co. v. Keogh*, 365 F.2d 965, 968 (D.C. Cir. 1966) ("[T]he stake here, if harassment succeeds, is free debate. … Unless persons … desiring to exercise their First Amendment rights are assured freedom from the harassment of lawsuits, they will tend to become self-censors."); *Nader v. de Toledano*, 408 A.2d 31, 38-39 (D.C. 1979) (explaining that modern defamation law "implement[s] the First Amendment policy of maximization of public debate through minimization of the incentives for self-censorship presented by the threat of defamation liability"); *McBride v. Merrell Dow & Pharms. Inc.*, 717 F.2d 1460, 1466-67 (D.C. Cir. 1983) (warning that "[e]ven if many [defamation] actions fail, the risks and high costs of litigation may lead to undesirable forms of self-censorship," and "self-censorship affecting the whole public is hardly less virulent for being privately administered"); *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 595 (D.C. 2000) ("Imposition of liability upon an individual on the basis of his words … threatens to inhibit speech and to undermine the core values of a free society.").

Courts within the District of Columbia have vigilantly protected the breathing space essential to free expression and guarded against the potential chilling effect of defamation suits. Under D.C. law, "[a] statement of opinion is actionable if—but only if—it has an explicit or

19

implicit factual foundation and is therefore objectively verifiable." *Armstrong v. Thompson*, 80

A.3d 177, 184 (D.C. 2013) (citation omitted); *accord Weyrich v. New Republic, Inc.*, 235 F.3d 617,

624 (D.C. Cir. 2001) ("For a statement to be actionable under the First Amendment, it must at a

minimum express or imply a verifiably false fact about [the plaintiff]." (citing *Milkovich*, 497 U.S.

at 19-20)).[26]

Conversely, if "a speaker is expressing a subjective view, an interpretation, a theory,

conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the

statement is not actionable." *Guilford*, 760 A.2d at 597 (quoting *Haynes v. Alfred A. Knopf, Inc.*,

8 F.3d 1222, 1227 (7th Cir. 1993)); *accord Weyrich*, 235 F.3d at 624 ("[A] statement of opinion

relating to matters of public concern which does not contain a provably false factual connotation

will receive full constitutional protection." (quoting *Milkovich*, 497 U.S. at 20)).

Whether the challenged statement is protected by the First Amendment constitutes a

question of law. *Farah v. Esquire Mag., Inc.*, 736 F.3d 528, 534 (D.C. Cir. 2013); *Sigal*

*Construction Corp. v. Stanbury*, 586 A.2d 1204, 1210 (D.C. 1991). When determining whether

the statement reflects the author's subjective interpretation rather than conveying verifiably false

facts, the D.C. Circuit has instructed courts to "err on the side of non-actionability." *Moldea v. N.Y.*

---

[26] D.C. law applies in this diversity action because Plaintiff filed suit here; his alleged injury occurred here, where he regularly represents clients; and the law of his home state (Georgia) does not recognize a cause of action for injurious falsehood, which Plaintiff asserts in Count II of his complaint. *See* Compl. ¶¶ 2, 26, 30 (alleging that Plaintiff "suffer[ed] significant damages" in Washington, D.C., where he "regularly represents clients"); *Mastro v. Potomac Elec. Power Co.*, 447 F.3d 843, 857 (D.C. Cir. 2006) (recognizing that "the weight of authority considers that the law to be applied [to defamation actions] is that of the place where the plaintiff suffered injury by reason of his loss of reputation" and applying D.C. law to a defamation claim brought by a non-D.C. resident); Compl. ¶¶ 33-37 (asserting claim for injurious falsehood); *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1154 (11th Cir. 2011) (observing that "the Georgia Supreme Court [has] explicitly refused to decide whether a cause of action for injurious falsehood (also called 'trade libel') lies in Georgia, and no Georgia court has since held that such a cause of action exists").

*Times Co.*, 22 F.3d 310, 317 (D.C. Cir. 1994) ("*Moldea II*"); *Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1292 (D.C. Cir. 1988) (citing *Hepps*, 475 U.S. at 776). Consistent with that instruction, and pursuant to the Supreme Court's directive to expeditiously weed out unmeritorious defamation suits, courts applying *Milkovich* routinely dismiss claims for defamation and related torts at the motion-to-dismiss stage.[27]

**B.     Both the context and language of Mr. Weissmann's one-off tweet strongly signal that it is non-actionable opinion.**

"The First Amendment demands that the court assess the disputed statement[] in [its] proper context." *Farah*, 736 F.3d at 535 (quoting *Weyrich*, 235 F.3d at 625). Accordingly, courts evaluate four factors to determine whether the statement conveys a provably false factual connotation: (1) the broad social context in which the statement appeared, including the medium of publication and the genre of writing; (2) the immediate context of the statement, including any unchallenged language surrounding it; (3) the meaning of the specific language used in the statement; and (4) the statement's verifiability. *Id.* at 534-35 (citing *Moldea II*, 22 F.3d at 314-15, 317; *Weyrich*, 235 F.3d at 624-25; *Ollman v. Evans*, 750 F.2d 970, 983 (D.C. Cir. 1984) (en banc)); *accord Sigal*, 586 A.2d at 1210 (articulating a similar four-part test). In conducting this analysis, courts must consider the statement "in the sense in which it would be understood by the readers to whom it was addressed"—i.e., by its "primary intended audience." *Farah*, 736 F.3d at 535, 537 (citation omitted).

