UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STEFAN PASSANTINO,

        *Plaintiff*,

   v.

ANDREW WEISSMANN,

        *Defendant*.

Civil Action No. 23-2780 (LLA)

## MEMORANDUM OPINION AND ORDER

Plaintiff Stefan Passantino brings this action against Defendant Andrew Weissmann, alleging defamation (Count I) and injurious falsehood (Count II) stemming from a September 2023 social media post. In the post, Mr. Weissmann referred to Mr. Passantino—a lawyer—as someone "who coached [a Congressional witness] to lie." ECF No. 1 ¶ 18. Mr. Weissmann moves to dismiss the case under Federal Rule of Civil Procedure 12(b)(6). ECF No. 7. For the reasons explained below, the court will grant his motion in part and dismiss Count II, but will allow Count I to proceed.

### I.    Factual Background

The following factual allegations drawn from Mr. Passantino's complaint, ECF No. 1, are accepted as true for the purpose of evaluating the motion before the court. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Mr. Passantino has been a lawyer for more than thirty years. ECF No. 1 ¶ 5. In 2017 and 2018, he served as a senior lawyer in the Trump administration. *Id.* ¶ 6. Since then, he has been in private practice. *Id.*

Following the attack on the U.S. Capitol on January 6, 2021, the House of Representatives established a Select Committee to investigate what had happened. *Id.* ¶ 7. As part of its investigation, the Select Committee interviewed numerous witnesses, including Cassidy Hutchinson, a former special assistant to President Trump who had been serving under the direction of White House Chief of Staff Mark Meadows on January 6, 2021. *Interview of Cassidy Hutchinson (Feb. 23, 2022) Before the Select Comm. to Investigate the January 6th Attack on the U.S. Capitol*, 117th Cong., 2d Sess. (2022) ("Feb. 13 Deposition"), Tr. 9:2-20.[1]

Mr. Passantino represented Ms. Hutchinson at her first three closed-door Select Committee depositions on February 23, March 7, and May 17, 2022. ECF No. 1 ¶ 9. While the complaint does not specify exactly when this occurred, Ms. Hutchinson sent text messages to a friend expressing that she "d[idn]'t want to comply" with the Committee's requests. *Id.* ¶ 13. In the same conversation, however, she noted that "Stefan [Passantino] want[ed] [her] to comply." *Id.*

Following the second deposition, Ms. Hutchinson felt that she had "withheld things" from the Select Committee and wanted to "go in and . . . elaborate . . . and kind of expand" on some topics. *Continued Interview of Cassidy Hutchinson (Sept. 14, 2022) Before the Select Comm. to Investigate the January 6th Attack on the U.S. Capitol*, 117th Cong., 2d Sess. (2022) ("Sept. 14 Deposition"), Tr. 86:10, 85:18-21. Unbeknownst to Mr. Passantino, Ms. Hutchinson asked a

---

[1] When ruling on a motion to dismiss, the court may only consider "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, or documents upon which the plaintiff's complaint necessarily relies even if the document is produced not by the parties." *Vasser v. McDonald*, 228 F. Supp. 3d 1, 8-9 (D.D.C. 2016) (quoting *Busby v. Capital One, N.A.*, 932 F. Supp. 2d 114, 133-34 (D.D.C. 2013)). The court may also consider "matters of which [the court] may take judicial notice." *Hurd v. District of Columbia*, 864 F.3d 671, 678 (D.C. Cir. 2017) (second alteration in original) (quoting *EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997)). Mr. Passantino's complaint references, cites, and quotes Ms. Hutchinson's various depositions before the Select Committee. *See* ECF No. 1 ¶ 9-12, 9 nn.1-3, 16-17, 16 n.5, 17 nn.6-7. The court will therefore consider the transcripts of these depositions as incorporated by reference into the complaint.

2

friend to "back channel to the committee and say that there [were] a few things that [she] want[ed] to talk about." *Id.* 85:24-25; *id.* 86:15-16 (explaining that she did "not [want to] let Stefan know that [she was] back channeling for this interview"). While Ms. Hutchinson deliberately kept this from Mr. Passantino, she explained at a future deposition that, at that time, she "wasn't at a place where [she] wanted to terminate [her] attorney-client relationship with [Mr. Passantino]." *Id.* 86:10-12.

