**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STEFAN PASSANTINO,

                    *Plaintiff*,

      v.

ANDREW WEISSMANN,

                    *Defendant*.

Case No.  1:23–cv–2780–LLA

**DEFENDANT ANDREW WEISSMANN'S
MEMORANDUM IN SUPPORT OF MOTION FOR JUDGMENT ON THE PLEADINGS**

**TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

RELEVANT BACKGROUND ..................................................................................... 4

    A.   The Court Already Has Or Can Take Judicial Notice Of The Materials Cited In This Motion. ....................................................................................................................... 4

    B.   The September 14 Congressional Testimony—Made Public Nearly A Year Before The Tweet—Detailed Mr. Passantino's Legal Advice To Ms. Hutchinson................................... 5

    C.   Ms. Hutchinson Told Mr. Passantino That She Had "Lied" to Congress After Following His Advice. .................................................................................................................. 10

    D.   Ms. Hutchinson Dismissed Mr. Passantino In June 2022 And, With New Counsel, Provided Substantive Testimony to Congress. ..................................................................... 13

    E.   The December 19 Hearing And Contemporaneous Release Of Ms. Hutchinson's Testimony Generated Wide Criticism Of Mr. Passantino's "Coaching" Her To "Lie." ...... 15

    F.   Mr. Weissmann Published The Tweet Nine Months After The Public Release Of Ms. Hutchinson's Testimony. .............................................................................................. 20

    G.   Mr. Passantino's Lawsuit Relies On And Does Not Challenge The Truth Of Ms. Hutchinson's Testimony At Issue Here. ............................................................................ 20

    H.   On October 30, 2024, The Court Entered The MTD Order, Which Defined The "Sting" Of The Tweet. ............................................................................................................... 22

ARGUMENT ............................................................................................................... 24

   I.   MR. PASSANTINO'S CLAIM FOR DEFAMATION FAILS BECAUSE IT IS SUBSTANTIALLY TRUE AS A MATTER OF LAW THAT HE "COACHED" MS. HUTCHINSON "TO LIE." ...................................................................................... 24

   II.   SEPARATELY AND INDEPENDENTLY, THE COMPLAINT REQUIRES DISMISSAL BECAUSE IT FAILS TO ADEQUATELY PLEAD FAULT. ...................... 28

    A.   The Complaint Does Not Plead Facts Demonstrating Negligence. ............................. 29

    B.   The Complaint Does Not Plead Facts Demonstrating Actual Malice. ........................ 30

CONCLUSION ............................................................................................................. 34

# TABLE OF AUTHORITIES

**CASES**[*]

*\* Armstrong v. Thompson*, 80 A.3d 177, 183–85 (D.C. 2013)................................. 24, 28

*\* Arpaio v. Zucker*, 414 F. Supp. 3d 84 (D.D.C. 2019) ................................................. 34

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ........................................................................ 23

*Baumann v. District of Columbia*, 744 F. Supp. 2d 216 (D.D.C. 2010)........................ 23

*Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216 (D.D.C. 2004) ............................ 24, 27

*Cannon v. District of Columbia*, 717 F.3d 200 (D.C. Cir. 2013) .................................... 5

*Carpenter v. King*, 792 F. Supp. 2d 29 (D.D.C. 2011), *aff'd,* 473 F. App'x 4 (D.C. Cir. 2012). 25, 27, 30

*Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29 (D.C. Cir. 1990)........................ 30

*\* Couch v. Verizon Commun., Inc.*, 2021 WL 4476698 (D.D.C. Sept. 30, 2021), *aff'd,* 105 F.4th 425 (D.C. Cir. 2024) ....................................................................... 32, 33, 34

*Doe 2 v. Trump*, 319 F. Supp. 3d 539 (D.D.C. 2018)............................................. 5, 33

*Econ. Rsch. Servs., Inc. v. Resolution Econs., LLC*, 208 F. Supp. 3d 219 (D.D.C. 2016) ........... 24

*Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36 (D.D.C. 2022) ............................... 25, 27

*\* Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974) ............................................... 31, 32

*Hall v. District of Columbia*, 867 F.3d 138 (D.C. Cir. 2017)......................................... 5

*Harris v. Amalgamated Transit Union Loc. 689*, 825 F. Supp. 2d 82 (D.D.C. 2011)................. 24

*Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78 (D.D.C. 2022) ........................... 33

*Hourani v. Mirtchev.* 796 F.3d 1 (D.C. Cir. 2015) ....................................................... 30

---

[*] Cases upon which Defendant chiefly relies are marked with an asterisk.

*Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017) ............................................................................................... 5

*Jones v. U–Haul Co. of D.C.*, 169 F. App'x 590 (D.C. Cir. 2005) ............................... 29

*Kaempe v. Myers*, 367 F.3d 958 (D.C. Cir. 2004) ....................................................... 5

*Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446 (D.C. Cir. 2018)................. 4

*Kendrick v. Fox Television*, 659 A.2d 814 (D.C. 1995) ....................................... 27, 29

*M&C Saatchi PR LLP v. Beer Frost, Inc.*, No. 16 CIV. 8866 (KPF), 2019 WL 2717199.......... 27

*Margolies v. Rudolph*, No. 21–CV–2447–SJB, 2022 WL 2062460 (E.D.N.Y. June 6, 2022)..... 28

* *Mason v. Am. Prospect, Inc.*, 2024 WL 4345855 ........................................ 24, 25, 26

*Medcalf v. Walsh*, 938 F. Supp. 2d 478 (S.D.N.Y. 2013)............................................... 29

*Mirbaha v. Pompeo*, 513 F. Supp. 3d 179 (D.D.C. 2021) ............................................. 5

*Myers v. D.C. Hous. Auth.*, No. 1:20–CV–00700–APM, 2021 WL 1167032, (D.D.C. Mar. 26, 2021) ................................................................................................... 28

*Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263 (D.D.C. 2011)...................................... 24

*New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) ................................................ 32

*Newman v. Howard U. Sch. of L.*, 715 F. Supp. 3d 86 (D.D.C. 2024) ......................... 26

*Rollins v. Wackenhut Servs.*, 703 F.3d 122 (D.C. Cir. 2012) .................................... 23

*Rollins v. Wackenhut Servs.*, 802 F. Supp. 2d 111 (D.D.C. 2011) ............................ 23

*Rosen v. Am. Israel Pub. Affs. Comm.*, 41 A.3d 1250 (D.C. 2012) ............................ 23

*Sai v. Transportation Sec. Admin.*, 326 F.R.D. 31 (D.D.C. 2018)................................. 27

*Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128 (D.D.C. 2009)................................... 23

*Tah v. Glob. Witness Publ'g, Inc.*, 991 F.3d 231 (D.C. Cir. 2021)................................ 32

* *Tannerite Sports, LLC v. NBCUniversal News Grp.*, 864 F.3d 236 (2d Cir. 2017) ........... 25, 27

*Tavoulareas v. Piro,* 817 F.2d 762 (D.C. Cir. 1987) ................................................... 34

\* *Waldbaum v. Fairchild Publ., Inc.*, 627 F.2d 1287 (D.C. Cir. 1980) ........................... 30, 31, 32

*White v. Fraternal Order of Police,* 909 F.2d 512 (D.C. Cir. 1990) ............................ 25

## <u>INTRODUCTION</u>

Plaintiff Stefan Passantino has sued Defendant Andrew Weissmann for defamation based on a September 15, 2023 tweet (the "Tweet") stating that Cassidy Hutchinson's prior lawyer "coached" her to lie to the United States House of Representatives' Select Committee to Investigate the January 6th Attack on the United States Capitol (the "Select Committee"). ECF No. 1 ("Compl." or "Complaint"). Mr. Passantino's defamation claim (which is the only one remaining) suffers from at least two fatal flaws that require dismissal pursuant to Rule 12(c) of the Federal Rules of Civil Procedure ("Rule" or "Rules"). *See* ECF No. 17 ("MTD Order") (dismissing Plaintiff's other claim for injurious falsehood).

*First*, Mr. Passantino's lawsuit cannot stand as a matter of law because there would be no different effect on a reader between the pleaded truth—that he instructed Ms. Hutchinson to testify that she did not recall certain events irrespective of whether she did—and the "sting" of the Tweet. In its Order denying Mr. Weissmann's motion to dismiss as to the defamation claim, the Court held the "sting" of the Tweet to be that "Mr. Passantino had committed a specific act—encouraging or preparing a specific witness to make false statements." Mr. Passantino's Complaint incorporates by reference transcripts of Ms. Hutchinson's transcribed interviews, including her testimony that Mr. Passantino advised her that her interactions with the Select Committee should focus on protecting President Donald Trump and not recounting information the Select Committee can obtain from others. Ms. Hutchinson testified under penalty of law that Mr. Passantino told her that "***Your go–to, Cass, is 'I don't recall*'**" even in response to "certain questions that I ***would recall***" because the Select Committee "***doesn't know what you can and can't recall, so we want to be able to use that as much as we can***."

The Complaint does not allege that any specific material fact in Ms. Hutchinson's testimony about Mr. Passantino's legal advice was untruthful—to the contrary, it expressly relies

on the truth of Ms. Hutchinson's testimony, specifically when she testified that he did not explicitly tell her to lie and that she was comfortable following his advice.  Mr. Passantino's Complaint maintains that because he did not instruct Ms. Hutchinson to lie, it must be false to claim that he "coached" her to lie.  The two are of course distinct.  Mr. Passantino ignores that Ms. Hutchinson, in the very testimony on which he relies for its truth, explained that while he never directly told her to lie, he "***sort of instructed me not to answer certain topics that I raised with him***" by counseling her that she could say she did not recall certain events because the Select Committee did not "***know what you can and can't recall***."