---

[27] *See, e.g.*, *Farah*, 736 F.3d at 534-35, 539-40; *Khodorkovskaya v. Gay*, 5 F.4th 80, 82, 84-85 (D.C. Cir. 2021); *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 159-60, 162 (D.D.C. 2014); *Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 40, 46-48 (D.D.C. 2022), *appeal docketed*, No. 22-7117 (D.C. Cir. Aug. 22, 2022); *Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78, 99-101 (D.D.C. 2022); *Donald J. Trump for President*, 2023 WL 1765193, at *6, *9.

Here, all four factors weigh heavily in favor of Mr. Weissmann, so the defamation claim cannot proceed. And because the defamation claim fails, the claim for injurious falsehood fails as well. *See Farah*, 736 F.3d at 540 (affirming that a plaintiff "may not use related causes of action to avoid the constitutional requisites of a defamation claim" (quoting *Moldea II*, 22 F.3d at 319-20)).

    i. <u>The challenged statement was made by a well-known "political pundit" and public commentator on social media.</u>

Context is "critical," as both the D.C. Circuit and the D.C. Court of Appeals have repeatedly affirmed since *Milkovich*. *Farah*, 736 F.3d at 535, 537 (examining a political blog); *Khodorkovskaya v. Gay*, 5 F.4th 80, 85 (D.C. Cir. 2021) (assessing a fictional theatrical production); *see Moldea II*, 22 F.3d at 314-15 (explaining that "*Milkovich* did not disavow the importance of context" and considering a book review); *Weyrich*, 235 F.3d at 624-25 (stressing that "the court must consider the statement in context" and evaluating a magazine of political commentary); *Guilford*, 760 A.2d at 597 (reiterating that "'*Milkovich* did not disavow the importance of context,' and it therefore remains critical to our inquiry that the allegedly defamatory utterances in this case appeared in an Op-Ed column"); *see also Partington v. Bugliosi*, 56 F.3d 1147, 1153 (9th Cir. 1995) ("The Supreme Court and other courts have emphasized that one must analyze a statement in its broad context to determine whether it implies the assertion of an objective fact.").

It's easy to understand why: Although a specific statement, standing alone, may seem factual, the context in which it is made can signal that it is actually an expression of opinion. *See, e.g.*, *Moldea II*, 22 F.3d at 317 ("recogniz[ing] that, in the context of a book review, it is highly debatable whether [the disputed] statement is sufficiently verifiable to be actionable in defamation"). The "broader social context" in which the statement appeared is particularly "vital

to [its] proper understanding." *Farah*, 736 F.3d at 535. Different types of writing are imbued with different social conventions and customs, which influence how speech will be received by its intended audience. *Id.* (citing *Ollman*, 750 F.2d at 983-84); *Khodorkovskaya*, 5 F.4th at 85 (same).

Twitter offers a prime example. Like other internet platforms, Twitter encourages a "generally informal," "unedited," and "freewheeling, anything-goes" writing style. *Ganske v. Mensch*, 480 F. Supp. 3d 542, 552-53 (S.D.N.Y. 2020) (collecting cases). Its "obvious space limitations" also compel commentators to "express themselves in condensed fashion without providing what might be considered the full picture." *Ollman v. Evans*, 750 F.2d 970, 986 (D.C. Cir. 1984) (en banc); *see Carroll v. Trump*, 2023 WL 4393067, at *15 (S.D.N.Y. July 5, 2023) (recognizing that "a character-limited post on Twitter" is a "context[] that courts have determined tended to signal expressions of opinion"), *aff'd in part*, 88 F.4th 418 (2d Cir. 2023). These features "lead[] readers to give less credence to allegedly defamatory remarks published on the [site]." *Ganske*, 480 F. Supp. 3d at 553 (alteration and citation omitted).

Cognizant of Twitter's social conventions, numerous courts have held "the fact that Defendant's allegedly defamatory statement … appeared on Twitter conveys a strong signal to a reasonable reader that this was Defendant's opinion." *Id.*; *see Broughty v. Bouzy*, 2023 WL 5013654, at *5 (D.N.J. Aug. 7, 2023) ("Crucially, the 'over-all context' in which the alleged defamation occurred here is Twitter. … Twitter is a public forum where a reasonable reader will expect to find many more opinions than facts." (collecting cases)); *see also Rapaport v. Barstool Sports Inc.*, 2024 WL 88636, at *3 (2d Cir. Jan. 9, 2024) ("[S]ocial media, blogs, and sports talk radio" are "all platforms where audiences reasonably anticipate hearing opinionated statements.").