In early June 2022, after the third deposition, Ms. Hutchinson fired Mr. Passantino and retained Bill Jordan and Jody Hunt as her new counsel. *Id.* 110:6-9. She subsequently gave a fourth, televised deposition on June 28, which received substantial media coverage. *See, e.g.*, Maggie Haberman, *Cassidy Hutchinson Stuns With Testimony About Trump on Jan. 6*, N.Y. Times (June 28, 2022), https://perma.cc/2YRT-3PZL; Tyler Olson, Kelly Laco, *January 6 hearing: Top 5 moments of explosive Cassidy Hutchinson testimony on Trump, attack on Capitol*, Fox News (June 28, 2022), https://perma.cc/33EC-Z7Z6; Aaron Blake, *Cassidy Hutchinson's explosive—and damning—Jan. 6 testimony*, The Washington Post (June 28, 2022), https://perma.cc/RQD2-8YYA.[2]

After her fourth deposition, Ms. Hutchinson sent a letter to the Select Committee stating that she intended to "waive [her] attorney-client privilege [with Mr. Passantino] in order to share information with the Committee that [was] relevant to [her] prior testimony." Sept. 14 Deposition, Tr. 5:7-11. The Select Committee accordingly scheduled her for a fifth deposition for September 14, 2022. *See id.* 1:15.

---

[2] The court may take judicial notice of news articles for their existence, but not for the truth of the statements asserted within. *See, e.g.*, *Hourani v. Psybersolutions*, 164 F. Supp. 3d 128, 132 n.1 (D.D.C. 2016).

3

At her fifth deposition, Ms. Hutchinson revealed additional details about the preparation she and Mr. Passantino had done ahead of her first Select Committee deposition. Specifically, the two had met "for a couple hours" on February 16, 2022 to discuss her upcoming testimony. *Id.* 28:14-18. When Ms. Hutchinson suggested printing out a calendar so that she could "get[] the dates right" with respect to timelines of events, Mr. Passantino said "No, no, no." *Id.* 30:14-19. He told her that the plan was "to downplay [her] role" and that "the less [she] remember[ed], the better." *Id.* 30:19-31:2. When Ms. Hutchinson brought up an incident that occurred inside the Presidential limousine on January 6 (which she had been told about by a colleague), Mr. Passantino said "No, no, no, no, no. We don't want to go there. We don't want to talk about that." *Id.* 34:12-24.

Mr. Passantino then told Ms. Hutchinson: "If you don't 100 percent recall something, even if you don't recall a date or somebody who may or may not have been in the room, ['I don't recall' is] an entirely fine answer, and we want you to use that response as much as you deem necessary." *Id.* 36:7-10. Ms. Hutchinson then asked, "if I do recall something but not every little detail, . . . can I still say I don't recall?" to which Mr. Passantino replied, "Yes." *Id.* 36:11-13. The morning of the first deposition, Mr. Passantino reminded Ms. Hutchinson to "[j]ust downplay [her] position," telling her that her "go-to [response was] 'I don't recall.'" *Id.* 49:16-19, 52:8.

At her fifth deposition, Ms. Hutchinson discussed a line of questioning from her first deposition about the January 6 incident in the Presidential limousine. *Id.* 55:3-56:21. She explained that, during a break after facing repeated questions on the topic, she had told Mr. Passantino in private, "I'm f*****. I just lied." *Id.* 55:15-16. Mr. Passantino responded, "You didn't lie. . . . They don't know what you know, Cassidy. They don't know that you can recall some of these things. So you [sic] saying 'I don't recall' is an entirely acceptable response

4

to this." *Id.* 55:16-20.  He concluded, "You're doing exactly what you should be doing." *Id.* 55:23-24.  Ms. Hutchinson explained that, in the moment, she "[felt] like [she] couldn't be forthcoming when [she] wanted to be."  *Id.* 56:3-4.

Ms. Hutchinson did, however, state at her fifth deposition: "I want to make this clear to [the Select Committee]: Stefan [Passantino] never told me to lie."  ECF No. 1 ¶ 17; Sept. 14 Deposition, Tr. 42:11.  She recalled him saying to her: "I don't want you to perjure yourself, but 'I don't recall' isn't perjury.  They don't know what you can and can't recall." Sept. 14 Deposition, Tr. 42:12-13.  She then reiterated to the Select Committee, "[H]e didn't tell me to lie.  He told me not to lie." *Id.* 42:20-21.