None of the allegations in the Complaint contest the other parts of Ms. Hutchinson's testimony about Mr. Passantino's advice either, including that he told her to protect the president, that she need not recount facts learned from others, and that "I don't recall" is the "best answer" even in response to questions regarding events about which she did have "insight" or about conversations she overheard because the "less you remember the better."  The incorporated transcripts reflect Ms. Hutchinson's reliance on that advice: she used some version of "I don't recall" more than 650 times during the three transcribed interviews when Mr. Passantino was her counsel.  There is no material difference between encouraging Ms. Hutchinson to make false statements (the "sting" of the Tweet) and these instructions (the "pleaded truth").

The conclusion that Ms. Hutchinson's testimony described quintessential coaching to be untruthful is confirmed by the way the Select Committee, the press, and legal associations all interpreted Mr. Passantino's advice, long before the Tweet.  In December 2022—nearly a year before the Tweet—the Select Committee publicly characterized Ms. Hutchinson's testimony as reflecting advice from Mr. Passantino that she "***could in certain circumstances tell the Committee that she didn't recall facts when she actually did recall them***."  The public release of her

testimony, also in December 2022, generated similar headlines and reporting:

- *"**Trump–Connected Lawyer Told Key Jan. 6 Witness to Lie to Committee**"*;

- "Hutchinson accuses her first lawyer, former Trump White House ethics counsel Stefan Passantino, of **coaching her to tell committee investigators during her interviews that she did not recall certain things**";

- A "former Trump White House lawyer named Stefan Passantino, who represented her early in the process, had **instructed her to feign a faulty memory**…";

- "Jan. 6 committee says a Trump–connected lawyer **advised Cassidy Hutchinson to mislead the committee** on what she knew";

- "…**her own lawyer** — a former ethics counsel in the Trump White House — **advised her against being fully forthcoming with lawmakers** and told her 'the less you remember, the better'";

- "Stefan Passantino, one of her attorneys who is associated with the Trump world, **pressured her to pretend she did not remember** in response to questioning"; and

- "The upshot of these and other such incidents to which Hutchinson testified in September is the unmistakable appearance of coordinated and carefully timed actions by multiple people **meant to keep Hutchinson from speaking honestly to the committee**."

And two associations of lawyers filed bar complaints against Mr. Passantino six months before the Tweet alleging that he violated ethical rules by coaching Ms. Hutchinson to mislead the Select Committee.  The Tweet, issued many months later, did no more than draw the same conclusion from Ms. Hutchinson's testimony, albeit without the use of Mr. Passantino's name.  Accordingly, the Tweet is substantially true and not actionable as a matter of law.  *Infra* Argument § I.

*Second*, the lawsuit independently warrants dismissal for failure to plead any facts demonstrating fault, which is a required element of defamation.  Whether negligence or actual malice is the applicable standard—which the Court can, but need not, decide to grant this Motion—the Complaint is insufficient.  It relies only on conclusory assertions, devoid of any facts, which cannot establish either type of fault as a matter of law.  Preventing plaintiffs like Mr. Passantino from filing lawsuits designed to chill speech is precisely why the law, rooted in the First

Amendment, demands pleading *facts* that demonstrate fault or from which fault can be sufficiently inferred.  The Complaint does not.  Mr. Passantino's attempt to plead fault by claiming "partisan animus" is legally deficient to meet the requisite standard.  Indeed, the Complaint and the materials it incorporates do not only fail to substantiate a claim of negligence or actual malice, they affirmatively demonstrate that anyone would (and Mr. Weissmann did) reasonably believe that Mr. Passantino coached Mr. Hutchinson to lie.  Accordingly, dismissal of the lawsuit is required. *Infra* Argument § II.

## **RELEVANT BACKGROUND**

### A.    **The Court Already Has Or Can Take Judicial Notice Of The Materials Cited In This Motion.**

The Court deemed it proper at the Rule 12 stage to consider the four transcripts of Ms. Hutchinson's interviews with the Select Committee on February 23, 2022, March 7, 2022, May 17, 2022, and September 14, 2022, which the Complaint "references, cites, and quotes" in its allegations.  MTD Order at 2 n.1 (citing Compl. ¶ 9–12, 9 nn.1–3, 16–17, 16 n.5, and 17 nn.6–7 to find transcripts "incorporated by reference into Complaint"); *see* Ex. 1 ("September 14 Interview"); Ex. 2 ("February 23 Interview"); Ex. 3 ("March 7 Interview"); Ex. 4 ("May 17 Interview").[1]  In its MTD Order, the Court also took judicial notice of the Select Committee's final public session on December 19, 2022 and the existence of various news articles reporting on Ms. Hutchinson's testimony.  *See* MTD Order at 5 n.3 ("The court may take judicial notice of congressional hearings and legislative materials.  *Kaspersky Lab, Inc. v. U.S. Dep't of Homeland Sec.*, 909 F.3d 446, 464 (D.C. Cir. 2018)."); *id*. at 3 & n.2 (taking judicial notice of three articles from June 28, 2022); *id*. at 5–6 (taking judicial notice of two articles published in December 2022,

---

[1] All references to "Ex." refer to exhibits attached to Ms. Governski's declaration, which also includes their full citations and URLs, where applicable.

including an CNN article titled "*Exclusive: Trump's former White House ethics lawyer told Cassidy Hutchinson to give misleading testimony to January 6 committee, sources say*"); *see* Ex. 5 ("December 19 Hearing") & Ex. 6 ("CNN Article").

In addition to relying on the documents the Court already properly considered in its MTD Order (Exs. 1–6), the following factual background derives from materials of which the Court can take judicial notice. *See* Ex. 7 ("June 20 Interview"); Ex. 8 ("June 28 Testimony"); Ex. 9 ("September 15 Interview"); Ex. 10 ("Executive Summary"); Exs. 11–17 (additional news articles from December 2022); Exs. 18 and 19 (bar complaints against Mr. Passantino regarding his representation of Ms. Hutchinson). The Court's reliance on these sources is consistent with the MTD Order, Mr. Passantino's own filings, and supported by the law of this Circuit. *See* MTD Order at 3 n.2, 5 (judicial notice of "congressional hearings and legislative materials" and the "existence" of news articles); *Hall v. District of Columbia*, 867 F.3d 138, 152 (D.C. Cir. 2017) (when considering a Rule 12(c) motion, courts can consider the defendant's answer together with the complaint); *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) ("documents attached to or incorporated in the complaint, matters of which the court may take judicial notice, and matters of public record"); *see also Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013); *Mirbaha v. Pompeo*, 513 F. Supp. 3d 179, 185 & n.2 (D.D.C. 2021); *Johnson v. Comm'n on Presidential Debates*, 202 F. Supp. 3d 159, 167 (D.D.C. 2016), *aff'd*, 869 F.3d 976 (D.C. Cir. 2017).

**B.    The September 14 Congressional Testimony—Made Public Nearly A Year Before The Tweet—Detailed Mr. Passantino's Legal Advice To Ms. Hutchinson.**

Mr. Passantino was a senior lawyer during President Trump's first term in office and served as counsel to "several witnesses" before the Select Committee. Compl. 1, 7. He represented Ms. Hutchinson, who received a subpoena from the Select Committee in January 2022, for the

5

February 23, March 7, and May 17 Interviews, during which she testified under "penalty of law." Compl. ¶ 1, 7, 9; MTD Order at 2.  Ms. Hutchinson terminated her relationship with Mr. Passantino after the May 17 Interview and sat for a fourth interview on September 14, 2022 to discuss the legal advice she received from him.  *See* Compl. ¶ 16.[2]  All of the information in this section derives from the Complaint or the September 14 Interview.

During the September 14 Interview, Ms. Hutchinson testified that she received an unsolicited call from Mr. Passantino on February 7, 2022 informing her that he would serve as her attorney for purposes of responding to the Select Committee's subpoenas and at no cost to her. Ex. 1 at 21:3–22:14. When Ms. Hutchinson asked Mr. Passantino whether she should sign an engagement letter, he responded: "No, no, no.  We're not doing that" and "Don't worry.  *We have you taken care of*."  *Id.* at 21:16–17.[3]  And when she asked Mr. Passantino "where the funding for this" was coming from, he said that "*we're not telling people where funding is coming from right now*" and that she should not worry.  *Id.* at 21:23–22:4.

Ms. Hutchinson did worry, and recalled speaking with her mother a few days after later, saying: "*they will ruin my life, Mom, if I do anything that they don't want me to do*."  *Id.* at 32:7–17.  Ms. Hutchinson testified to thinking that "there were people in Trump world who were a little more worried about me being more forthcoming with the committee because of the access and insight that I had into what was happening throughout these months."  *Id.* at 13:1–5; *see also id.* at 19:23–20:5, 29:6–7.

---

[2] The transcripts of Ms. Hutchinson's testimony are "publicly" and "readily available," including on the Select Committee's own website.  Compl. 9 & nn.1–3 (citing and linking to the transcripts on the Select Committee website for the February 23, March 7, and May 17, and September 14 Interviews).  In the September 14 Interview, Ms. Hutchinson waived her attorney client privilege as to Mr. Passantino's prior representation "in order to share information with the committee that's relevant to [her] prior testimony." Ex. 1 at 5:7–13.

[3] Bolded and italicized material, throughout the brief, is emphasis added.

Mr. Passantino and Ms. Hutchinson met at his office in Washington, D.C. on February 16, 2022 to prepare for her first transcribed interview with the Select Committee (the February 22 Interview). *Id*. at 28:14–20, 29:4–7; Compl. ¶ 9. According to Ms. Hutchinson's testimony at the September 14 Interview, Mr. Passantino rejected her request to look at her calendar to refresh her recollection during their meeting on February 16, 2022, explaining: "Everyone is on the same page" to "downplay" her role and that "***the less you remember, the better***." Ex. 1 at 30:14–31:2; *see also id*. at 33:13–21.