That the tweet was posted by Mr. Weissmann, a well-known "political pundit" and commentator on a national television network and elsewhere, serves as an even stronger indication

that his remarks would reasonably be understood as expressions of his personal opinion.[28] Compl. ¶ 1. Forums created by political commentators—such as blogs, op-ed columns, and talk shows— are "the well-recognized home of opinion." *Ollman*, 750 F.2d at 990 (addressing "statements by well-known, nationally syndicated columnists on the Op-Ed page of a newspaper"); *see Farah*, 736 F.3d at 537 (ruling that the statement was properly considered opinion in part because it appeared on a political blog); *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1157 (9th Cir. 2021) (concluding that "the broad context of [Rachel] Maddow's show makes it more likely that her audiences will 'expect her to use subjective language'"); *McDougal v. Fox News Network, LLC*, 489 F. Supp. 3d 174, 183 (S.D.N.Y. 2020) (reasoning that Tucker Carlson's statements were not actionable given "the context of commentary talk shows"); *see also Brian v. Richardson*, 660 N.E.2d 1126, 1130 (N.Y. 1995) (stating that "the identity, role and reputation of the author may be factors to the extent that they provide the reader with clues as to the article's import").

Indeed, the D.C. Circuit has expressly held that "[a]ny reasonable reader of political blog commentary knows that it often contains conjecture and strong language, particularly where the discussion concerns … a polarizing topic." *Farah*, 736 F.3d at 540; *see Weyrich*, 235 F.3d at 625-26 (concluding that the challenged statement "constitute[d] protected, unverifiable comment" in part because the forum in which it was published was "well-known" for "political commentary"); *Ollman*, 750 F.2d at 984, 986 (explaining that "it is well understood that editorial writers and commentators frequently 'resort to the type of caustic bombast traditionally used in editorial

---

[28] Because a single forum may contain different types of writing, courts also venture one level deeper to assess "the specific context or setting" within the forum where the challenged statement appeared. *Ollman*, 750 F.2d at 984, 986 (distinguishing between a "column on the editorial or Op-Ed page" and "'hard' news like those printed on the front page or elsewhere in the news sections of the newspaper"); *accord Guilford*, 760 A.2d at 582-83 (same); *Herring Networks*, 8 F.4th at 1157 (distinguishing between MSNBC as a whole and "[Rachel] Maddow's show in particular").

writing to stimulate public reaction,'" and "[r]eaders expect that columnists will make strong statements, sometimes phrased in a polemical manner that would hardly be considered balanced or fair elsewhere in the newspaper").

This case is no exception. Plaintiff himself describes Mr. Weissmann as a "political pundit" for a national television network, and Mr. Weissmann has publicly provided his views on aspects of the January 6th investigation on numerous occasions. Compl. ¶ 1; *see supra* 17. Against "that baseline of knowledge," Mr. Weissmann's Twitter followers—i.e., his "primary intended audience"—were surely "familiar with [his] history of publishing" candid assessments of political and legal events that reflected his personal judgment, *Farah*, 736 F.3d at 537, and were therefore "predisposed to view what [he] writes as opinion," *Ollman*, 750 F.2d at 986-88.

The subject of the tweet also alerted readers that it represented Mr. Weissmann's subjective interpretation. *Farah*, 736 F.3d at 537 (considering the "substance of the story"). Mr. Weissmann's commentary concerned an undeniable issue of national importance: Congress's investigation into the January 6th attack on the U.S. Capitol, and possible efforts by a lawyer to obstruct that investigation. And not just any lawyer—the self-professed "chief ethics lawyer in President Trump's White House" who "represented several witnesses" in the probe. Compl. ¶¶ 6-7; Georgia Complaint ¶¶ 3, 11. Plaintiff's conduct—as recounted in the very transcript on which Plaintiff now relies—spurred national news coverage and multiple bar complaints. Even the January 6th Committee itself took notice. *See supra* 13-16; *Montgomery v. Risen*, 875 F.3d 709, 713 (D.C. Cir. 2017) (holding that the challenged statements involved matters of public concern because the plaintiff "was the subject of major national news coverage"). In that context, Mr. Weissmann's statement characterizing Plaintiff's conduct as "coach[ing]" was an "evaluation[] quintessentially of a type readers would expect to find." *Moldea II*, 22 F.3d at 315.

Thus, this factor militates in favor of treating Mr. Weissmann's comment as opinion.

      ii.      <u>The challenged statement was immediately preceded by subjective language and based upon publicly available facts.</u>

The language surrounding the challenged statement, like the social context in which it was made, also shapes its interpretation. For example, courts differentiate between "a one-off rhetorical comment" and "a sustained attack," finding the former more likely to be protected under the First Amendment. *Compare Clifford v. Trump*, 339 F. Supp. 3d 915, 927-28 (C.D. Cal. 2018) (dismissing the case in part because the defendant "did not repeat the allegations"), *aff'd*, 818 F. App'x 746 (9th Cir. 2020), *with Peak Health Ctr. v. Dorfman*, 2019 WL 5893188, at *10 (N.D. Cal. Nov. 12, 2019) (distinguishing the defamatory article, which "purport[ed] to be an 'investigative report' based on extensive research," from "a radio talk show host's off-the-cuff assessment" in holding that parts of the article were not protected opinion), *and Weyrich*, 235 F.3d at 628 (reasoning that the defamatory article's "repeated tale" of appellant's volatile temper and apparent emotional instability could lead a reasonable reader to conclude that appellant was in fact an emotionally unstable individual). Moreover, where the statement appeared alongside other expressions of opinion, *Ollman*, 750 F.2d at 982, or was based upon publicly available facts already known to readers, *Farah*, 736 F.3d at 539, it is not actionable. Consistent with these principles, the D.C. Circuit has "counsel[ed] strongly against straining to squeeze factual content from a single sentence in a column that is otherwise clearly opinion." *Ollman*, 750 F.2d at 991.