At the Committee's final public session on December 19, 2022, a Congressmember announced that they had "obtained evidence" that "one lawyer told a witness the witness could in certain circumstances tell the Committee that she didn't recall facts when she actually did recall them."  *Business Meeting to Consider the Select Committee's Final Report; Select Comm. to Investigate the January 6th Attack on the U.S. Capitol (December 19, 2022)*, 117th Cong., 2d Sess., at 8 (2022).[3]

After the Committee released the transcripts from the Ms. Hutchinson's closed-door depositions, multiple news outlets claimed that the "lawyer" referred to by the Select Committee member was Mr. Passantino.  *See, e.g.*, Maggie Haberman & Luke Broadwater, *Lawyer for Key Jan. 6 Witness Seeks to Rebut Panel's Claim of Interference*, N.Y. Times (Dec. 20, 2022), https://perma.cc/W6RA-FVTR; Katelyn Polantz, et al., *Exclusive: Trump's former White House*

---

[3] The court may take judicial notice of congressional hearings and legislative materials. *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018).

*ethics lawyer told Cassidy Hutchinson to give misleading testimony to January 6 committee, sources say*, CNN (Dec. 21, 2022), https://perma.cc/6UHM-HGHM.

On September 15, 2023, Mr. Weissmann—a former prosecutor who now serves as a "political pundit" for MSNBC—posted the following on X (formerly known as Twitter):



ECF No. 1 ¶¶ 1, 18; Andrew Weissmann (@AWeissmann_), X (Sept. 15, 2023, 3:18 p.m.), https://perma.cc/324Q-6YSM. Mr. Weissmann made the post in response to an alert that Mr. Hunt had been subpoenaed in an unrelated case. Andrew Weissmann (@AWeissmann_), X (Sept. 15, 2023, 3:18 p.m.). Mr. Weissmann had approximately 320,000 followers on X at the time. ECF No. 1 ¶ 18.

Mr. Passantino alleges that Mr. Weissmann's post "deeply damaged [his] 30-year reputation and caused him to lose significant business and income." *Id.* ¶ 21. Prior to the allegations surrounding his representation of Ms. Hutchinson, Mr. Passantino had "never been accused by a client, or anyone else, of unethical or illegal behavior." *Id.* ¶ 8.

## II. Procedural Background

In September 2023, Mr. Passantino sued Mr. Weissmann, alleging defamation (Count I) and injurious falsehood (Count II) stemming from the social media post. ECF No. 1. After the complaint was docketed, the case was reassigned to the undersigned in December 2023. Docket, No. 23-CV-2780 (D.D.C. Dec. 15, 2023).

In February 2024, Mr. Weissmann moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). ECF No. 7. Mr. Passantino filed an opposition, ECF No. 13, and Mr. Weissmann filed a reply, ECF No. 15. The motion is now ripe for disposition.

### III.    Legal Standard

To survive a Rule 12(b)(6) motion to dismiss, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff pleads facts that are more than "'merely consistent with' a defendant's liability" and that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Twombly*, 550 U.S. at 557); *see Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) ("Plausibility requires 'more than a sheer possibility that a defendant has acted unlawfully.'" (quoting *Iqbal*, 556 U.S. at 678)). The court will only "assume [the] veracity" of "well-pleaded factual allegations." *Iqbal*, 556 U.S. at 679. Conclusory allegations are "not entitled to the assumption of truth." *Id.* at 680-81. "A complaint survives a motion to dismiss even '[i]f there are two alternative explanations, one advanced by [the] defendant and the other advanced by [the] plaintiff, both of which are plausible.'" *Banneker Ventures*, 798 F.3d at 1129 (alterations in original) (quoting *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011)).

### IV.    Discussion

This court is exercising diversity jurisdiction and accordingly applies District of Columbia law. *See Metz v. BAE Sys. Tech. Sols. & Servs. Inc.*, 774 F.3d 18, 21-22 (D.C. Cir. 2014).

### A.      Count I: Defamation

#### 1.      Relevant Defamation Law

To state a claim of defamation,

> [a] "plaintiff must allege and prove four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm."

*Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009) (quoting *Oparaugo v. Watts*, 884 A.2d 63, 76 (D.C. 2005)).  At this stage, the parties only dispute the first element—specifically, whether Mr. Weissmann's statement was an opinion incapable of serving as the basis of an actionable defamation claim.  ECF No. 7-1, at 19-35; ECF No. 13, at 4-18.