She recalled explaining to Mr. Passantino that her role as an aide to Mark Meadows— President Trump's chief of staff at the time of January 6—afforded her "a lot of exposure to Members of Congress" and she would "overhear things," to which Mr. Passantino responded that "***if you had just overheard conversations that happened, you don't need to testify to that***." *Id*. at 33:22–34:8. For example, Ms. Hutchinson testified that she told Mr. Passantino about an "incident that happened in the Beast"—the moniker for the presidential limo—when the president was returning to the White House from hosting a rally at the Ellipse on January 6 (the "Ellipse Rally") that she learned about from the President's then–deputy chief of staff, Tony Ornato:

> "… I said something to Stefan like, 'Yeah, I had this conversation with Tony Ornato when we got back from the rally that day, and he told me that the President tried to wrap his hands around Bobby's neck and strangle him because he wouldn't take him to the Capitol.'
>
> And Stefan said, '***No, no, no, no, no***.' I remember he, like, sat back in his chair, and he's like, '***No, no, no, no, no. We don't want to go there. We don't want to talk about that***.'
>
> I said, again, trying to kind of appease what he was saying — no, I own that — I said, 'I agree, Stefan, but what if they do?'
>
> '***They have no way of knowing that. Nobody would ever***' — he said, '***Did you ever tell anybody about that?***'
>
> I said, "No, I've never told anybody about that."

And he said, 'Well, I don't think that Tony would have told anybody about that.' And he's like, '***That's an example of one of those stories that is just going to give the committee a headline***. It's not important to anything that actually happened on that day. It's a headline. It's a cool story for them. It will be on the news for a couple days. I don't want you to be the one to have to tell that story. Tony told it to you. **If anybody is going to tell it, it's Tony's responsibility to tell it.** *But just because he told you doesn't mean that you need to share that with them*.'

So then I remember asking him, 'Okay, ***well, what's the line that I draw here? Like, do I not ever say anything that I overheard, because I overheard a lot of things?***'

And he had said, '***Look, the goal with you is to get you in and out. Keep your answers short, sweet, and simple, seven words or less. The less the committee thinks you know, the better, the quicker it's going to go. It's going to be painless. And then you're going to be taken care of.*** You're going to be done. It's going to be off of your hands.'

So I said, 'Okay.'

And we dropped the limo incident at that point."

*Id*. at 34:12–35:20.

Ms. Hutchinson recounted that Mr. Passantino stressed that "'***I don't recall' is your answer***":

"…'***If you don't 100 percent recall something, even if you don't recall a date or somebody who may or may not have been in the room, that's an entirely fine answer, and we want you to use that response as much as you deem necessary***.'

I said, '***But, if I do recall something but not every little detail, Stefan, can I still say I don't recall?***'

***And he had said, 'Yes.'***

***And I said, 'But if I do remember things but not every little detail, and I say I don't recall, wouldn't I be perjuring myself?***'

And he had — ***Stefan had said something to the effect of, 'The committee doesn't know what you can and can't recall, so we want to be able to use that as much as we can unless you really, really remember something very clearly.*** And that's when you give a

> short, sweet response.   You don't want to get ahead of their
> questioning.  Let them ask the questions.  And you'll know."

*Id*. at 36:5–20.  Ms. Hutchinson testified that even where she told Mr. Passantino about events into

which she had "a lot of insight" (such as President Trump's "logistical movements" on January 6),

Mr. Passantino repeatedly instructed her that "'***I don't recall*** *is the best answer to any of that*"

and "***The less you remember, the better***."  *Id*. at 37:1–38:2; *see id.* at 48:12–15.

Ms. Hutchinson recounted how she told Mr. Passantino over breakfast the morning of the

first transcribed interview that she was "nervous" that the Select Committee was going to ask her

"***certain questions that I would recall***."  *Id*. at 49:16–18; 52:4–7.  She remembered Mr. Passantino

responding: "***Your go–to, Cass, is 'I don't recall***'" and the Selection Committee was "***talking to***

***so many people that, even if you were entirely forthcoming with them, they're going to have all***

***this by the end from someone else anyway***."  *Id*. at 49:16–23; 52:4–8.  He told her that she should

"***focus on protecting the President***" and getting "in and out" with the Select Committee that day.

*Id*. at 50:1–3.  Ms. Hutchinson said that Mr. Passantino reiterated that if she started using "I don't

recall" in the beginning of her testimony, "they're going to realize really quick that they have better

witnesses than you, and they're not going to ask you as complicated of questions as you're worried

about."   *Id*. at 52:9–11.   Ms. Hutchinson later characterized the advice she received as Mr.

Passantino in advance of the first interview:

> "… so now I've moved on from where ***he sort of instructed me not***
> ***to answer certain topics that I raised with him or to*** — Stefan never
> said — ***I want to make this clear to you: Stefan never told me to***
> ***lie.  He specifically told me, 'I don't want you to perjure yourself,***
> ***but 'I don't recall' isn't perjury.  They don't know what you can***
> ***and can't recall.***'
>
> So, even as we had gone through, you know, the Beast story or the
> pardon situations and the magnetometers, stories like that, I just
> want to make sure I'm not making it sound like — now, I have a
> different perspective now after securing my lovely legal team.  **But**
> **I just want to make sure that I make it clear that he didn't say,**

'I want you to lie and say that you don't recall on these things
when I know you recall.'  It was a, 'You're not lying if you say
you don't recall.'

So I just want — I know it's little, but I just want it to be clear,
because I — he didn't tell me to lie.  He told me not to lie.  But
'I don't recall' is not a lie in Stefan's --"

*Id*. at 42:9–21; Compl. ¶ 17.

### C.    Ms. Hutchinson Told Mr. Passantino That She Had "Lied" to Congress After Following His Advice.

During the first three transcribed interviews—the ones for which Mr. Passantino

represented her—Ms. Hutchinson used an iteration of "I don't recall" more than 650 times:

| Testimony | February 23 Interview | March 7, 2022 Interview | May 17, 2022 Interview |
|---|---|---|---|
| "I don't know" | 81 | 59 | 86 |
| "I don't recall" | 72 | 94 | 18 |
| "I'm not sure" | 34 | 51 | 25 |
| "I don't remember" | 22 | 44 | 43 |
| "I can't recall" | 11 | 4 | 0 |
| "Not that I can recall" | 8 | 3 | 5 |

Exs. 2–4.[4]  During the February 23 Interview, for example, Ms. Hutchinson testified that she did

not "recall" whether President Trump knew that attendees at the Ellipse Rally had weapons.  Ex.

2 at 89:19–9:19.  When pressed about what she learned happened in the Beast after the Ellipse

Rally, Ms. Hutchinson said she understood the President "accepted" that he would not be going to

the Capitol and that "to my knowledge, there was nothing that happened in the motorcade from

---

[4] All of the information in this section derives from the Complaint and the four transcripts it
incorporates (the February 21, March 7, May 17, and September 14 Interviews). The above chart
group phrases where appropriate.  *See also* HUTCHINSON, ENOUGH at 277–78 ("I mostly followed
Stefan's instructions.  For the record, I said 'I don't know' eighty-five times, 'I don't recall'
seventy times, 'I'm not sure' thirty-nine times, 'I don't remember twenty-one times, 'I can't recall'
twelve times, 'not that I can recall' eight times, 'I'm trying to recall' twice, and 'I don't specifically
recall' twice; and I used a dozen other phrases denying knowledge that I possessed.")

the Ellipse back up to the White House that was out of touch or a new development from the

conversations that had ensued in the days prior." *Id*. at 106:6–13.

Later, with new counsel in her September 14 Interview, Ms. Hutchinson testified about

discussing the Beast–related testimony with Mr. Passantino during a break at her first transcribed

interview:

> "… I looked at Stefan, and I said, 'Stefan, I am fucked.' And he was
> like, 'Don't freak out. You're fine.' ***I said, 'No, Stefan, I'm fucked.
> I just lied.'*** And he said, 'You didn't lie.'

> I said, 'No, Stefan. Do you know how many times they just asked
> me that question? ***I just lied***.' ***And he said, 'They don't know what
> you know, Cassidy. They don't know that you can recall some of
> these things. So you saying "I don't recall" is an entirely
> acceptable response to this***.'

> He's like, 'They're prodding. They want there to be something.
> ***They don't know that there is something.*** We're not going to give
> them anything because this is not important. You're doing great.
> You're doing fine. ***You're doing exactly what you should be
> doing***.'"

Ex. 1 at 55:13–24. Ms. Hutchinson testified that she kept telling Mr. Passantino, "***I lied. I lied, I

lied, I lied***," because she "never would've covered that story up, because I knew – ***I knew what I

was told***" but she felt like she could not "be forthcoming when I wanted to be." *Id*. at 56:5–9. Ms.

Hutchinson recalled that Mr. Passantino assured her that she was "fine," *id.* at 56:17, and "***doing

the right thing***," *id.* at 56:21, because "***They don't know you know a lot. You think they know,

because you do***." *Id*. at 56:19–20. She explained to the Select Committee that she had told Mr.

Passantino during another break from the February 23 Interview that she knew "a decent amount"

about potential speakers at the Ellipse Rally because Mr. Meadows (i.e. "Mark") "was fairly

involved in planning," but that Mr. Passantino advised her that just "***because you knew what Mark

was doing doesn't mean that you have to answer these questions***." *Id*. at 41:10–14.