Yet that is precisely what Plaintiff attempts here. In fact, he goes one step further: He picks out eight words (situated within a parenthetical, no less) from a solitary tweet containing thirty-six words in total. Compl. ¶¶ 18, 23. As indicated by the parenthetical, the other twenty-eight words weren't even about him—they were about Ms. Hutchinson's new lawyer. Compl. ¶ 16. So how did Mr. Weissmann distinguish them? With a quintessential expression of opinion: The new

lawyer was Ms. Hutchinson's "good" lawyer—not the one who coached her to lie. Compl. ¶ 18; *see Coles v. Washington Free Wkly., Inc.*, 881 F. Supp. 26, 31-32 (D.D.C. 1995) (holding that statements characterizing an attorney's performance constitute "subjective impressions" that "are not capable of being proven true or false"), *aff'd*, 88 F.3d 1278 (D.C. Cir. 1996); *Partington*, 56 F.3d at 1157-58 (concluding that assessments of a lawyer's performance are "inherently subjective and therefore not susceptible of being proved true or false" and observing that this conclusion is "well supported by existing caselaw").

It is equally notable what the tweet did *not* say. Mr. Weissmann did not claim—and the Complaint does not allege—that he was "in a position to make first-hand observations of [Plaintiff's] conduct," *Ollman*, 750 F.2d at 985 n.31, or "aware of facts unavailable to the public at large," *Houlahan v. World Wide Ass'n of Specialty Programs & Sch.*, 2006 WL 785326, at *3 (D.D.C. Mar. 28, 2006). To the contrary, as Plaintiff himself underscores in the Complaint, Mr. Weissmann was "aware of [Ms. Hutchinson's] testimony," and that testimony was "readily available" to anyone with internet access—including Mr. Weissmann's Twitter followers. Compl. ¶¶ 1, 9-11, 16-18, 27. What's more, Ms. Hutchinson's testimony was the subject of widespread media coverage and commentary. *See supra* 13-16. Against that backdrop, it would "def[y] common sense" to suppose that "politically informed readers"—such as the followers of a political blog or a political pundit's Twitter account—were "unaware of [this] controversy or the heated debate it had provoked." *Farah*, 736 F.3d at 537.

Besides, Mr. Weissmann's personal assessment of Plaintiff's advice when preparing Ms. Hutchinson to testify tracked Ms. Hutchinson's widely reported and publicly available testimony. According to the September 14, 2022 transcript on which Plaintiff relies in his complaint:

- Mr. Passantino advised Ms. Hutchinson to "[j]ust downplay your position." Tr. 49:19. "Your go-to [response] is 'I don't recall.'" Tr. 52:5-8.

27

- When Ms. Hutchinson asked how to answer questions about conversations she had overheard, Mr. Passantino counseled that "the goal with you is to get you in and out. Keep your answers short, sweet, and simple, seven words or less. The less the Committee thinks you know, the better, the quicker it's going to go." Tr. 35:12-18.

- When Ms. Hutchinson recounted hearing how President Trump had leaned over the seat in the presidential limo and grabbed the driver, Mr. Passantino responded, "No, no, no, no, no," and added, "We don't want to go there. We don't want to talk about that." He explained that "just because [someone] told you doesn't mean that you need to share that with [the Committee]." Tr. 34:12-35:11.

- Mr. Passantino also advised Ms. Hutchinson that "unless you remember [ ] a very specific day with a very specific event [ ], 'I don't recall' is your answer." Tr. 36:4-6.

- Mr. Passantino further counseled Ms. Hutchinson that "I don't recall" would be "entirely fine" in other situations, including where she did not "100 percent recall something." Tr. 36:7-10.

- In explaining why "I don't recall" was an appropriate response, Mr. Passantino told Ms. Hutchinson that "[t]he Committee doesn't know what you can and can't recall." Tr. 36:16-18.

- When Ms. Hutchinson inquired "where the funding for this is coming from," Mr. Passantino declined to say, but reassured her, "Don't worry, we're taking care of you." Tr. 21:23-22:4. He subsequently stated, on the morning of her first deposition, "We just want to focus on protecting the President." Tr. 50:1-2.

These circumstances definitively establish that the challenged statement constitutes non-actionable opinion. Because Mr. Weissmann based his evaluation of Mr. Passantino's conduct on publicly available, well-known facts, his followers understood that it "represent[ed] [Mr. Weissmann's] interpretation of [those] facts," and they remained "free to draw [their] own conclusions." *Moldea II*, 22 F.3d at 317 (quoting *Moldea v. N.Y. Times Co.*, 15 F.3d 1137, 1144-45 (D.C. Cir. 1994) ("*Moldea I*")). The D.C. Circuit has long held that "this type of statement is not actionable in defamation." *Id.*; *see Farah*, 736 F.3d at 539.

> iii.   The challenged statement conveys no precise meaning.

The context in which Mr. Weissmann's statement was made conclusively shows that it would not have reasonably been understood as a provable assertion of fact. This conclusion is only

reinforced by the language of the statement itself. Because Mr. Weissmann's assessment inextricably incorporates his subjective judgment as to what constitutes "coaching," it cannot "convey facts." *Ollman*, 750 F.2d at 981.