For "a challenged statement to be actionable as defamation, 'it must at a minimum express or imply a verifiably false fact'" about the plaintiff.  *Zimmerman v. Al Jazeera Am., LLC*, 246 F. Supp. 3d 257, 276 (D.D.C. 2017) (quoting *Weyrich v. New Republic, Inc.*, 235 F.3d 617, 624 (D.C. Cir. 2001)).  That is because First Amendment protection attaches to statements "that cannot 'reasonably [be] interpreted as stating actual facts' about an individual" in an effort to ensure "that public debate [does] not suffer."  *Milkovich v. Lorain J. Co.*, 497 U.S. 1, 20 (1990) (first alteration in original) (quoting *Hustler Mag., Inc. v. Falwell*, 485 U.S. 46, 50 (1988)).  For this reason, opinions are generally not actionable because they are often "so imprecise or subjective that [they are] not capable of being proved true or false."  *Farah v. Esquire Mag.*, 736 F.3d 528, 534-35 (D.C. Cir. 2013); *see Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000) (explaining that if a "speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts," the statement is entitled to First Amendment protection (quoting *Haynes v. Alfred A. Knopf, Inc.*, 8

F.3d 1222, 1227 (7th Cir. 1993))).  That being said, the Supreme Court has made clear that there is no blanket "defamation exemption for anything that might be labeled [an] 'opinion.'" *Milkovich*, 497 U.S. at 18.  This is because "expressions of 'opinion' may often imply an assertion of objective fact."  *Id.*; *see Stevens v. Tillman*, 855 F.2d 394, 398 (7th Cir. 1988) ("Every statement of opinion contains or implies some proposition of fact, just as every statement of fact has or implies an evaluative component.").

Deciding whether a statement implies verifiably false facts or instead an opinion is a question of law.  *See Farah*, 736 F.3d at 534-35.  In conducting this inquiry, the "publication must be taken as a whole, and in the sense in which it would be understood by the readers to whom it was addressed."  *Id.* at 535 (quoting *Afro-Am. Publ'g Co. v. Jaffe*, 366 F.2d 649, 655 (D.C. Cir. 1966) (en banc)).  Consistent with District law, the D.C. Circuit has adopted a four-factor test to determine whether a statement implies a verifiably false assertion of fact or is a nonactionable opinion.  Courts must consider: (1) "the common usage or meaning of the allegedly defamatory words themselves," (2) "the degree to which the statements are verifiable," (3) "the context in which the statement occurs," and (4) "the broader social context into which the statement fits."  *Ollman v. Evans*, 750 F.2d 970, 979-84 (D.C. Cir. 1984) (en banc); *see Myers v. Plan Takoma, Inc.*, 472 A.2d 44, 47 (D.C. 1983).  There is no set order or hierarchy to these factors.  *Ollman*, 750 F.2d at 980 n.17 ("We do not . . . suggest that the four-factor analysis is to be undertaken in a rigid lock-step fashion . . . [A] logical starting point . . . may be the broad social context or . . . the language surrounding the challenged statements[.]").

### 2.  Applying the *Ollman* Factors

The parties agree that this motion boils down to a core question: was Mr. Weissmann's social media post that "[Mr. Passantino] coached [a witness] to lie" a verifiably false fact, or a

9

subjective opinion?  *See* ECF No. 7-1, at 20-21; ECF No. 13, at 4-6; ECF No. 15, at 4.  This is not an easy inquiry, and the answer in such cases is rarely clear cut.  *See Ollman*, 750 F.2d at 978 ("While courts are divided in their methods of distinguishing between assertions of fact and expressions of opinion, they are universally agreed that the task is a difficult one.").  Different aspects of Mr. Weissmann's statement and its context point in both directions.  But for the reasons explained below, the court agrees with Mr. Passantino that Mr. Weissmann's statement is not one of subjective opinion.[4]

### a. Common usage or meaning of the allegedly defamatory words

The first *Ollman* factor requires the court to determine whether the challenged statement "has a precise meaning and thus is likely to give rise to clear factual implications."  750 F.2d at 980.  The touchstone of this inquiry is whether "the average reader [could] fairly infer any specific factual content from [the statement]."  *Id.* at 980 n.18.  As the *Ollman* court noted, "[a] classic example of a statement with a well-defined meaning is an accusation of a crime."  *Id.* at 980.