In her September 14 Interview, Ms. Hutchinson told the Select Committee that she kept thinking throughout the February 23 Interview: "***This is wrong. I don't like who I'm being right now. I don't like the way that I'm handling this right now***." *Id.* at 64:25–65:4. But Ms. Hutchinson was "constantly thinking" about and "trying so hard to be loyal" President Trump, Mr. Meadows, and the Trump White House "***because I felt like I had to be*** with Mr. Passantino *"sitting next to me.*" *Id.* at 64:19–21. Even though Mr. Passantino "had never explicitly" told her there would be "repercussions" if she did not follow his advice," *id.* at 64:21–22, he "had planted the seeds of, 'we know you're loyal, we know you're going to do the right thing, we know you're Team Trump, like, we want to take care of you.'" *Id.* at 52:20–22. Ms. Hutchinson testified that Mr. Passantino told her that "***We're all really proud of you***" after her first interview when she confided in him that she felt "***really guilty and bad about not answering some questions***." *Id.* at 65:6–10.

At the end of the February 23 Interview, the Select Committee scheduled a second transcribed interview with Ms. Hutchinson for March 7, 2022. Ex. 2 at 200:6–16. Ms. Hutchinson later told the Select Committee that she did not recall receiving "any separate counsel and legal advice" in advance of the second interview and followed Mr. Passantino's earlier advice to say "I don't recall" as much as she could. Ex. 1 at 72:13–16, 52:7–8; *see generally* Ex. 3 (Ms. Hutchinson saying "I don't recall" 59 times). Reflecting on the first two transcribed interviews, Ms. Hutchinson felt that she "became someone" she "never thought" she "would become," Ex. 1 at 77:9–15, and expressed her concerns to Mr. Passantino. *Id.* at 81:11–16. He responded that "'***the President was not mad about anything***'" he read in the transcripts of her interviews, *id.*, at 82:4–5, and reminded her that "'***we want to make sure that like whatever he's reading isn't going to put you in a bad situation***.'" *Id.* at 82:11–12.

12

Eventually, Ms. Hutchinson asked a friend to "back channel" to the Select Committee that there were "a few things that I want to talk about" and "expand on[.]"  *Id*. at 85:18–25.  Ms. Hutchinson recalled Mr. Passantino advising her before the May 17 Interview that the Select Committee would be less interested in her testimony if she answered in sentences no more than four words.  *Id*. at 90:6-9.  While continuing to assert that she did not recall certain events, Ms. Hutchinson did tell the Select Committee about a "conversation in the West Wing" along the lines of "Mike Pence deserves to be f***ing hung."  Ex. 4, 6:15–20.  Ms. Hutchinson "could feel" Mr. Passantino looking at her and "he would say something along the lines of, 'How do they have all of this? How do they know that you know all of this?'"  Ex. 1 at 96:21–23, 97:7–9.  Ms. Hutchinson recalled her mother asking if Ms. Hutchison was "happy" with Mr. Passantino's representation, and remembered "laughing, saying 'No, I'm F'd.'"  *Id*. at 32:8–14.

### D.     Ms. Hutchinson Dismissed Mr. Passantino In June 2022 And, With New Counsel, Provided Substantive Testimony to Congress.

By the beginning of June 2022, it appeared that the Select Committee would ask Ms. Hutchinson to testify publicly.  *Id*. at 107:5–109:4.  Ms. Hutchinson told the Select Committee during her September 14 Interview that Mr. Passantino had advised her in June 2022 that her "best move" was "refusing to cooperate," *id*. at 107:17–18, despite the risk that she might be held in contempt.  *Id*. at 108:12–23.  At that point, he advised her that "Trump world" was paying for her legal fees, *id*. at 87:17-20, 88:8-14, which made it "really clear" to her that Mr. Passantino "was invested in others' interests more than mine the entire time."  *Id.* at 101:16–23.  Ms. Hutchinson decided not to continue following Mr. Passantino's "bad legal advice" and terminated their attorney-client relationship in June 2022 because her "character" and "integrity mean more to me than anything."  *Id*. at 109:22–23.  Ms. Hutchinson retained new counsel, including former

longtime Department of Justice ("DOJ") attorney Jody Hunt. *See id*. at 110:6–9; Compl. ¶ 16; MTD Order at 3.

Ms. Hutchinson sat for a fourth transcribed interview on June 20, 2022, in person with Mr. Hunt beside her, and provided robust testimony about the events leading up to and on January 6. Ex. 7. For example, she testified that Mr. Ornato confirmed to her the morning of January 6 that he had told President Trump that people gathering for the Ellipse Rally had "knives, guns in the form of pistols and rifles, bear spray, body armor, spears, flagpoles," *Id*. at 13:25–14:6, and that the President was "fired up," *id*. at 12:15–16, about wanting "the mags taken away to get everybody in." *Id*. at 11:21–22. Ms. Hutchinson testified that she overhead President Trump backstage at the Ellipse Rally saying "something to the effect of, 'You know, I don't F'ing care that they have weapons. They're not here to hurt me. Take the F'ing mags away. Let my people in. They can march to the Capitol from here. Let the people in. Take the F'ing mags away.'" *Id*. at 11:23–12:2. At the end of the June 20 Interview, Ms. Hutchinson addressed questions relating to Mr. Passantino's previous representation, including that she fired him because she did not "want Trump World financing or money to determine or dictate how I was going to handle this moving forward." *Id*. at 156:14–16. She explained that she "just had this bad gut instinct" the majority of the time Mr. Passantino has served as her counsel and felt "like I had sold myself" and "boxed" herself in. *Id*. at 157:2–8.

On June 28, 2022, Ms. Hutchinson testified as the sole live witness at a publicly televised Select Committee hearing. *See* Ex. 8. Ms. Hutchinson confirmed not only that Mr. Ornato had told her that President Trump knew in advance about weapons at the Ellipse Rally but also "what happened in the Beast," *id.* at 15, when Mr. Trump and his head of security, Bobby Engel, were heading back to the White House:

> "… once the President had gotten into the vehicle with Bobby, he thought that they were going up to the Capitol, and when Bobby had relayed to him 'we are not, we don't have the assets to do it, it is not secure, we are going back to the West Wing,' the President had very strong, a very angry response to that.
>
> Tony described him as being irate. The President said something to the effect of: 'I am the F'ing President. Take me up to the Capitol now.'
>
> To which Bobby responded: 'Sir, we have to go back to the West Wing.'
>
> The President reached up toward the front of the vehicle to grab at the steering wheel. Mr. Engel grabbed his arm and said: 'Sir, you need to take your hand off the steering wheel. We are going back to the West Wing.  We are not going to the Capitol.'
>
> Mr. Trump then used his free hand to lunge toward Bobby Engel. When Mr. Ornato had recounted the story to me, he had motioned toward his clavicles."

*Id*. at 16.  Ms. Hutchinson, while commenting on her "sharp memory," testified about President Trump's endorsement of the rioters' "Hang Mike Pence" chants and confirmed that Mr. Meadows conveyed to her that President Trump thought "'Mike deserves it.'" Ex. 7 at 27:7-28:7.  Ms. Hutchinson's live televised testimony in June 2022 generated "substantial media coverage," MTD Order at 3, with media outlets reporting on her "bombshell," "explosive" testimony and declaring her "the most powerful witness yet" in the Select Committee's investigation.  *See* Ex. 11; Ex. 13, Maggie Haberman, *Cassidy Hutchinson Stuns With Testimony About Trump on Jan. 6*, N.Y. Times (June 28, 2022), www.nytimes.com/2022/06/28/us/cassidy-hutchinson-trump.html.

> **E.    The December 19 Hearing And Contemporaneous Release Of Ms. Hutchinson's Testimony Generated Wide Criticism Of Mr. Passantino's "Coaching" Her To "Lie."**

During its live, televised December 19 Hearing, the Select Committee explicitly stated that

"***one lawyer told a witness the witness could in certain circumstances tell the Committee that she didn't recall facts when she actually did recall them***." Ex. 5 at 8; *see also* MTD Order at 5

The Select Committee at the same time released its Executive Summary, which included—under

a heading titled "EFFORTS TO AVOID TESTIFYING, EVIDENCE OF OBSTRUCTION, AND

ASSESSMENTS OF WITNESS CREDIBILITY"— the following bullets summarizing

"testimony from a witness about her decision to terminate a lawyer who was receiving payments

for the representation from a group allied with President Trump":

- "***The lawyer had advised the witness that the witness could, in certain circumstances, tell the Committee that she did not recall facts when she actually did recall them***";

- "During a break in the Select Committee's interview, the witness expressed concerns to her lawyer that an aspect of her testimony was not truthful.  ***The lawyer did not advise her to clarify the specific testimony that the witness believed was not complete and accurate, and instead conveyed that, 'They don't know what you know, [witness]. They don't know that you can recall some of these things.  So you saying 'I don't recall' is an entirely acceptable response to this.***'";

- "***The lawyer instructed the client about a particular issue that would cast a bad light on President Trump: 'No, no, no, no, no.  We don't want to go there.  We don't want to talk about that***.'"

Ex. 10 at 118, 121–122 (emphasis added); *see also* Ex. 1 at 52:4–8, 54:5–55:24, 34:22–24, 100:20–

25, 21:23–22:4, 95:9–96:2, 82:8–12; Ex. 7 at 154:11–156:4; Ex. 8 at 27.

The next morning, national news media identified Mr. Passantino by name, beginning with

the CNN Article (of which the Court already took judicial notice) with its headline, "***Exclusive:***

***Trump's former White House ethics lawyer told Cassidy Hutchinson to give misleading***

***testimony to January 6 committee, sources say***."  Ex. 6; MTD Order at 5.  The CNN Article

stated:

"The January 6 committee made a startling allegation on Monday, claiming it had evidence that a Trump–backed attorney ***urged a key witness to mislead the committee about details they recalled***.