An "indefinite" and "ambiguous" term such as "coached" is not "likely to give rise to clear factual implications." *Ollman*, 750 F.2d at 979-80. Far from evoking a "well-defined," "commonly understood" meaning, *id.*, the word "lend[s] [itself] to varying interpretations," *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 12 (D.D.C. 2019). In the present context of witness preparation, "there is considerable disagreement as to the definition of 'coaching' as opposed to legitimate preparation." ABA Standing Comm. on Ethics and Professional Responsibility, *Formal Opinion 508: The Ethics of Witness Preparation* at 2 n.6 (2023) ("*Formal Opinion 508*") (quoting Tom Barber, *Restrictions on Lawyers Communicating with Witnesses During Testimony: Law, Lore, Opinions, and the Rule*, 83 Fla. Bar J. 58 (July-Aug. 2009)).[29]

Indeed, few authorities have explicitly defined this term, and those that have offer little clarity. The American Bar Association (ABA), for example, has defined "coaching" as "unethical or ethically questionable conduct." *Formal Opinion 508* at 2. The Supreme Court has similarly suggested that "coaching" refers to "possible improper influence on [witness] testimony." *Geders v. United States*, 425 U.S. 80, 89 (1976). Based on the reputational harm alleged in the Complaint, this appears to be Plaintiff's definition as well. *See* Compl. ¶¶ 1, 5, 7, 12, 28-29 (alleging that Mr. Weissmann's tweet impugned Plaintiff's reputation as an honorable and ethical attorney).

---

[29] Available at https://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/ethics-opinions/aba-formal-opinion-508.pdf.

As courts have acknowledged, however, terms connoting unethical or improper behavior are inherently subjective. *See Bauman*, 377 F. Supp. 3d at 11 (recognizing that "statements suggesting the plaintiff engaged in 'serious integrity violations' and other 'serious issues of misconduct and unethical behavior' were unverifiable opinions that simply 'reflected one person's subjective view of the underlying conduct'" (quoting *Armstrong*, 80 A.3d at 187-88)); *Catalfo v. Jensen*, 657 F. Supp. 463, 468 (D.N.H. 1987) (emphasizing that "[e]thical standards are inherently subjective"); *see also Automated Transactions, LLC v. Am. Bankers Ass'n*, 216 A.3d 71, 82 (N.H. 2019) ("[I]f a challenged statement is defined, but that definition itself 'does not have a precise meaning such that it is capable of verification,' neither does the challenged statement.").

In short, the word "coached" can "mean[] different things to different people at different times and in different situations"—a reality that only highlights its ambiguous nature. *Cummins v. SunTrust Cap. Markets, Inc.*, 649 F. Supp. 2d 224, 245 (S.D.N.Y. 2009) (describing "cheating" as "a question of characterization"), *aff'd*, 416 F. App'x 101 (2d Cir. 2011); *see McCabe v. Rattiner*, 814 F.2d 839, 842 (1st Cir. 1987) (reasoning that "scam" has no precise meaning because "it means different things to different people," and "[w]hile some connotations of the word may encompass criminal behavior, others do not"); *Piccone v. Bartels*, 785 F.3d 766, 772-73 (1st Cir. 2015) (concluding that statements regarding defendant's impression of plaintiffs' professionalism were not actionable because "professional" possesses both subjective and objective connotations).

Because interpretation of "coached" inevitably entails a judgment-laden assessment of Mr. Passantino's advice, as recounted in Ms. Hutchinson's testimony, the word's usage signals that Mr. Weissmann's tweet reflects his personal opinion.

        iv.     <u>The challenged statement is not objectively verifiable.</u>

Where, as here, the challenged statement is not "objectively capable of proof or disproof," "a reasonable reader will not believe that the statement has specific factual content." *Ollman*, 750

30

F.2d at 979, 981. Verifiability also has significant First Amendment implications. As the D.C. Circuit has explained, "the First Amendment is endangered when attempts are made to prove [an unverifiable] statement true or false. Lacking a clear method of verification with which to evaluate a statement[,] … the trier of fact may improperly tend to render a decision based upon approval or disapproval of the contents of the statement, its author, or its subject." *Id.* at 981. To mitigate this risk, the D.C. Circuit has consistently instructed courts to "err on the side of non-actionability" where the question of verifiability is a close call. *Moldea II*, 22 F.3d at 317 (quoting *Liberty Lobby*, 838 F.2d at 1292).

Mr. Weissmann's tweet is not capable of objective verification for two distinct reasons. *First*, as established above, the term "coached" is inherently subjective and therefore "variously interpretable." *Ollman*, 750 F.2d at 980. And "a statement with a number of possible meanings is by its nature unverifiable." *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 159 (D.D.C. 2014); *see Farah*, 736 F.3d at 534-35 ("Where a statement is so imprecise or subjective that it is not capable of being proved true or false, it is not actionable in defamation."); *Clemmons v. Acad. for Educ. Dev.*, 70 F. Supp. 3d 282, 308 (D.D.C. 2014) ("[S]tatements that lend themselves to varying interpretations are insufficient for a defamation claim because they cannot be proved 'false.'"); *Bauman*, 377 F. Supp. 3d at 12 (finding the statements "too amorphous" and "susceptible of multiple interpretations" to be verifiable).