The allegedly defamatory portion of the post can be distilled into: "[Mr. Passantino] coached [Ms. Hutchinson] to lie."  ECF No. 1 ¶ 18.  The definition of the verb "lie" is clear.  To "lie" is "[t]o tell an untruth; to speak or write falsely."  *Lie*, Black's Law Dictionary (12th ed. 2024).  The parties do not dispute this definition.  *See* ECF No. 7-1, at 29-31 (choosing to focus on the word "coached"); ECF No. 13, at 6-9 (same).  The definition of the verb "coach" is "to

---

[4] For the purposes of this motion, the parties do not dispute other possible defenses to a claim for defamation, such as whether the content of Mr. Weissmann's post was substantially true.  *See* ECF No. 13, at 5; *see generally* ECF Nos. 7 & 15.  After this court's resolution of the motion to dismiss, Mr. Weissmann is free to raise any such defenses not barred by the Federal Rules.  *See Long v. Howard Univ.*, 550 F.3d 21, 24-25 (D.C. Cir. 2008) ("[A] defense can be raised [as late as] at trial so long as it was properly asserted in the answer and not thereafter affirmatively waived.").  The court is thus only deciding whether Mr. Weissmann's statement is nonactionable as a subjective opinion.

instruct, direct, or prompt." *Coach*, Merriam-Webster's Dictionary, https://perma.cc/XD8G-7DU5. While Mr. Weissmann argues that "coached" is "indefinite," "ambiguous," and "can 'mean different things to different people at different times and in different situations,'" ECF No. 7-1, at 29-30 (brackets and citations omitted), the court concludes that the word conveys a sufficiently precise meaning in the challenged social media post.

Readers of a statement do not isolate and parse individual words into all of their possible connotations. Mr. Weissmann wrote that Mr. Passantino "coached [a witness] to lie." ECF No. 1 ¶ 18. In that string of text, read as a whole, the clear factual implication is that Mr. Passantino "instruct[ed], direct[ed], or prompt[ed]" Ms. Hutchinson "to lie" to the Select Committee. While it is true that general statements that someone is "spreading lies" or "is a liar" are not categorically actionable in defamation, *see Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 133 (D.D.C. 2009), Mr. Weissmann's post very directly claimed that Mr. Passantino had committed a specific act— encouraging or preparing a specific witness to make false statements. A reasonable reader is likely to take away a precise message from that representation. *See Rosen v. Am. Israel Pub. Affs. Comm.*, 41 A.3d 1250, 1258 (D.C. 2012) (considering whether the statement "communicates [a] specific message about a discernable fact to an uninformed hearer").

Mr. Weissmann cites a handful of sources suggesting that "coaching" can refer to "unethical or ethically questionable conduct" or "possible improper influence on [witness] testimony." ECF No. 7-1, at 29 (first quoting ABA Standing Comm. on Ethics and Pro. Resp., *Formal Opinion 508: The Ethics of Witness Preparation*, at 2 (2023); next quoting *Geders v. United States*, 425 U.S. 80, 89 (1976)). Yet even inserting these slightly different interpretations of "coached" does not change the "sting" of the statement: that Mr. Passantino got Ms. Hutchinson to lie to the Select Committee. *See Liberty Lobby, Inc. v. Dow Jones & Co.*, 838 F.2d 1287, 1296

11

(D.C. Cir. 1988) (evaluating the potentially defamatory nature of a statement based on its "sting"). He also argues that accusations of "integrity violations" or "unethical behavior" are ordinarily too subjective to support a defamation claim. ECF No. 7-1, at 32-33; *see Armstrong v. Thompson*, 80 A.3d 177, 187-88 (D.C. 2013) (holding that statements that the plaintiff was being investigated for "serious integrity violations," "serious misconduct," and "unethical behavior" were subjective opinions); *Bauman v. Butowsky*, 377 F. Supp. 3d 1, 11 (D.D.C. 2019) (agreeing with *Armstrong*). But accusing someone of being unethical, more generally, is different than charging them with a specific, deceptive act. Mr. Weissmann's argument would likely fare differently if he had claimed that Mr. Passantino had "acted unethically," but that is not what he said. Even if the court substitutes in Mr. Weissmann's preferred definition of "coached"—that Mr. Passantino "improperly influenced" someone "to *lie*," ECF No. 1 ¶ 18 (emphasis added)—such a meaning differs from claiming that someone comports themselves unethically. Accordingly, this factor weighs in Mr. Passantino's favor.

### b.  Degree to which the statements are verifiable

Verifiability hinges on a deceptively difficult question: "is the statement objectively capable of proof or disproof?" *Ollman*, 750 F.2d at 981. In some ways, this second factor overlaps with the first because the common usage of the statement's words will determine whether the statement—as a whole—can be proven true or false.

Mr. Weissmann advances two arguments for why the statement is not verifiable. First, he reasserts his claim that "coached" is too ambiguous of a term, and that "a statement with a number of possible meanings is by its nature unverifiable." ECF No. 7-1, at 31 (quoting *McCaskill v. Gallaudet Univ.*, 36 F. Supp. 3d 145, 159 (D.D.C. 2014)). However, as discussed above, *supra* Part IV(A)(2)(a), the phrase "coached her to lie" is sufficiently precise to "give rise to clear factual

12

implications." *See Ollman*, 750 F.2d at 980.  Mr. Weissmann's ambiguity argument is therefore not persuasive.