***Though the committee declined to identify the people, CNN has learned that Stefan Passantino, the top ethics attorney in the***

> *Trump White House, is the lawyer who allegedly advised his then–client, former White House aide Cassidy Hutchinson, to tell the committee that she did not recall details that she did, sources familiar with the committee's work tell CNN*."

Ex. 6 at 1. The CNN Article included a quotation from Select Committee member and House Representative Zoe Lofgren about Ms. Hutchinson: "***She was advised to say that she didn't recall something when she did. So that's pretty serious stuff***." *Id*. at 2. The same day, a Rolling Stone article led with the following headline: "***Trump-Connected Lawyer Told Key Jan. 6 Witness to Lie to Committee***: *Cassidy Hutchinson delivered damning testimony despite being advised Stefan Passantino, who was being paid by the former president's PAC*." Ex. 11 at 1 (emphasis added). A Business Insider article from the same day reported that the "Jan. 6 committee says ***a Trump-connected lawyer advised Cassidy Hutchinson to mislead the committee on what she knew, CNN reports***." Ex. 12 at 1.

The Select Committee released the transcripts of Ms. Hutchinson's transcribed interviews on December 22, 2022, which intensified the press reporting on Mr. Passantino's advice to Ms. Hutchinson:

- "In her testimony, ***Hutchinson accuses her first lawyer, former Trump White House ethics counsel Stefan Passantino, of coaching her to tell committee investigators during her interviews that she did not recall certain things***. She said he also discouraged her from jogging her memory or even bringing notes to her interviews that investigators could then collect." Ex. 13.

- "In extraordinary closed–door testimony made public Thursday, Hutchinson recounted how those in the former president's circle dangled job opportunities and financial assistance as she was cooperating with the committee investigating the Capitol riot and how ***her own lawyer — a former ethics counsel in the Trump White House — advised her against being fully forthcoming with lawmakers and told her 'the less you remember, the better*.'"** Ex. 14.

- "The transcripts seemed to add credence to the committee's suggestion that someone in Trump's sphere had attempted to

tamper with one of the committee's witnesses.  Hutchinson expressed that ***Stefan Passantino, one of her attorneys who is associated with the Trump world, pressured her to pretend she did not remember in response to questioning***, while offering her job opportunities." Ex. 15.

- "The upshot of these and other such incidents to which Hutchinson testified in September is the ***unmistakable appearance of coordinated and carefully timed actions by multiple people meant to keep Hutchinson from speaking honestly to the committee*** — what the law refers to, when proven, as a conspiracy." Ex. 16.

- "When the report and its accompanying materials were finally released, we learned that Hutchinson told the committee that ***a former Trump White House lawyer named Stefan Passantino, who represented her early in the process, had instructed her to feign a faulty*** memory and "focus on protecting the President." Ex. 17.

None of these outlets has published a retraction and the articles remain available online as of the date of this filing, and thus at the time of the Tweet.

In March 2023, two different organizations founded by lawyers—Lawyers Defending American Democracy ("LDAD") and The 65 Project—filed ethics complaints against Mr. Passantino.  Ex. 18 ("LDAD Complaint") & Ex. 19 ("65 Project Complaint") (together, the "Bar Complaints").[5]  The Bar Complaints publicly accused Mr. Passantino of violating the Rules of Professional Conduct and seeking to obstruct the Select Committee's investigation, including by "encouraging" Ms. Hutchinson "to give false testimony to Congress," Ex. 18 at 1, and "to not be forthcoming with the Select Committee."  Ex. 19 at 6.  The LDAD Complaint included the following description:

> "In meetings with Ms. Hutchinson in advance of her testimony, Mr. Passantino repeatedly assured her that it was permissible to respond **'I do not recall' to any question seeking information on**

---

[5] Among the more than 30 signatories of the LDAD Complaint include former presidents of the ABA (Martha W. Barnett) and National Association of Women Leaders (Deborah S. Froling), and multiple leaders of the DC Bar (such as Marc Fleischaker, Patrick McGlore, Marna S. Tucker, and Melvin White).

**conversations or situations to which she was only an observer**, or as to which she lacked a complete memory. **This advice was flatly incorrect.** It is bedrock law that, where an examiner asks a competent question seeking information about relevant facts and circumstances within the knowledge of the witness, including conversations that she witnessed, her obligation is to testify truthfully to the best of her memory. Mr. Passantino – indeed any competent attorney – understands this basic obligation.

*While the boundaries on lawyer 'coaching' may be uncertain in some circumstances, they are not uncertain here, for it is crystal clear that '[a]n attorney must respect the important ethical distinction between discussing testimony and seeking improperly to influence it.' Geders v. United States*, 425 U.S. 80, 90 n.3 (1976). *Thus, when Mr. Passantino counseled Ms. Hutchinson to* "respond in a way that avoid[ed] providing information, as, for example, by denying memory of the events under inquiry," *he led her into* "testimonial obduracy" *that was plainly improper*. *In re Weiss*, 703 F.2d 653, 662 (2d Cir. 1983). That Mr. Passantino also advised Ms. Hutchinson that she should testify truthfully highlights that he knew it, too. Nevertheless, in an attempt to end run this elemental standard, he sought to stretch her understanding of the boundaries of the truth. *The outcome was false testimony to the Committee that she did not recall events that she plainly remembered in detail – testimony that she immediately told Mr. Passantino she regretted*."

Ex. 18 at 12. The press reported on the Bar Complaints in real time.[6]

---

[6] *See, e.g.*, Charlie Savage, *Group Seeks Disbarment of a Trump-Aligned Lawyer for a Key Jan. 6 Witness*, N.Y. Times (Mar. 6, 2023), www.nytimes.com/2023/03/06/us/politics/trump-lawyer-ethics-jan-6.html; Nick Reynolds, *Trump Attorney Could Face Disbarment over Cassidy Hutchinson Testimony*, Newsweek (Mar. 6, 2023), www.newsweek.com/trump-attorney-could-face-disbarment-over-cassidy-hutchinson-testimony-1785869; Andrew Goudsward, *Group wants Trump-aligned lawyer investigated over Capitol riot testimony*, Reuters (Feb. 15, 2023), www.reuters.com/legal/legalindustry/group-wants-trump-aligned-lawyer-investigated-over-capitol-riot-testimony-2023-02-15/; Justin Wise, *Trump Lawyer Passantino Needs Georgia Bar Probe, Group Says*, Bloomberg Law (Feb. 16, 2023), www.news.bloomberglaw.com/business-and-practice/trump-lawyer-passantino-needs-georgia-bar-probe-group-says.

### F. Mr. Weissmann Published The Tweet Nine Months After The Public Release Of Ms. Hutchinson's Testimony.

Mr. Weissmann is a former career DOJ prosecutor and senior attorney in the Special Counsel Robert Mueller investigation, and a legal commentator on the cable network MSNOW (formerly known as MSNBC). *See* Compl. 1; ECF No. 19 ("Answer") at 2. On September 15, 2023, Mr. Weissmann published the Tweet, which focused on and named only Mr. Hunt and Ms. Hutchinson, but referred to plaintiff by his former position: "Hunt also is Cassidy Hutchinson's good lawyer. (Not the one who coached her to lie) And he is the guy who took notes of Trump saying, when Mueller was appointed, quoting him as saying 'I'm f….d.'" *See* Compl.¶ 1; Answer at 2, 10–11. Ms. Hutchinson published her book *Enough* 11 days later, on September 26, 2023, in which she repeated the above testimony about Plaintiff. *See* CASSIDY HUTCHINSON, ENOUGH 271–303 (2023).

### G. Mr. Passantino's Lawsuit Relies On And Does Not Challenge The Truth Of Ms. Hutchinson's Testimony At Issue Here.

On September 22, 2023, one week after the publication of the Tweet, Mr. Passantino filed this lawsuit. *See generally*, Compl. 1–21. At no point prior to filing the lawsuit did Mr. Passantino ask Mr. Weissmann to retract the Tweet or alert him to the suit, choosing instead to file the Complaint. In it, he claims he lost business as a result of the Tweet in the week between its publication and the filing of the lawsuit. *Id*. ¶ 21.

The Complaint makes the conclusory assertion that that the Tweet is an "insidious lie" because Mr. Passantino "never coached Ms. Hutchinson to lie" to the Select Committee. Compl. ¶ 1. But it does not allege what predicate facts are false. The Complaint does not challenge the truth of any of Ms. Hutchinson's testimony about the legal advice Ms. Passantino provided to her.

*See generally* Compl. ¶¶ 1–21.[7]   To the contrary, the Complaint relies heavily (and almost exclusively) on the truthfulness of the content of the "readily available transcripts" of Ms. Hutchinson's testimony, including by repeatedly citing from page 42 of the September 14 Interview (attached hereto as Ex. 1).   *See* Compl. ¶ 1 (Ms. Hutchinson "even testified, under penalty of law: 'I want to make this clear to you: Stefan [Passantino] never told me to lie. . . .He told me not to lie'" (brackets and ellipses in original)); *id.* ¶ 10 ("Any review of these readily available transcripts makes it obvious…"); *id*. ¶ 11  ("As was readily apparently to Defendant, and anyone else reading those publicly available transcripts…"); *id.* ¶ 16 ("On September 14, 2022, Ms. Hutchinson testified for a fourth time before the Select Committee…and she said, 'I want to make this clear to you: Stefan never told me to lie.'" (citing September 14 Interview at 42:11)); *id.* ¶ 17 ("Ms. Hutchinson continued, 'I just want to make sure that I make it clear that he didn't say, "I want you to lie and say that you don't recall on these things when I know you recall."' And she said again, 'he didn't tell me to lie.  He told me not to lie.'" (citing September 14 Interview (Ex. 1) at 42:17–18, 20–21)).  While repeatedly relying on parts from page 42 of the September 14 Interview (Ex. 1), the Complaint omits the immediately surrounding context of the testimony it cites, including that Mr. Passantino "***instructed***" Ms. Hutchinson "***not to answer certain topics that I raised with him***" based on his assurances that "***'I don't recall' isn't perjury. They don't know what you can and can't recall***."  *See* Ex. 1 42:9–21; Compl. ¶ 17. The Complaint implicitly concedes the truth of Ms. Hutchinson's testimony about his counsel by alleging that the advice he provided her was "fully consistent with her sole interests as expressed to him by Ms. Hutchinson."