*Second*, there is no "objective standard" or bright-line rule for assessing when an improper "coaching to lie" has occurred in the absence of an explicit instruction—as the overwhelming weight of authority attests. *Partington*, 56 F.3d at 1157-58 (concluding that evaluations of a lawyer's performance are "not susceptible of being proved true or false" because "[t]here is no objective standard by which one can measure an advocate's abilities with any certitude or

determine conclusively the truth or falsity of statements made regarding the quality of his or her performance"); *see, e.g.*, *State v. Earp*, 571 A.2d 1227, 1234 (Md. 1990) ("[T]he line that exists between perfectly acceptable witness preparation on the one hand, and impermissible influencing of the witness on the other hand, may sometimes be fine and difficult to discern[.]"); Joseph D. Piorkowski, Jr., Note, *Professional Conduct and the Preparation of Witnesses for Trial: Defining the Acceptable Limitations of "Coaching,"* 1 Geo. J. Legal Ethics 389, 389 (1987) ("Some behavior, such as subornation of perjury, is clearly unacceptable. There remains, however, a vast realm of conduct that could potentially be characterized as improperly seeking to influence a witness's testimony."); John S. Applegate, *Witness Preparation*, 68 Tex. L. Rev. 277, 279 (1989) ("[T]he line between preparing and prompting (or 'coaching,' the usual term of opprobrium) is rarely clear even for the most scrupulous."); Fred C. Zacharias & Shaun Martin, *Coaching Witnesses*, 87 Ky. L.J. 1001, 1001 (1999) ("Although we all yearn for bright-line rules that tell us how to conduct our affairs, it is clear that ethics regulation tolerates a range of conduct.").

Even the ABA—the organization responsible for promulgating the Model Rules of Professional Conduct—has admitted that "[t]he distinction between legitimate witness preparation and guidance versus unethical efforts to influence witness testimony, a practice sometimes known as coaching, … can be ambiguous owing in large part to the concurrent ethical duties to diligently and competently represent the client and to refrain from improperly influencing witnesses." *Formal Opinion 508* at 2.

Against that backdrop, it is no surprise that courts in D.C. and across the country have held that statements concerning the propriety of an individual's conduct are fully protected. *See, e.g.*, *Armstrong*, 80 A.3d at 187-88 (statements characterizing plaintiff's actions as "serious integrity violations," "serious misconduct and other violations," "gross misconduct and integrity violations,"

and "serious issues of misconduct, integrity violations and unethical behavior" were non-actionable because "[a]ll of these reflected one person's subjective view of the underlying conduct and were not verifiable as true or false"); *Wait v. Beck's N. Am., Inc.*, 241 F. Supp. 2d 172, 183 (N.D.N.Y. 2003) ("Statements that someone has acted unprofessionally or unethically generally are constitutionally protected statements of opinion." (collecting cases)); *Small Bus. Bodyguard Inc. v. House of Moxie, Inc.*, 230 F. Supp. 3d 290, 315 (S.D.N.Y. 2017) ("Calling someone an 'unethical, unscrupulous unprofessional' … is a 'constitutionally protected statement of opinion.'" (alterations omitted)); *Obsidian Fin. Grp., LLC v. Cox*, 812 F. Supp. 2d 1220, 1238 (D. Or. 2011) ("unethical" constitutes a "non-provable, figurative, or subjective-type word[] which tend[s] to negate the impression that defendant asserts [a] provable statement[] of fact"), *aff'd*, 740 F.3d 1284 (9th Cir. 2014); *Catalfo*, 657 F. Supp. at 468 ("marked by low ethical standards" is not "capable of verification" because "[e]thical standards are inherently subjective"); *WinePress Publ'g v. Levine*, 2009 WL 3765188, at *5 (W.D. Wash. Nov. 9, 2009) (statements that "either directly state or imply that [plaintiff] is dishonest or unethical" are non-actionable expressions of opinion); *Kartte v. Davis*, 2022 WL 1442789, at *4 (D.D.C. May 6, 2022) (statement that plaintiff had "negligible ethics" would likely constitute protected opinion).

Assertions of misleading or deceptive behavior have also been held non-actionable expressions of opinion under the First Amendment. *See, e.g.*, *Standing Comm. on Discipline of U.S. Dist. Ct. for Cent. Dist. of Cal. v. Yagman*, 55 F.3d 1430, 1440-41 (9th Cir. 1995) ("allegation of 'dishonesty' does not imply facts capable of objective verification"); *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724, 728 n.7 (1st Cir. 1992) ("assertion that appellants are 'blatantly misleading the public' … is subjective and imprecise, and therefore not capable of verification or refutation by means of objective proof"); *Lane v. Random House, Inc.*, 985 F. Supp. 141, 150-51

(D.D.C. 1995) (plaintiff is "guilty of misleading the American public"); *Bauman*, 377 F. Supp. 3d at 10, 12-13 (plaintiff is "a hired guy who will say anything" and who "should apologize to the country for crafting a lie"); *Xereas v. Heiss*, 933 F. Supp. 2d 1, 19 (D.D.C. 2013) (plaintiff is engaged in "dishonest business practices" and "deceptive sales practices"); *Accuardi v. Fredericks*, 2014 WL 848263, at *11 (D. Or. Mar. 4, 2014) (plaintiff is "dishonest, a crook and incompetent attorney").