Second, Mr. Weissmann asserts that there is no objective standard for assessing when someone has coached another to lie—at least in the absence of an explicit instruction to do so. ECF No. 7-1, at 31-32.  For support, he cites various cases for the proposition that evaluating a lawyer's performance is "not susceptible of being proved true or false." *Id.* at 31 (quoting *Partington v. Bugliosi*, 56 F.3d 1147, 1157 (9th Cir. 1995)).  Those cases are not particularly useful, however, because they primarily discuss the quality of an attorney's representation, not whether the attorney committed or engaged in a particular act.  There is a difference between calling an attorney's representation "good" or "bad," on one hand, and saying that an attorney "lied" or "told the truth," on the other.  The former is a subjective spectrum indicative of an opinion; the latter is a yes-or-no binary indicative of a fact.

As for the cases that *do* concern the act of witness preparation (rather than the quality of an attorney's representation generally), *see State v. Earp*, 571 A.2d 1227 (Md. 1990), an "objective standard" is only lacking if the court assumes that the term "coach" is ambiguous.  If one reasonably reads "coach" to mean "instruct, direct, or prompt" in the context of Mr. Weissmann's full social media post, then the statement is verifiable.  Mr. Passantino either "coached"—that is, he "instruct[ed], direct[ed], or prompt[ed]"—Ms. Hutchinson to lie, or he didn't.  The second *Ollman* factor thus favors Mr. Passantino.

**c.      Context in which the statement occurs**

This inquiry focuses on the immediate context surrounding the challenged statement.  *See Ollman*, 750 F.2d at 982.  For example, a sentence asserting a seemingly factual claim takes on an entirely different meaning if situated in a satirical newspaper column.  *See Farah*, 736 F.3d at 537

13

(holding that the readers of a satirical blog would not reasonably take its assertions at face value). The D.C. Circuit has cautioned against "squeez[ing] factual content from a single sentence in a column that is otherwise clearly opinion." *Ollman*, 750 F.2d at 991.

Here, Mr. Weissmann's post contained only three sentences. It began by stating that "[Mr.] Hunt is Cassidy Hutchinson's good lawyer." ECF No. 1 ¶ 18. Both parties agree that this is "obviously" an opinion. ECF No. 13, at 13; ECF No. 15, at 10. Then, in a parenthetical, it reads: "(Not the one who coached her to lie)." ECF No. 1 ¶ 18. Finally, it concludes, "And [Mr. Hunt] is the guy who took notes of Trump saying, when Mueller was appointed, quoting him as saying 'I'm f....d.'" *Id.* Mr. Passantino argues that the final sentence is clearly a factual assertion, ECF No. 13, at 13, and Mr. Weissmann does not contest that characterization, *see* ECF No. 15, at 10-14.

Nothing about the surrounding context suggests that the reference to Mr. Passantino's "coach[ing]" Ms. Hutchinson "to lie" is facetious or sarcastic. It presents neutrally, nestled between a statement of opinion and a statement of fact. Mr. Weissmann contends that because the challenged statement follows a statement of opinion, it must also be an opinion, especially because it comes in the form of a parenthetical. ECF No. 15, at 10. Mr. Passantino takes the opposite view, arguing that the challenged statement must be a statement of fact because it is followed by a statement of fact. ECF No. 13, at 13-14. Given how short the full statement is, the court cannot divine much from the contested language's location to determine whether it is presented as a subjective thought or a verifiable fact.

Another consideration under this factor is whether the speaker pairs the statement with any "cautionary language" (e.g., "I think" or "some believe"). *Ollman*, 750 F.2d at 982-83. Such language can give a reader advance warning to "discount that which follows." *Id.* at 983 (quoting

14

*Burns v. McGraw-Hill Broad. Co.*, 659 P.2d 1351, 1360 (Colo. 1983)).  At the same time, the effect of cautionary language should not be overstated.  *See Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 64 (2d Cir. 1980) ("It would be destructive of the law of libel if a writer could escape liability . . . simply by using, explicitly or implicitly, the words 'I think.'").  Mr. Weissmann's post contains no cautionary language; accordingly, there is nothing to indicate that his characterization of Mr. Passantino's conduct is an opinion or a subjective view.  This factor thus leans ever so slightly in Mr. Passantino's favor but not in an appreciable way.