---

[7] The Complaint also does not challenge any of Ms. Hutchinson's testimony relating to the nature of his engagement, including the lack of an engagement letter, the initial refusal to disclose who was paying for his legal services, or the eventual confirmation that "Trump world" was the source of funding.

Compl. ¶ 7. And it makes the anodyne point, equally consistent with coaching, that the "substance" of her testimony "was entirely her own, unfettered, and in response to the questions asked by the Select Committee." *Id*. ¶ 10.

With respect to the required pleading of Mr. Weissmann's state of mind at the time of the Tweet's publication, the Complaint pleads limited allegations relating to Mr. Weissmann's supposed state of mind when publishing the Tweet, again singling out only the part of Ms. Hutchinson's testimony on page 42 of the September 14 Interview about not being told directly to lie:

> "Given the publicly available transcripts of Ms. Hutchinson's testimony, Mr. Passantino's obvious cooperation with the Select Committee, and Ms. Hutchinson's statements that Mr. Passantino did not tell her to lie, and in fact told her to tell the truth and to cooperate, Defendant knew that his statement was false, or he recklessly disregarded its falsity, and therefore published the statement with actual malice. At the very least, Defendant should have known with ordinary care that his statement was false, and therefore published the statement negligently."

¶ 27. The Complaint includes the conclusory allegation that Mr. Weissmann "was aware" of Ms. Hutchinson's testimony on page 42 of the September 14 Interview, but "still chose to smear Mr. Passantino in advancement of his newfound career as partisan political pundit" and "because of partisan animus and Mr. Passantino's prior affiliation with President Trump." *Id.* ¶¶ 1, 20. The Complaint speculates that Mr. Weissmann was motivated to attack "Mr. Passantino as a means of distracting from and rehabilitating the contradictory and uncredible aspects of Ms. Hutchinson's testimony." *Id.* ¶ 20.

**H.    On October 30, 2024, The Court Entered The MTD Order, Which Defined The "Sting" Of The Tweet.**

On October 30, 2024, the Court granted Mr. Weissmann's motion to dismiss a claim of injurious falsehood and denied the motion to dismiss as to the defamation claim. *See* MTD Order.

The MTD Order on the defamation claim was based only on finding that the Tweet did not reflect "subjective opinion."[8]  The Court in its MTD Order explained that "Mr. Weissmann is free to raise any such defenses not barred by the Federal Rules," including "whether the content of Mr. Weissmann's post was substantially true." MTD Order at 10 n.4 (citation omitted).    Mr. Weissmann answered the Complaint on November 14, 2024, and raised, among others, the defenses of substantial truth and lack of malice.  Answer at 15–16.

## LEGAL STANDARD

"The standard for a motion for judgment under Rule 12(c) is essentially the same standard as a motion to dismiss under Rule 12(b)(6)." *Rollins v. Wackenhut Servs.*, 802 F. Supp. 2d 111, 116 (D.D.C. 2011) ("*Rollins I*"), *aff'd*, 703 F.3d 122 (D.C. Cir. 2012) ("*Rollins II*").  As with Rule 12(b)(6) motion, a complaint must, to survive a Rule 12(c) motion, "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Rollins II*, 703 F.3d at 129) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to plausibly state a claim.  *Iqbal*, 556 U.S. at 678.  The Court is not bound to accept legal conclusions. *Baumann v. District of Columbia*, 744 F. Supp. 2d 216, 222 (D.D.C. 2010).

---

[8] In the MTD Order, the Court explained: "Readers of a statement do not isolate and parse individual words into all of their possible connotations. Mr. Weissmann wrote that Mr. Passantino 'coached [a witness] to lie.' ECF No. 1 ¶ 18. In that string of text, read as a whole, the clear factual implication is that Mr. Passantino 'instruct[ed], direct[ed], or prompt[ed]' Ms. Hutchinson 'to lie' to the Select Committee. While it is true that general statements that someone is 'spreading lies' or 'is a liar' are not categorically actionable in defamation, *see Sinclair v. TubeSockTedD*, 596 F. Supp. 2d 128, 133 (D.D.C. 2009), Mr. Weissmann's post very directly claimed that Mr. Passantino had committed a specific act—encouraging or preparing a specific witness to make false statements. A reasonable reader is likely to take away a precise message from that representation. *See Rosen v. Am. Israel Pub. Affs. Comm.*, 41 A.3d 1250, 1258 (D.C. 2012) (considering whether the statement 'communicates [a] specific message about a discernable fact to an uninformed hearer')." MTD Order at 11.

When considering a Rule 12(c) motion, courts may consider "documents attached to or incorporated in the complaint, matters of which courts may take judicial notice, and documents appended to a motion to dismiss whose authenticity is not disputed, if they are referred to in the complaint and integral to a claim." *Econ. Rsch. Servs., Inc. v. Resolution Econs., LLC*, 208 F. Supp. 3d 219, 227 (D.D.C. 2016) (quoting *Harris v. Amalgamated Transit Union Loc. 689*, 825 F. Supp. 2d 82, 85 (D.D.C. 2011)).   Courts also regularly take judicial notice of public records without converting a motion into a motion for summary judgment.   *Ndondji v. InterPark Inc.*, 768 F. Supp. 2d 263, 272 (D.D.C. 2011); *Mason v. Am. Prospect, Inc.*, 2024 WL 4345855, at *5 (D.D.C. Sept. 30, 2024) (AliKhan, J.).

## ARGUMENT

## I.     MR. PASSANTINO'S CLAIM FOR DEFAMATION FAILS BECAUSE IT IS SUBSTANTIALLY TRUE AS A MATTER OF LAW THAT HE "COACHED" MS. HUTCHINSON "TO LIE."

Mr. Passantino's lawsuit cannot survive because the Tweet is "substantially true"—its "sting" would not have "a different effect on the mind of the reader from that which the pleaded truth would have produced."   *See Armstrong v. Thompson*, 80 A.3d 177 (D.C. 2013) (the "'gist' or 'sting'" of defendant's statement that the plaintiff was under internal investigation "is not materially distinguishable" from the admitted fact that he previously was under investigation even though it had since concluded); *Mason*, 2024 WL 4345855, at *6  ("In other words, a 'statement is not considered false unless it 'would have a different effect on the mind of the reader from that which the pleaded truth would have produced'" (quoting ROBERT D. SACK, LIBEL, SLANDER, AND RELATED PROBLEMS 138 (1980))); *Benic v. Reuters Am., Inc.*, 357 F. Supp. 2d 216, 221 (D.D.C. 2004) ("'Substantially true' means that the 'gist' of the statement is true or that the statement is substantially true, as it would be understood by its intended audience."); *accord Tannerite Sports,*

*LLC v. NBCUniversal News Grp.*, 864 F.3d 236, 242 (2d Cir. 2017);[9] *cf. White v. Fraternal Order of Police,* 909 F.2d 512, 520 (D.C. Cir. 1990) (substantial truth will succeed as a defense if "a communication, viewed in its entire context, merely conveys materially true facts from which a defamatory inference can reasonably be drawn").[10]

As this Court has held, the "sting" of the Tweet is that "Mr. Passantino had committed a specific act—encouraging or preparing a specific witness to make false statements" and "got Ms. Hutchinson to lie to the Select Committee." MTD at 11. The "pleaded truth"—based on the allegations of the Complaint and the September 14 Interview that the Complaint incorporated by reference and on which it heavily relies—is that Mr. Passantino, among other things, instructed Ms. Hutchinson not to answer certain questions by saying she "did not recall" events, even if she did recall them, because the Select Committee did not "know what you can and can't recall." *See* Compl. ¶ 1, 16–17, 27 (quoting page 42 of September 14 Interview); Ex. 1 at 42; MTD Order at 3–6. The more than 650 iterations of "I don't recall" in the transcripts of Ms. Hutchinson's first three transcribed interviews, on which the Complaint also depends, reflects that Mr. Passantino successfully got Ms. Hutchinson to follow his advice. *See generally supra* at Factual Background § B; Compl.¶¶ 10–11, 27.

---

[9] The Court in the MTD Order applied D.C. law without engaging in a choice–of–law analysis, and it can do the same here because there is no conflict between defamation law of D.C. or New York, which is the place of publication and Mr. Weissmann's domicile, with respect to substantial truth and actual malice. *See* Answer at 3. This Motion cites both D.C. and New York law to show their agreement, while reserving the right to challenge applicable choice–of–law if necessary.

[10] Whether a statement is substantially true is an issue of law properly decided on the pleadings. *See Mason*, 2024 WL 4345855, at *7 ("when a 'trial court can find as a matter of law that a challenged publication is substantially true, then it may properly grant judgment for the defendant'" (citations omitted) (citing cases); *see* also *Tannerite Sports*, 864 F.3d at 247; *Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 48 (D.D.C. 2022)*; Carpenter v. King*, 792 F. Supp. 2d 29, 38 (D.D.C. 2011), *aff'd,* 473 F. App'x 4 (D.C. Cir. 2012).