That Mr. Passantino never outright told Ms. Hutchinson to lie, as he alleges, Compl. ¶¶ 16-17, or not to answer any of the Committee's questions, Compl. ¶ 11, does not justify departing from this well-established precedent. Nor does it matter whether Mr. Passantino's "coaching" was ultimately successful. Compl. ¶ 10. No reasonable reader would think that "coaching" encompasses only explicit or effective instruction. Instead, the question raised here is one of subjective assessment: in the absence of an outright instruction to lie, when does an attorney's conduct cross the line from legitimate witness preparation to impermissible coaching.

That is the assessment Mr. Weissmann made here. Mr. Passantino may well make a different one. Under the First Amendment, both may be expressed without fear of liability, because neither conveys a provably false factual proposition. For these reasons, Plaintiff's defamation claim should be dismissed with prejudice. *Abbas v. Foreign Pol'y Grp., LLC*, 783 F.3d 1328, 1340 (D.C. Cir. 2015) ("dismissal with prejudice is appropriate" where the challenged statement, "as a matter of law, do[es] not qualify as false and defamatory").

So, too—and for the same reasons—dismissal is required of Plaintiff's claim for injurious falsehood. That claim is "based upon the same allegedly defamatory speech" as Plaintiff's defamation claim. *Farah*, 736 F.3d at 540; *compare* Compl. ¶ 23, *with* Compl. ¶ 35. As the D.C. Circuit has made clear, a plaintiff "may not use related causes of action to avoid the constitutional

requisites of a defamation claim." *Farah*, 736 F.3d at 540 (quoting *Moldea II,* 22 F.3d at 319-20)).

Accordingly, "[a] plaintiff cannot maintain a cause of action for injurious falsehood" where "the

court has already concluded that the [challenged statements] are privileged" under the First

Amendment. *Q Int'l Courier, Inc. v. Seagraves*, 1999 WL 1027034, at *7 (D.D.C. Feb. 26, 1999);

*cf. McCaskill*, 36 F. Supp. 3d at 158 (stating that "[c]laims of defamation and false-light invasion

of privacy relying on identical allegations are analyzed together under District law" and dismissing

both claims because the challenged speech constituted protected opinion). Because Mr.

Weissmann's subjective assessment of Mr. Passantino's conduct is a fully protected expression of

opinion, it is not actionable as defamation or injurious falsehood.

## II.  Plaintiff's Injurious Falsehood Claim Fails for the Independent Reason that Plaintiff Failed to Adequately Allege Special Damages.

Even apart from this, Count II of the Complaint, which purports to state a claim for the

common law tort of injurious falsehood, should be dismissed on the independent ground that

Plaintiff has not sufficiently pled the requisite special damages—indeed, Plaintiff has not alleged

*any* concrete harm that he has suffered as a result of Mr. Weissmann's one-off tweet. Special

damages are an essential element of injurious falsehood. *3M Co. v. Boulter*, 842 F. Supp. 2d 85,

118 (D.D.C. 2012) (Wilkins, J.); *see Art Metal-U.S.A., Inc. v. United States*, 753 F.2d 1151, 1155-

56 & n.6 (D.C. Cir. 1985). Consequently, Plaintiff must adequately allege special damages for his

injurious falsehood claim to survive a Rule 12(b)(6) motion to dismiss. *See 3M Co.*, 842 F. Supp.

2d at 118 (dismissing injurious falsehood claim for failure to plead special damages).

This element is subject to Rule 9(g)'s "heightened" pleading standard, which requires that

special damages "be specifically stated." *Browning v. Clinton*, 292 F.3d 235, 245 (D.C. Cir. 2002);

*Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018); *3M Co.*, 842 F. Supp. 2d at 118.

"[B]oilerplate recitation[s], unaccompanied by any factual detail," do not come close to satisfying

this standard. *Smith*, 886 F.3d at 128. Instead, Plaintiff "must allege actual damages with 'particularity' and specify 'facts showing that such special damages were the natural and direct result' of the defendant's conduct (here, the alleged false and disparaging [tweet])." *Browning*, 292 F.3d at 245 (collecting cases). In other words, Plaintiff "must plead economic harm and causation." *KLEO AG v. Rivada Networks, Inc.*, 2023 WL 7921969, at *3 (D.D.C. Nov. 16, 2023), *appeal docketed*, No. 23-7175 (D.C. Cir. Dec. 22, 2023). Where Plaintiff "neither quantifies [his] loss nor identifies any lost business relationships" and "merely asserts in general terms that [the challenged statement] cost [him] financially," his claim "cannot survive Rule 12(b)(6) review." *Browning*, 292 F.3d at 245-46.

"Boilerplate recitations" and "general terms" are all Plaintiff puts forward here. With respect to economic harm, he identifies no "particular [clients] whose business has been lost," and he proffers no financial statements showing his "amount of [income] before and after the disparaging publication." *Browning*, 292 F.3d at 245-46; *see Schoen v. Wash. Post*, 246 F.2d 670, 671-72 (D.C. Cir. 1957) (ruling that special damages were specifically stated where plaintiff identified three particular customers who had withdrawn their business and presented business receipts from before and after the disparaging publication). Instead, Plaintiff merely asserts that he "los[t] significant business and income," Compl. ¶ 21; "suffer[ed] significant damages," Compl. ¶ 30; and "suffered direct pecuniary losses," Compl. ¶ 37. And the only figure he provides is the one that gets him into federal court. Compl. ¶¶ 32, 37 (claiming damages "in excess of $75,000"). Such sparse allegations cannot satisfy Rule 9(g).