### d. Broader social context into which the statement fits

The fourth and final *Ollman* factor evaluates the broader social context beyond the statement and its immediate surroundings.  *Ollman*, 750 F.2d at 983.  On this factor, the parties mainly dispute the effect of X as an internet forum and Mr. Weissmann's status as a "political pundit."  ECF No. 7-1, at 22-26; ECF No. 13, at 15-18.

Starting with X, the statement's backdrop, Mr. Weissmann asserts that it is generally considered an "informal" and "freewheeling" internet forum.  ECF No. 7-1, at 23 (quoting *Ganske v. Mensch*, 480 F. Supp. 3d 542, 553 (S.D.N.Y. 2020)).  Indeed, the Supreme Court has recognized that individuals use "social media . . . to engage in a wide array of protected First Amendment activity on topics 'as diverse as human thought.'"  *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (quoting *Reno v. Am. C. L. Union*, 521 U.S. 844, 870 (1997)).  As a result, some courts have held that "the fact that Defendant's allegedly defamatory statement . . . appeared on Twitter conveys a strong signal to a reasonable reader that [it] was Defendant's opinion."  *Ganske*, 480 F. Supp. 3d at 553.

While Mr. Weissmann is correct that X is seen by many as a free market for the exchange of subjective ideas, its use is not always one-sided.  Journalists and reporters use X to post news

15

alerts and factual content. *See Boulger v. Woods*, 917 F.3d 471, 482 (6th Cir. 2019) ("[T]he Twitter account of an online news source, such as the *New York Times*, is not meaningfully distinguishable from a hard copy news story. Consequently, it is clear that Twitter can be used to disseminate both factual accounts and assertions, as well as commentary and opinion."). Additionally, public health organizations and law enforcement departments use X to notify communities about ongoing emergencies. *See Price v. County of Los Angeles*, 504 F. Supp. 3d 1099, 1103 (C.D. Cal. 2020) (noting that Los Angeles County used its official Twitter account to "provid[e] information about curfew"). As one court observed:

> Many established news reporting outlets maintain Twitter accounts for the very purpose of reporting the news. An individual Twitter user may use his or her account to bring attention to particular facts and news stories; another, to share personal opinions about those new stories; another, to engage in political satire; another, to post personal anecdotes; and so on. Others may engage in a combination of these activities. As a result, a reader cannot tell anything about whether a particular Twitter account is likely to contain reporting on facts, versus personal opinion or rhetorical questions, from the mere fact that the author uses . . . Twitter as his or her preferred communication medium.

*Boulger v. Woods*, 306 F. Supp. 3d 985, 1003 (S.D. Ohio 2018), *aff'd*, 917 F.3d 471 (6th Cir. 2019).

Accordingly, inferring that Mr. Weissmann's statement was an opinion based solely on his use of the X platform risks overlooking "society's expectations of journalistic conduct on [X]." *See Fairbanks v. Roller*, 314 F. Supp. 3d 85, 91 (D.D.C. 2018) (expressing doubt over the defendant's claim that "the social conventions surrounding political disagreements and off-the-cuff statements on Twitter ma[k]e readers unlikely to interpret her statement as factual"). That is especially so when Mr. Weismann is a public figure connected to a news organization and not a private user. *See* ECF No. 1 ¶ 1.

This leads to Mr. Weissmann's status as a "political pundit." *See id.* Both parties characterize him as such, but they have vastly different views about what that means. *Compare*

ECF No. 7-1, at 23 (describing Mr. Weissmann as "a well-known 'political pundit' and commentator on a national television network and elsewhere"), *with* ECF No. 1 ¶ 1 (describing Mr. Weissmann as a "partisan political pundit"). Mr. Passantino asserts that Mr. Weissmann's career as a former prosecutor, his twenty-plus years of experience in the Department of Justice, and his record as an accomplished author of a book about federal prosecutions make his audience more likely to view his statements as facts. ECF No. 13, at 16-17. And while Mr. Weissmann currently serves as a political commentator on MSNBC, Mr. Passantino argues that that should not shield his comments from liability. ECF No. 13, at 16-17.

Mr. Passantino is correct that "there is no blanket immunity for statements that are 'political' in nature . . . [because] the fact that statements were made in a political context does not indiscriminately immunize every statement contained therein." *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 57 (D.D.C. 2021) (internal quotation marks omitted) (quoting *Weyrich*, 235 F.3d at 626). Individuals who immerse themselves in political commentary are still capable of defaming others with verifiably false assertions. And, presumably, Mr. Weissmann does not limit his social media activity strictly to offering opinions. After all, at least one-third of the social media post in question was an expression of objective fact. Clearly, then, Mr. Weissmann's audience of followers can expect him to present *some* statements of fact.