A reasonable reader of Ms. Hutchinson's September 14 Interview would, *and in fact did*, understand her testimony to reflect that Mr. Passantino coached her to make false statements to the Select Committee. *See supra* at Factual Background § D (media recounts describing Ms. Hutchinson's testimony as "coaching her to tell committee investigators during her interviews that she did not recall certain things" (even if she did) and to "lie" and "pretend she did not remember in response to questioning" and to "mislead" the Select Committee "on what she knew" and not speak "honestly" or be "fully forthcoming" in her testimony); *id*. (Select Committee stating Mr. Passantino "told" Ms. Hutchinson to "tell the Committee that she didn't recall facts when she actually did recall them"); *supra* § J (LDAD Bar Complaint characterizing Mr. Passantino's conduct as "'coaching'" Ms. Hutchinson to "respond in a way that avoided providing information, as, for example, by denying memory of the events under inquiry").[11]

The lack of any daylight between the "sting" of the Tweet and Ms. Hutchinson's uncontested testimony necessitates dismissal as a matter of law. *See Mason*, 2024 WL 4345855, at *8 (dismissal because the "'gist'" of the allegedly defamatory article that the plaintiff did not respond to specific questions was "substantially true" because materials properly before the Court reflected that she responded only on background); *Newman v. Howard U. Sch. of L.*, 715 F. Supp. 3d 86, 112 (D.D.C. 2024) (dismissing complaint based on substantial truth because an open letter claiming that a classmate died from a condition linked to COVID-19 was "suggestive of precisely

---

[11] Ms. Hutchinson herself viewed Mr. Passantino's advice as encouraging her to be untruthful, as reflected by her telling him that she had "***just lied***" by telling the Select Committee that she did not "recall" facts relating to what occurred in the Beast that she later testified to recalling. *See supra* at Factual Background § A; *Compare, e.g.,* Ex. 1 at 39:11–20 (Ms. Hutchinson telling Mr. Passantino at the February 16 Meeting that she knew President Trump wanted to remove the "mags"), *with* Ex. 2 at 86:24–87:23, 90:7–19 (Ms. Hutchinson responding that she did not "recall" these details in her February 23 Interview with Mr. Passantino), *with* Ex. 7 at 11:23–12:6 (Ms. Hutchinson recalling these details in her June 20 Interview with new counsel).

what" the alleged defamatory statement conveyed: that a classmate died from the COVID–19 vaccine); *see also Tannerite Sports*, 864 F.3d at 243  (affirming dismissal of alleged defamatory description of rifle targets as "bombs" because, even if not precise, the "gist" of the statement was that the targets are designed to explode, which was true);[12] *Florio v. Gallaudet Univ.*, 619 F. Supp. 3d 36, 48 (D.D.C. 2022) (dismissing complaint because there was "no material difference" between a "conceded description" of a salute as similar to one used by the Nazis and a statement "calling the salute an 'apparent Nazi salute'"); *Carpenter*, 792 F. Supp. 2d at 38 (even if defendant "mischaracterized the specific nature of the defense plaintiff advanced at his trial, the column is substantially true: it fairly reports both that plaintiff was charged with, and acquitted of, the April 7 murder"); *Cf Benic*, 357 F. Supp. 2d at 221 (granting summary judgment against plaintiff who disagreed with a "characterization" of him as a "bad manager" because one of the "stated reasons for his termination was that allegedly he was a bad manager").[13]

Mr. Passantino may now argue and attempt to provide factual support for a claim that Ms. Hutchinson was not telling the truth about his legal advice, but Mr. Passantino cannot amend the Complaint by opposition.  *M&C Saatchi PR LLP v. Beer Frost, Inc.*, 2019 WL 2717199, at *3 (S.D.N.Y. June 28, 2019); *Sai v. Transportation Sec. Admin.*, 326 F.R.D. 31, 33 (D.D.C. 2018). He is bound by the allegations in his Complaint, and the only factual assertion on which he relies to purportedly demonstrate the Tweet's falsity is the portion of Ms. Hutchinson's testimony on page 42 of the September 14 Interview in which she states that he "didn't tell me to lie" and "told

---

[12] The Second Circuit in *Tannerite* instructed courts to avoid applying an "overly technical or exacting conception of truth" when evaluating the "substantial truth" so that "the public may be furnished news and information." *Id.*

[13] The Complaint does not allege that a witness would be testifying truthfully by responding to a question that she does not have any recollection when she in fact does.  Advising a witness that she can say she does not recall events that she does recall would be coaching her to lie.  *See Kendrick*, 659 A.2d at 822.

me not to lie." The fact that he did not explicitly instruct Ms. Hutchinson to lie has never been in

dispute, including in Ms. Hutchnson's testimony or the Tweet. Ms. Hutchinson, the Select

Committee, legal associations, numerous media outlets, and Mr. Weissmann all drew the same

conclusion from Ms. Hutchinson's undisputed testimony (including on page 42 of the September

14 Interview): even without providing an explicit instruction to lie, Mr. Passantino coached her to

make false statements to the Select Committee.[14] Because a reasonable reader would, and did,

view Mr. Passantino's advice as coaching, and even encouragement, to lie, Mr. Passantino has

failed to "plead facts that, if proven, would allow a reasonable person to consider the statement

false,' *i.e.*, 'facts that, if proven, would establish that the defendant's statements were not

substantially true.'" *Margolies v. Rudolph*, 2022 WL 2062460, at *10 (E.D.N.Y. June 6, 2022)

(citation omitted) (alterations in original) (cleaned up); *accord Myers v. D.C. Hous. Auth.*, 2021

WL 1167032, at *6 (D.D.C. Mar. 26, 2021); *Armstrong*, 80 A.3d at 185.

## II.    SEPARATELY AND INDEPENDENTLY, THE COMPLAINT REQUIRES DISMISSAL BECAUSE IT FAILS TO ADEQUATELY PLEAD FAULT.

The Complaint necessitates dismissal for the independent reason that it fails to adequately

plead fault. The Court need not determine if Mr. Passantino is a public figure (which he is, for the

reasons discussed below in § II(B)(ii)(a)) because the Complaint does not, consistent with the

materials incorporated by reference, sufficiently plead negligence. *See infra* § II(B)(i). Even if

*arguendo* the Complaint sufficiently pleads negligence, it still fails to state a claim for defamation

because, as a public figure, Mr. Passantino must allege facts demonstrating actual malice, and he

---

[14] Ms. Hutchinson made a similar point when testifying that Mr. Passantino had "planted the seeds" even without ever "explicitly" telling her there would be repercussions if she did not evince loyalty to President Trump in her testimony. Ex. 1 at 52:17–24, 53:3–7.

does not do so. *Infra* § II(B).[15]

### A.     The Complaint Does Not Plead Facts Demonstrating Negligence.

The Complaint and the transcripts it incorporates by reference do not plead facts establishing negligence in issuing the allegedly defamatory Tweet. *Jones v. U-Haul Co. of D.C.*, 169 F. App'x 590, 591 (D.C. Cir. 2005); *see Kendrick v. Fox Television*, 659 A.2d 814, 822 (D.C. 1995) ("Negligent publication is the unreasonable failure, under the circumstances, to take care that the statement made was true. The defendant must exercise the degree of care which ordinarily prudent persons engaged in the same kind of business usually exercise under similar circumstances."); *accord Medcalf v. Walsh*, 938 F. Supp. 2d 478, 487 (S.D.N.Y. 2013).   The Complaint does not plead facts that refute that Mr. Weissmann had "reasonable grounds for believing" that the Tweet was true, as reflected by sworn testimony of a percipient witness and the conclusion of myriad other reasonable people—including the Select Committee and legal associations who submitted the Bar Complaints—all interpreting Ms. Hutchinson's testimony as confirming that Mr. Passantino coached her to lie.   *See* Restatement (Second) of Torts § 580B (1977) (assessing negligence by inquiring whether the defendant "had reasonable grounds for believing that the communication was true").   The only remotely factual allegation in the Complaint relating to fault is its repeated reference to same testimony on page 42 of the September 14 Interview in which Ms. Hutchinson said Mr. Passantino did not *explicitly* tell her to lie.  Compl. ¶1, 7, 17, 21, 27.  But, for the reasons discussed in § I, that is entirely consistent with coaching, particularly in the full context of Ms. Hutchinson's testimony, and consequently does not provide a factual basis to plead negligence.

---

[15] The Complaint appears to concede that Mr. Passantino must plead actual malice, including not only by using its term but also by failing to plead facts demonstrating that he is a private figure. *See* Compl. ¶ 19, 21.

The Complaint's lack of factual predication of negligence, coupled with its reliance on Ms. Hutchinson's testimony, and the widely shared viewed by members of the Select Committee, the press, and the bar that Mr. Passantino's advice amounted to coaching and encouraging Ms. Hutchinson to lie, forecloses Mr. Passantino from sufficiently pleading negligence.   In short, dismissal is warranted for failure to plead any facts demonstrating Mr. Weissmann acted negligently by publishing the Tweet.   *Hourani v. Mirtchev.* 796 F.3d 1, 16 (D.C. Cir. 2015) ("Simply alleging that one year someone said something false on the Internet, without more, does not come anywhere near stating a plausible defamation claim."); *Carpenter v. King*, 792 F. Supp. 2d 29, 36 (D.D.C. 2011), *aff'd*, 473 F. App'x 4 (D.C. Cir. 2012) (granting motion to dismiss where plaintiff failed to allege negligent reliance upon other sources and therefore the necessary element of fault).