Plaintiff's allegations as to causation fare no better, for they are nothing more than "conclusory statements alleging that Defendant[] caused damage to [Plaintiff], with no specific facts reflecting that causation." *3M Co.*, 842 F. Supp. 2d at 118; *see* Compl. ¶ 21 (alleging that the

challenged statement "caused [Plaintiff] to lose significant business and income"); Compl. ¶ 30 (alleging that the challenged statement "directly and proximately caused [Plaintiff] to suffer significant damages"); Compl. ¶ 32 (alleging that Plaintiff's damages were "a direct and proximate result of the misconduct of Defendant"); Compl. ¶ 37 (alleging that Plaintiff "suffered direct pecuniary losses as a result of Defendant's accusation").

Courts in this Circuit have consistently rejected such generic and speculative allegations. *See Smith*, 886 F.3d at 128 (affirming that Rule 9(g) was not satisfied where the complaint alleged that "as a direct and proximate result of [defendant's] statements, [plaintiffs] have suffered pecuniary damage, as well as injury to reputation, impairment to standing in their community, personal humiliation, pain and suffering, and emotional distress"); *Browning*, 292 F.3d at 246 (concluding that Rule 9(g) was not satisfied where the complaint stated that "'as a proximate result of the publication of [defendant's] article, neither [plaintiff] w[as] able to sell the publishing and other rights in the manuscript,' and therefore that they suffered damages 'including but not limited to marketing and other business expenses incurred, loss of goodwill, and emotional distress and mental anguish'"); *3M Co.*, 842 F. Supp. 2d at 118 (holding the causation requirement not satisfied where the complaint alleged that "[a]s a natural, direct, and proximate result of defendants' wrongful actions, [plaintiff] has suffered special damages, as identified herein, the full amount which will be proven at trial"); *KLEO AG*, 2023 WL 7921969, at *3 (finding the causation requirement not satisfied where the complaint stated, in reference to each alleged economic harm, that "[o]n information and belief, the loss of these relationships was caused by [defendant's] defamatory statements").

And for good reason: "[S]pecial damages, unlike general damages, are not the necessary consequence of the defendant's conduct, but stem from the particular circumstances of the case."

*Browning*, 292 F.3d at 245 (alterations and citation omitted). The "particular circumstances" of this case strongly suggest that any actual pecuniary harm suffered by Mr. Passantino was not the product of Mr. Weissmann's lone tweet, but rather of the manifold criticisms publicly lodged against Mr. Passantino by media outlets, watchdog organizations, and the January 6th Committee itself in the wake of Ms. Hutchinson's testimony. *See supra* 13-16. Eight words in a parenthetical can hardly compete with scores of news articles describing Mr. Passantino's conduct in identical or materially indistinguishable terms. As Plaintiff himself alleges in another complaint, he "separated from one of his firms, Michael Best, due to the allegations in the news media" concerning his representation of Ms. Hutchinson—long before the tweet at issue was ever posted. Georgia Complaint ¶ 71. [30] And that does not even account for the "well-publicized" bar complaints and congressional findings that had also been circulating for months by the time Mr. Weissmann shared his one-line assessment—documents that contained detailed accusations of ethical violations and obstruction. Georgia Complaint ¶ 74.[31] Indeed, if Mr. Weissmann's eight-word evaluation were truly as "insidious" as Plaintiff claims, it's a wonder that he never demanded a retraction. Compl. ¶ 1. Under these circumstances, it strains credulity to believe that Plaintiff's purported losses were "the natural and direct result" of Mr. Weissmann's tweet. *Browning*, 292 F.3d at 245.

Plaintiff's vague and conclusory allegations fall far short of Rule 9(g)'s heightened pleading standard for special damages. As a result, he cannot maintain a suit for injurious falsehood.

---

[30] *See* Justin Wise, *Michael Best, Trump Lawyer Passantino Part Ways, Law Firm Says*, BLOOMBERG LAW (Dec. 28, 2022), https://news.bloomberglaw.com/business-and-practice/michael-best-trump-lawyer-passantino-part-ways-law-firm-says.

[31] *See* LDAD Complaint (22 pages); 65 Project Complaint (7 pages); Final Report at 121-22.

## CONCLUSION

For the foregoing reasons, this action should be dismissed with prejudice for failure to state a claim.


Dated:  February 26, 2024                          Respectfully submitted,

                                                   /s/ *Ian Heath Gershengorn*
Andrew J. Thomas*                                  Ian Heath Gershengorn
JENNER & BLOCK LLP                                 Leslie K. Bruce**
2029 Century Park East                             JENNER & BLOCK LLP
Suite 1450                                         1099 New York Avenue, NW
Los Angeles, CA 90067                              Suite 900
(213) 239-6900                                     Washington, D.C. 20001
ajthomas@jenner.com                                (202) 639-6869
                                                   igershengorn@jenner.com
* admitted *pro hac vice*
                                                   ** application for admission pending

*Counsel for Defendant Andrew Weissmann*