At the same time, Mr. Weissmann is correct that reasonable readers know to expect subjective analysis from commentators. As a political pundit (rather than, say, a news anchor), his statements possess a general air of opinion rather than fact. "Reasonable consumers of political news and commentary understand that spokespeople are frequently (and often accurately) accused of putting a spin or gloss on the facts or taking an unnecessarily hostile stance toward the media or others." *Bauman*, 377 F. Supp. 3d at 13. And numerous courts have held that the average

17

reader, viewer, or listener tempers his or her expectations of hearing factual reporting in the world of punditry. *See, e.g.*, *Farah*, 736 F.3d at 540 ("Any reasonable reader of political blog commentary knows that it often contains conjecture and strong language, particularly where the discussion concerns . . . a polarizing topic[.]" (citation omitted)); *Herring Networks, Inc. v. Maddow*, 8 F.4th 1148, 1157 (9th Cir. 2021) (concluding that "the broad context of [Rachel] Maddow's show makes it more likely that her audiences will 'expect her to use subjective language that comports with her political opinions.'" (quoting *Herring Networks, Inc. v. Maddow*, 445 F. Supp. 3d 1042, 1050 (S.D. Cal. 2020))); *Ollman*, 750 F.2d at 984 ("In short, it is well understood that editorial writers and commentators frequently 'resort to the type of caustic bombast traditionally used in editorial writing to stimulate public reaction.'" (quoting *Nat'l Rifle Ass'n v. Dayton Newspapers*, *Inc.*, 555 F. Supp. 1299, 1309 (S.D. Ohio 1983))).

On balance, the fourth factor weighs in Mr. Weissmann's favor. But even so, the court concludes that the overall analysis of the *Ollman* factors suggests that his statement was not a subjective opinion.

### B.   Count II: Injurious Falsehood

In order to plead injurious falsehood, a plaintiff must allege (1) that the defendant "made an unprivileged publication of false statements concerning [the plaintiff]," (2) that the defendant's publication "was made with knowledge or reckless disregard of the falsity of the statements," and (3) "special damages." *3M Co. v. Boulter*, 842 F. Supp. 2d 85, 118 (D.D.C. 2012). Mr. Passantino concedes that he must plead special damages in order to survive a motion to dismiss, but asserts that he has satisfied this element. ECF No. 13, at 22-23.

Special damages are subject to a heightened pleading standard under Federal Rule of Civil Procedure 9(g). *Browning v. Clinton*, 292 F.3d 235, 245 (D.C. Cir. 2002). The plaintiff must

"specifically state[]" the amount of damages "with particularity" and "specify facts showing that such special damages were the natural and direct result of the defendant's conduct." *Id.* (quoting *Fowler v. Curtis Publ'g Co.*, 182 F.2d 377, 379 (D.C. Cir. 1950)) (internal quotation marks omitted). A "boilerplate recitation, unaccompanied by any factual detail," is plainly insufficient. *Smith v. Clinton*, 886 F.3d 122, 128 (D.C. Cir. 2018) (rejecting the plaintiffs' assertion that "[a]s a direct and proximate result of [the defendant]'s statements, [the plaintiffs] have suffered pecuniary damage, as well as injury to reputation, impairment to standing in their community, personal humiliation, pain and suffering, and emotional distress" (first alteration in original)).

Here, Mr. Passantino asserts that he "suffered direct pecuniary losses as a result of Defendant's accusation, including costs associated with lost business opportunities and money spent to defend his own reputation, in excess of $75,000." ECF No. 1 ¶ 37. This mirrors the rote language that was rejected in *Smith*, and it thus falls short of the heightened standard under Rule 9(g). Accordingly, the court will dismiss Count II.

## V.   Conclusion

For the foregoing reasons, it is hereby **ORDERED** that Defendant's Motion to Dismiss, ECF No. 7, is **GRANTED** in part and **DENIED** in part, and Count II is dismissed. It is further **ORDERED** that Defendant shall file an answer to Count I on or before October 15, 2024. Fed. R. Civ. P. 12(a)(4)(A).

                          **SO ORDERED.**

                          /s/ Loren L. AliKhan
                          LOREN L. ALIKHAN
                          United States District Judge

Date:   September 30, 2024