**B.      The Complaint Does Not Plead Facts Demonstrating Actual Malice.**

      1.      <u>Mr. Passantino is a limited-purpose public figure.</u>

Mr. Passantino's central role in representing Ms. Hutchinson and other witnesses before the Select Committee, as well as the wide-spread public dissemination of her testimony before the Tweet was issued, renders him a limited-purpose public figure with respect to the Tweet, which was "germane" to those events and his role in them.  *See Clyburn v. News World Commc'ns, Inc.*, 903 F.2d 29, 31 (D.C. Cir. 1990) (elements of limited–public figure analysis are "(1) that there was a public controversy; (2) that the plaintiff played a sufficiently central role in the controversy; and (3) that the alleged defamatory statement was germane to the plaintiff's participation in the controversy" (citing *Waldbaum v. Fairchild Publ., Inc.*, 627 F.2d 1287, 1296–98 (D.C. Cir. 1980)).

There can be no reasonable dispute that January 6 itself, the Select Committee's related investigation, and Ms. Hutchinson's testimony and the legal advice she received, constitute a

public controversy. *Waldbaum*, 627 F.2d at 1297 (D.C. Cir. 1980) ("If the issue was being debated publicly and if it had foreseeable and substantial ramifications for nonparticipants, it was a public controversy."). It is a public controversy to this day. Mr. Passantino is a limited public figure because he achieved "pervasive fame or notoriety" for his representation of Ms. Hutchinson, as illustrated by the rash of national news publications specifically naming him as attempting to influence and obstruct the Select Committee's work. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 345 (1974) ("Those classed as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved.");[16] *e.g.,* Ex. 1 at 49:22–23 (Mr. Passantino telling Ms. Hutchinson that "We just want to focus on protecting the President.").

Finally, the Tweet—which post-dated Mr. Passantino's injection into the public controversy—is directly germane to that public controversy. Mr. Passantino's decision to seek out and advise Ms. Hutchinson to misrepresent her recollection to the Select Committee, as well as his communications with the press during and following his representation of Ms. Hutchinson, "thrust" him "to the forefront of" this particular public controversy and he, therefore, assumed "the risk that the press, in fulfilling its role of reporting, analyzing, and commenting on well–known persons and public controversies, will focus on them and, perhaps, cast them in an unfavorable

---

[16] While Chief Justice Warren Burger's dissent in *Gertz* expressed concern about applying the public figure rule to attorneys who represent clients in high-profile cases for fear of jeopardizing the important right to counsel, *Gertz*, 418 U.S. at 355 (Burger, C.J., dissenting), no such risk is present in this case. Chief Justice Burger appeared to be concerned with attorneys being unfairly defamed for the conduct of their less popular clients—but here, it is *Mr. Passantino's conduct* that injected him into the controversy. Further, the majority in *Gertz* did not suggest a blanket rule that a lawyer's representation never can render him a public figure, but rather confirmed that the limited public figure analysis (including if the plaintiff is an attorney) centers on asking whether he "thrust himself into the vortex of this public issue" or engaged " the public's attention in an attempt to influence its outcome." *Id.* at 352.

light," *Waldbaum*, 627 F.2d at 1292; *see, e.g.,* Ex. 1 at 98:21-99:16 (Ms. Hutchinson details Mr. Passantino speaking to a journalist at *The New York Times* about her testimony, which she protested his doing at the time); Ex. 6 (CNN news article detailing  several statements from Mr. Passantino to CNN); Ex. 12 (Business Insider news article including statement by Mr. Passantino to *Business Insider*); Maggie Haberman & Luke Broadwater, *Lawyer for Key Jan. 6 Witness Seeks to Rebut Panel's Claim of Interference*, N.Y. Times (Dec. 20, 2022), www.nytimes.com/2022/12/20/us/politics/stefan-passantino-cassidy-hutchinson-jan-6.html.[17]

### 2.    The Complaint fails to adequately plead actual malice.

Mr. Passantino's status as a limited–purpose public figure means he must—but fails—to plead sufficient facts to meet the "daunting" actual malice standard to survive dismissal.  *Tah v. Glob. Witness Publ'g, Inc.,* 991 F.3d 231, 240 (D.C. Cir. 2021) (citation omitted).  Mr. Passantino did not, because he cannot, allege facts demonstrating that Mr. Weissmann published the Tweet "with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279–80 (1964); *Couch v. Verizon Commun., Inc.*, 2021 WL 4476698, at *3 (D.D.C. Sept. 30, 2021), *aff'd*, 105 F.4th 425 (D.C. Cir. 2024) (dismissing case because lack of facts showing defendant was "subjectively aware that it was highly probable" that the information was "(1) fabricated; (2) so inherently improbable that only a reckless person

---

[17] Mr. Passantino's status as a limited public figure is affirmed by his own intentional access of the media. *See, e.g.*, *Gertz*, 418 U.S. at 344 (public figures "usually enjoy significantly greater access to the channels of effective communication and hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy").  For example, Mr. Passantino sat for an interview with Tucker Carlson on November 1, 2024, during which he too drew the assessment that Ms. Hutchinson's testimony described coaching: "***There was significant discussion of the fact that [Ms. Hutchinson] had previously had this Trump lawyer who had effectively coached her not to tell the truth, had coached her to say, I don't recall when in fact she did recall all of those things***…"   THE TUCKER CARLSON SHOW: Stefan Passantino: Liz Cheney's J6 Crimes & Mission to Destroy Any Lawyer Who Dares Represent Trump, at 13:30–45 (Spotify, Nov. 2, 2024), open.spotify.com/episode/1pJUeGSQYg7acG59O11DB0.

would have put [it] in circulation; or (3) based wholly on an unverified anonymous telephone call or some other source that [Defendant] has obvious reasons to doubt") (citation omitted).  As a threshold point, the Tweet is substantially true, which defeats any basis for finding that Mr. Weissmann knew or should have known it was false.  Even if *arguendo* the Tweet were not true, for the reasons discussed above, the transcripts—in which Ms. Hutchinson states that Mr. Passantino did not tell her to lie but did instruct her to (1) focus on protecting the president, (2) not recount what she knew from others or had overhead, and (3) testify that she did not recall events because the Select Committee would be none the wiser—prove rather than refute that Mr. Weissmann reasonably believed his Tweet was truthful, *i.e.* published without actual malice.  It would be inconsistent with the transcripts of Ms. Hutchinson's incorporated–by–reference testimony to infer actual malice because it was "inherently" *probable* based upon testimony she proffered under penalty of law to conclude that Mr. Passantino coached her to lie.  *Couch*, 2021 WL 4476698, at *3.

Mr. Passantino's allegations contain "none of the requisite evidence of actual malice needed to support a defamation claim."  *Id.* at *5.  The Court need not accept Mr. Passantino's "quintessentially conclusory" allegations, particularly here where Ms. Hutchinson's testimony demonstrates Mr. Weissmann's lack of the requisite mental state since the transcripts are incorporated by reference, prove the substantial truth of his Tweet, and speak for themselves.  *Id.*; *see also Hindu Am. Found. v. Viswanath*, 646 F. Supp. 3d 78, 99 (D.D.C. 2022) (finding "conclusory allegations" to "fall far short of the 'daunting' standard of actual malice") (citation omitted).

Nor do the Complaint's allegations of "partisan animus" and speculative motivations overcome this deficiency.  *See, e.g., Couch*, 2021 WL 4476698, at *5 (inferring actual malice from

partisan bias "is wholly inappropriate" because "courts have repeatedly held that evidence of bias or even a preconceived agenda, alone, cannot support a claim of actual malice"); *Arpaio v. Zucker*, 414 F. Supp. 3d 84, 92 (D.D.C. 2019) ("The motivations behind defendants' communications— inspired by political differences or otherwise—do not impact whether defendants acted with actual malice as a matter of law."); *see also Tavoulareas*, 817 F.2d at 795 ("It is settled that ill will toward the plaintiff or bad motives are not elements of actual malice and that such evidence is insufficient by itself to support a finding of actual malice.").

The Court should not "pry open the gates of discovery just because" Mr. Passantino (wrongly) believes that Mr. Weissmann was "motivated by differences in political opinions" because doing so "would run afoul of the Supreme Court's landmark ruling in *New York Times Co. v. Sullivan*." *Arpaio v. Robillard*, 459 F. Supp. 3d 62, 66 (D.D.C. 2020 ) ("Even assuming the alleged 'leftist enmity' is real, the motivations behind defendants' communications—inspired by political differences or otherwise—do not impact whether defendants acted with actual malice as a matter of law."). The Court should dismiss the Complaint for failing to provide "any *factual basis* from which to draw the reasonable inference" that Mr. Weissmann acted with actual malice. *Couch*, 2021 WL 4476698, at *5; *see Hindu Am. Found.*, 646 F. Supp. 3d at 99 (pleading actual malice "requires much more" than simply saying someone "should have known better").

## <u>CONCLUSION</u>

For the reasons articulated in this Motion, Mr. Weissmann respectfully moves the Court to dismiss the Complaint with prejudice.


Dated: January 9, 2026                          Respectfully submitted,

                                                */s/Meryl C. Governski*
                                                Meryl C. Governski
                                                Linda E. Halfacre (*pro hac vice*)

34

DUNN ISAACSON RHEE LLP
401 9th Street NW
Washington, DC 20004
Phone: (202) 240–2927
mgovernski@dirllp.com
ehalfacre@dirllp.com

Jonathan I. Kravis
MUNGER, TOLLES & OLSON LLP
601 Massachusetts Ave. NW, Suite 500E
Washington, DC 20001–5369
Phone: 202–220–1130
jonathan.kravis@mto.com

Faith E. Gay
Rachel Slepoi (*pro hac vice*)
SELENDY GAY PLLC
1290 Avenue of the Americas
New York, NY 10104
Phone: (212) 390–9001
fgay@selendygay.com
rslepoi@selendygay.com

*Counsel for Defendant Andrew Weissmann*